1  SCOTT A. EDELMAN, SBN 116927
   GIBSON, DUNN & CRUTCHER LLP
2  2029 Century Park East
   Los Angeles, California 90067
3  Telephone: (310) 552-8500
   Facsimile: (310) 551-8741
4  Email: sedelman@gibsondunn.com

5  SCOTT M. MALZAHN, SBN 229204
   GIBSON, DUNN & CRUTCHER LLP
6  333 South Grand Avenue
   Los Angeles, California 90071
7  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
8  Email: smalzahn@gibsondunn.com

9  Attorneys for Plaintiffs Wells Fargo Bank
   Northwest, National Association and Triton
10 Aviation International, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a Utah corporation, not in its individual capacity, but solely as Owner Trustee, and TRITON AVIATION INTERNATIONAL LLC, a Nevada limited liability company;<br><br>Plaintiffs,<br><br>v.<br><br>RYAN INTERNATIONAL AIRLINES, INC., a Kansas corporation.<br><br>Defendants. | Case No. CV 09-3489 AHM (JWJx)<br><br>Hon. A. Howard Matz<br><br>**DECLARATION OF GARRETH T. SLEVIN IN SUPPORT OF PLAINTIFFS' AND COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>[Notice of Motion; Memorandum of Points & Authorities; Statement of Uncontroverted Material Facts; Declarations of Brian M. Monkarsh, Gus Merizalde, Elizabeth Critch, and Scott M. Malzahn filed concurrently; [Proposed] Order lodged concurrently]<br><br>Hearing Date:     July 19, 2010<br>Hearing Time:    10:00 a.m.<br>Hearing Place:   14<br><br>Discovery Cut-off:     June 14, 2010<br>Motion Cut-Off:         July 26, 2010<br>Pretrial Conference:   September 13, 2010<br>Trial Date:                  September 28, 2010 |

---

DECLARATION OF GARRETH T. SLEVIN IN SUPPORT OF PLAINTIFFS' AND COUNTERDEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION

# DECLARATION OF GARRETH T. SLEVIN

I, Garreth T. Slevin, state and declare:

1. I am the CFO and Vice President of World Star Aviation Services, Ltd ("World Star"). Prior to the formation of World Star in 2003, I was the Director of Finance at Triton Aviation Services, a corporate relative of plaintiff Triton Aviation International, LLC ("Triton").

2. I submit this Declaration in support of Plaintiffs and Counterdefendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication, in the above captioned action. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

3. Since the formation of World Star, I have provided consulting and management services to Triton in connection with its aircraft including the Boeing B757-28AER aircraft, manufacturer's serial number 24544 (the "Aircraft"), at issue in this lawsuit. These services include reviewing the commercial terms (e.g., rental rates) of proposed aircraft lease agreements and providing recommendations to Triton.

4. As a result of my work history, I am aware that Triton, pursuant to a trust agreement with the legal owner Wells Fargo Bank Northwest, National Association ("Wells Fargo"), is the beneficial owner of the Aircraft and its two Rolls-Royce RB211-535E4 aircraft engines, manufacturer's serial numbers 30751 and 30752.

5. In January 2005, Wells Fargo, not in its individual capacity, but as Owner Trustee for the benefit of Triton, entered into an Aircraft Lease Agreement (the "Lease") with Ryan in which it agreed to lease the Aircraft for a period of three years. As with many aircraft lease agreements,[1] the Lease includes a double rent provision that requires Ryan to pay twice the regular monthly rent to the lessor in the event that

---

[1] It is common in the airline industry for parties to include such double rent provisions in their lease agreements. ILFC, one of the world's largest airline lessors, and other aircraft lessors typically include double rent provisions in their leases.

1

Ryan fails to return the Aircraft on the scheduled redelivery date. This double rent provision is intended to discourage the late return of the Aircraft and provide compensation to Triton in the event of Ryan's breach of the return obligation.

6. As with other aircraft lessors, Triton expends a large amount of expense and effort to market and lease its aircraft so that leases are timed to minimize the amount of time that aircraft spend on the ground without earning revenue for the company. Accordingly, Triton typically times the delivery of an aircraft to the next lessee so that delivery occurs simultaneously with the scheduled return of the aircraft from the existing lessee. During lease negotiations, Triton negotiates with the next lessee over the delivery requirements (e.g., the condition of the aircraft) that must be satisfied to complete delivery of the aircraft. In order to fulfill these delivery obligations to the next lessee, Triton relies on its current lessee to return the aircraft in the condition required by the then existing lease agreement. (In addition, Triton often pays for additional work on the aircraft where the delivery requirements in the next lease agreement are different from the return conditions in the existing lease agreement.) Triton and its agents (including ILFC and World Star) make every effort to make sure that an existing lessee is aware of the technical conditions that must be satisfied to complete return of an aircraft and is properly preparing for the return six months ahead of the scheduled return date.

7. At the time the parties entered into the Lease, the timely return of the Aircraft was very important to Triton because Triton can suffer significant financial and reputational harm in the event that Ryan fails to return the Aircraft on time and in the condition required by the Lease. Of course, at the time the parties entered into the Lease, no one (including myself) could have known what harm Triton actually would suffer from Ryan's failure to return the Aircraft on time, but the double rent provision in the Lease was a reasonable approximation of the harm that Triton could have suffered; in fact, the double rent provision easily could have fallen far short of fully compensating Triton for its actual injuries. Triton could have suffered a wide range of

expected injuries from Ryan's failure to properly return the Aircraft including lost income from the next lessee of the Aircraft, cancellation or renegotiation of the next lease agreement, lost opportunity costs, and loss of goodwill and reputational injury.

8.  For example, under one likely scenario, there was a risk that Triton would not be able to fulfill its delivery commitments to the next lessee if Ryan failed to return the Aircraft on the scheduled return date in the condition required by the Lease. If this occurred, the next lessee might cancel its lease agreement for the Aircraft, resulting in a large loss of income to Triton and forcing Triton to restart its marketing efforts on an expedited basis to find another adequate lessee for the Aircraft. Triton then would be under time pressure to get another lease agreement in place for the Aircraft, and might be compelled to make a variety of compromises in the negotiation process to find a home for the Aircraft as quickly as possible. It could take Triton up to six months or possibly even longer to find another willing and adequate lessee for the Aircraft depending on the time of year, and this lessee may not want the Aircraft unless Triton can satisfy certain delivery requirements that would require Triton to pay for additional work (e.g., reconfiguring the aircraft, repainting the aircraft, changing out some avionics) that would not have been required if Ryan had properly returned the Aircraft on time.[2] Triton can also expect to suffer other losses such as costs associated with generating a new lease, legal fees associated with obtaining local legal advice in the jurisdiction of the new lessee, travel expenses, and costs associated with the examination of the financial strength of the new lessee. In total, Triton could have suffered more than $1.4 million in damages as a result of Ryan's late return of the Aircraft, in addition to other injuries such as lost opportunity costs, loss of goodwill, attorneys' fees and costs, and reputational injury.

---

[2] For example, another lessee may be located in a different part of the world where the Aircraft must satisfy different entry requirements than where it had been operating under Ryan's Lease.

3

DECLARATION OF GARRETH T. SLEVIN IN SUPPORT OF PLAINTIFFS' AND COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION

9. It is difficult and expensive for Triton to calculate the amount of its actual damages in the event a lessee (such as Ryan) breaches its return obligations. Many of the expenses incurred by Triton in this situation consist of the expenditure of time by Triton's employees and agents and lost opportunity costs, which are difficult to quantify. It is also difficult to quantify the reputational injury and the loss of future business suffered by Triton in the marketplace as a result of its inability to deliver its aircraft on time to its lessees in the expected condition. Further, it is a poor reflection on Triton's business when its customers chose to ignore their contractual obligations and Triton fails to realize the benefits of its bargains. Triton has to report to its bondholders when it is involved in litigation and when its customers fail to return aircraft on time. Such negative news causes distress to bondholders and can lead bondholders to sell their interests in the company. All of these costs to Triton are extremely difficult to quantify.

10. In February 2008, Wells Fargo and Ryan executed a letter agreement ("Side Letter No. 2") that amended the Lease in certain respects to allow Ryan to return the Aircraft with a temporary engine installed in place of the engine with manufacturer's serial number 30752 (the "Original Engine"). This agreement was a "win-win" for the parties: it allowed Triton to recover the Aircraft with two serviceable engines so that it could transfer the Aircraft to the next lessee as soon as possible, and it allowed Ryan to return the Aircraft without the Original Engine installed so as to avoid continuing double rent obligations under the Lease.

11. It is my understanding that Side Letter No. 2 (like the Lease) includes a provision requiring Ryan to pay double rent in the event Ryan fails to timely return the Original Engine in the condition required by the Lease. This provision was intended in part as an incentive to encourage Ryan to timely return the engine. However, it was a poorly designed incentive because the rent charged under Side Letter No. 2 is far lower than the average rental cost for an aircraft engine. It is customary for an aircraft engine of the same type as the Original Engine to be leased at the rental rate of about

$75,000 to $100,000 per month, rather than the $5,000 regular rent or $10,000 double rent charged in Side Letter No. 2. Thus, it was cheap for Ryan to continue to operate the Original Engine beyond the expiration of the negotiated for lease term.

12. At the time the parties entered into Side Letter No. 2, Triton had in place an agreement to lease the Aircraft to Zoom Airlines, Inc ("Zoom"). At that time, Triton had planned to deliver the Aircraft to Zoom with the Original Engine installed. After Ryan advised Triton that the Original Engine would not satisfy the return conditions in the Lease, the worthiness of the temporary engine as a short term replacement for the Original Engine on the Aircraft was analyzed. Triton then had to reach an understanding with Zoom to deliver the Aircraft without the Original Engine installed and instead with a temporary engine furnished by Ryan. If a problem arose with the temporary engine while it was installed on the Aircraft, Zoom could have demanded that Triton conduct certain repairs or compensate it for its injuries. The resulting financial cost to Triton easily could have exceeded the $10,000 charge in double monthly rent for the late return of the Original Engine. As with a late return of the Aircraft, it is difficult and expensive to quantify the damages (including lost time and opportunity costs, reputational injury, loss of goodwill, and other expenses) Triton could have suffered in the event of a late return of the Original Engine.

13. Additionally, Triton's financial exposure to the reserves reconciliation under paragraph 6 of Side Letter No. 2 increased the longer Ryan failed to return the Original Engine. Under that clause, Ryan was entitled to a reserves reconciliation for the difference between the utilization of the Original Engine by Ryan and the utilization of the temporary engine by the next lessee (first Zoom and later Air Slovakia, Inc.). Accordingly, by delaying the return of the Original Engine and keeping its utilization rates relatively small, Ryan could actually increase the amount of its reserves reconciliation credit. In fact, this is exactly what happened: the double rent charges for the Original Engine only partially offset Ryan's reserves reconciliation credit.

5

DECLARATION OF GARRETH T. SLEVIN IN SUPPORT OF PLAINTIFFS' AND COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION


14. I am aware that Ryan is entitled to a credit in this action for the remaining portion of its security deposit. Ryan originally paid a $300,000.00 security deposit but a portion of this security deposit has already been applied to delinquent amounts. Triton previously has deducted from the security deposit $561.25 for an FAA filing fee and $87,982.00 for technical discrepancies upon the return of the Aircraft.

I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the 21 day of June 2010 at San Francisco, California.

_____
Garreth T. Slevin

100873804_1.DOC

DECLARATION OF GARRETH T. SLEVIN IN SUPPORT OF PLAINTIFFS' AND COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION