1    Filomena E. Meyer [SBN 151410]
     fmeyer@hinshawlaw.com
2    HINSHAW & CULBERTSON LLP
     11601 Wilshire Blvd., Suite 800
3    Los Angeles, CA 90025
     Telephone:  310-909-8000
4    Facsimile:  310-909-8001

5
     Thomas J. Lester, Esq. [SBN 6189291]
6    tlester@hinshawlaw.com
     HINSHAW & CULBERTSON LLP
7    100 Park Avenue
     Rockford, IL 61101
8    Telephone: 815-490-4908
     Facsimile: 815-490-4901
9    [Admitted Pro Hac Vice]

10

11   Attorneys for Defendant/Counter-Claimant
     RYAN INTERNATIONAL AIRLINES, INC., a
12   Kansas corporation

13

                 UNITED STATES DISTRICT COURT
14
                 CENTRAL DISTRICT OF CALIFORNIA
15
                        WESTERN DIVISION
16

17   WELLS FARGO BANK                ) Case No.  CV 09-3489 AHM (JWJx)
     NORTHWEST, NATIONAL             )
18   ASSOCIATION, a Utah corporation, not )
     in its individual capacity, but solely as )
     Owner Trustee, and TRITON       ) DECLARATION OF FILOMENA E.
19   AVIATION INTERNATIONAL LLC, a   ) MEYER IN OPPOSITION TO
     Nevada limited liability company, ) PLAINTIFFS' MOTION FOR
                                     ) SUMMARY JUDGMENT
20
                Plaintiffs,          ) Date:   August 30, 2010
21                                   ) Time:  10:00 a.m.
            vs.                      ) Dept.:  14
22                                   )
     RYAN INTERNATIONAL AIRLINES,    )
23   INC., a Kansas corporation,     )
                                     )
24              Defendant.           )
                                     )
25                                   )
                                     )
26                                   )

27

28

                              1
     ──────────────────────────────────────────
          DECLARATION OF FILOMENA E. MEYER

                              31173721v1 900288 70544

1    I, Filomena E. Meyer, declare as follows:

2    1.    I am an attorney at law duly licensed to practice before all courts of

3  the State of California and before this Court. I am Senior Counsel at Hinshaw &

4  Culbertson, LLP, attorneys for Defendant and Counter-claimant RYAN

5  INTERNATIONAL AIRLINES, INC. ("Ryan").

6    2.    I submit this Declaration in support of Ryan's Opposition to the

7  Motion for Summary Judgment, or alternatively for Summary Adjudication filed

8  by Plaintiffs and Counter-defendants WELLS FARGO BANK NORTHWEST,

9  NATIONAL ASSOCIATION and TRITON AVIATION INTERNATIONAL

10  LLC's (collectively, "Triton"). I have personal knowledge of the facts set forth

11  herein, and if called as a witness, I could and would competently testify thereto.

12    3.    Attached hereto as **Exhibit "A"** is a true and correct copy of excerpts

13  of the deposition testimony of James Flynn taken by Plaintiffs in this case on April

14  5, 2010 and pertinent exhibits thereto.

15    4.    Attached hereto as **Exhibit "B"** is a true and correct copy of excerpts

16  of the deposition testimony of Gareth T. Slevin taken by Ryan in this case on July

17  15, 2010.

18    5.    Attached hereto as **Exhibit "C"** is a true and correct copy of excerpts

19  of the deposition testimony of Gustavo Merizalde taken by Ryan in this case on

20  July 13, 2010.

21    6.    Attached hereto as **Exhibit "D"** is a true and correct copy of pertinent

22  provisions of the January 10, 2005 Aircraft Lease Agreement between Plaintiffs

23  and Ryan in dispute in this case.

24    7.    Attached hereto as **Exhibit "E"** is a true and correct copy of excerpts

25  of the rough transcript of deposition testimony of Paul Rehder taken by Plaintiffs

26  in this case on August 3, 2010 and pertinent exhibits thereto.

27

28

DECLARATION OF FILOMENA E, MEYER

1    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.  Executed this 4ʰ day of August

3  2010 in Los Angeles, California.

4

5

6    _____

     Filomena E. Meyer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF FILOMENA E, MEYER

31173721v1 900288 70544

James Flynn - April 5, 2010.txt

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION

 3   WELLS FARGO BANK NORTHWEST,      )
     NATIONAL ASSOCIATION, a Utah     )
 4   corporation, not in its         )
     individual capacity, but        )
 5   solely as Owner Trustee, and    )
     TRITON AVIATION INTERNATIONAL   )
 6   LLC, a Nevada limited           )
     liability company,              )
 7                                    )
         Plaintiffs,                  )
 8                                    )
     vs.                             )  No. CV 09-3489 AHM(JWJx)
 9                                    )
     RYAN INTERNATIONAL AIRLINES,     )
10   INC., a Kansas corporation,      )
                                      )
11       Defendant.                   )

12

13            The deposition of JAMES FLYNN, called

14   for examination, taken before KIMBERLY WINKLER

15   CHRISTOPHER, CSR No. 084-002752, a Certified

16   Shorthand Reporter of the State of Illinois, at

17   120 West State Street, Suite 400, Rockford,

18   Illinois, on the 5th day of April, A.D. 2010, at

19   9:38 a.m.

20

21

22

23

24

25
```

                                                        2

```
 1        PRESENT:

 2             GIBSON, DUNN & CRUTCHER LLP
```

EXHIBIT A
4

James Flynn - April 5, 2010.txt

24    any detailed financial review?

25        A.    NO --

                                                                        31

1         MR. LESTER:  Objection to the form of the

2     question.  Go ahead and answer.

3         THE WITNESS:  No, not detailed.  I mean, I

4     was collecting data, but not -- I didn't really

5     start assembling it and looking at it, you know,

6     in detail.

7     BY MR. MALZAHN:

8         Q.    And, in fact, the only hard data you had

9     available before you started your financial review

10    four or five weeks ago was data that related to

11    reserves reconciliation issues, correct?

12        A.    Principally, right.

13        Q.    And this letter dated February 26th,

14    2010, provided you with additional hard data,

15    correct?

16        A.    Oh, yes, it did, which was very helpful.

17        Q.    Okay.  Good.

18            So you've mentioned that you have not

19    reached a final determination of what the parties'

20    respective contractual obligations are to each

21    other, correct?

22        A.    That's right.  I still have some -- some

23    gaps right now that I'm looking for.

24        Q.    I'd like you to turn to Exhibit A --

25        A.    Right.

                           3

**EXHIBIT A**

**5**

James Flynn - April 5, 2010.txt

32

1    Q.   (Continuing) -- of this document which

2  is -- this particular page is Bates-stamped ILFC

3  9535.

4    A.   Correct.

5    Q.   And you see that there are 14 separate

6  items listed here --

7    A.   Yes.

8    Q.   (Continuing) -- in addition to

9  attorneys' fees and costs at the very bottom of

10  the page?

11    A.   Yes.

12    Q.   I'd like you to review these 14 items

13  just by yourself and tell me with respect to each

14  one whether you've made a final determination as

15  to whether all, some, or none of these amounts are

16  owed by Ryan International to plaintiffs in this

17  lawsuit.  So let's start with Item No. 1.

18    A.   Well, Item No. 1 looks like it's a

19  rental period that extended between March 8th and

20  the 17th of March.  It was a stub period of rental

21  for the aircraft on the return.

22          The question in my mind is whether or

23  not that was the straight rate or whether that was

24  an acceleration or double rent that was being

25  applied to the -- to that number.

33

EXHIBIT A
6

James Flynn - April 5, 2010.txt

4    right now in front of you, it will take me a while

5    to determine that number.  But, I mean, I can do

6    it.  If you want me to do it, I'll do it if you'd

7    like me to do it.

8         Q.    Well, you have had an opportunity before

9    this deposition to review this letter, correct?

10        A.    Oh, yes, I have.

11        Q.    And you have reviewed this letter in

12   detail?

13        A.    And I have -- yes, I have.

14        Q.    Okay.  But you can't tell me now sitting

15   in this deposition if you've made a final

16   determination as to whether Ryan owes all, some,

17   or none of the amounts for Item No. 1?

18        A.    Not as I sit here right now.

19        Q.    Okay.  Can you tell me whether you've

20   made a final determination as to any of these

21   first 14 items as you're sitting now?

22        A.    Item 4 I think we agreed with, Item 4.

23   I think Item 5 was agreed with.  I think Item 8

24   was agreed with.  I think the Items 10, 11, and 12

25   I think were agreed with.


                                                    35


1              And I don't believe 1 was agreed with

2    because I think it was a double rent provision in

3    there.  And I think it was also double rent

4    provisions in 3 as well; we didn't agree with.

5    And rent -- and I think the March 15th -- I think

6    the 17 -- it would have been 5,000 a month.

                         Pag...

EXHIBIT A

7

James Flynn - April 5, 2010.txt

7    Let's see.  I think 2 was agreed with.

8    I believe 2 was agreed with.  And 6 and 7, I had

9    your copy of the summary of that invoice.  I

10   didn't have the detail of it to support it.  But

11   we acknowledged that I think there was just going

12   to be an obligation that was due at Ameco.  I just

13   didn't have the supporting documentation for it.

14   That's all.  And credit, you know, obviously you

15   accepted a credit, which was fine under Item 7.

16        I think that's all of them.  The accrued

17   interest obviously was a calculation on the

18   outstandings, and that would have varied based

19   upon the calculations that were made above so that

20   would have not been agreed to yet.

21        The credit for the reserve

22   reconciliation under 14, there was a -- I think it

23   was 357 hours that I could not substantiate in

24   that reconciliation that was attached.  It was

25   missing time.  I think you attached the --

                                                      36

1    Q.   And we can go through each of these

2    items individually, so let's not do that yet.

3    A.   Okay.

4    Q.   I think the only one you haven't

5    mentioned yet is Item No. 9.

6    A.   Shipping costs, it was reasonable to

7    ship it.  The question is in my mind was that a

8    reasonable amount to be paid and was that actually

9    paid if it was, and that would have been an

**EXHIBIT A**

**8**

James Flynn - April 5, 2010.txt

16  back to the other point when he wants to, okay,

17  Jim?

18          I'm sorry.  Listen and slow down so

19  you're listening to his question.

20      THE WITNESS:  All right.

21      MR. LESTER:  Let him finish his question

22  before you answer.

23      THE WITNESS:  Okay.  Go ahead.

24      MR. LESTER:  Thank you.  Sorry.

25      THE WITNESS:  That's all right.

                                                        39

1  BY MR. MALZAHN:

2      Q.    So with respect to Item No. 3, the only

3  question in your mind is whether double rent is

4  owed by Ryan or monthly rent is owed for the

5  original engine for the time period June 30th,

6  2008, through November 12th, 2009?

7      A.    Yes, whether or not it's double rent and

8  the time period November 12th is the end date.

9      Q.    Okay.  Now, you had started then to talk

10  about Item No. 2, so let's go there next.

11      A.    Okay.

12      Q.    I believe you testified earlier that you

13  believe Ryan agrees that monthly rent is owed on

14  the original engine ESN 30752 for the time period

15  March 18th, 2008, through June 29th, 2008; is that

16  correct?

17      A.    Correct.

18      Q.    So is the only question in your mind

EXHIBIT A
9

James Flynn - April 5, 2010.txt

22     MR. LESTER:  Objection to the form of the

23  question.  Go ahead.

24     THE WITNESS:  I understand what the -- I

25  understood what the lease stated, okay?  What my

41

1  question was is really was that double rent a

2  reasonable basis at that point in time.

3  BY MR. MALZAHN:

4     Q.  I understand you might have some

5  questions, but I'd like you to focus on my

6  question.

7        So my question is whether you understand

8  that the terms and conditions stated in the lease

9  govern the parties' contractual obligations with

10  respect to the aircraft?

11     MR. LESTER:  Objection to the form of the

12  question.  I mean, go ahead.

13     THE WITNESS:  I understand there was a

14  contractual commitment between the parties, yes,

15  but I don't know if it was -- I don't know if --

16  if the parties at the time they entered the lease

17  understood what that double rent provision was all

18  about.  I just don't know.

19  BY MR. MALZAHN:

20     Q.  You weren't there --

21     A.  I wasn't there.  That's the problem.

22     Q.  (Continuing) -- at the time the lease

23  was negotiated?

24     A.  I was not there.

**EXHIBIT A**

**10**

James Flynn - April 5, 2010.txt

25       Q.   Right.

                                                                    42

1        A.   So I look at that double rent and I say,
2    well, is this reasonable.  And, you know, my
3    position is, no, it's not reasonable.
4        Q.   So if you had been there while that
5    lease was being negotiated, you would have pushed
6    back and tried to get a different contractual
7    provision?
8        A.   Well, I would have -- I would have
9    looked at it as long as the parties are in earnest
10   achieving the same common goal of returning an
11   aircraft and an engine in a timely fashion with
12   each other, and that was the motive -- that's the
13   motive which we're both operating, then I would
14   like to know that there would be no double rent
15   unless we are -- there would be none.  It would
16   just be a single rent because that's what you had
17   contracted with me on with the aircraft or an
18   engine or whatever.  In the case of the engine
19   it's a little different because --
20       Q.   Let's stick with aircraft, okay?
21       A.   I think it's totally unreasonable.  The
22   double rent provision is totally unreasonable.
23       Q.   So my question was if you had been there
24   during the contractual negotiations for the lease,
25   you would have pushed back and tried to get a

                                                                    43

James Flynn - April 5, 2010.txt

6  before, yes, and I've seen it -- I've heard -- at,

7  you know, seminars on leases and so forth you've

8  heard this provision before.

9  BY MR. MALZAHN:

10      Q.   When have you heard about this provision

11  at seminars?

12      A.   Well, I mean, if you go and you talk to

13  a lawyer that may have been dealing with this,

14  these are common provisions that you may or may

15  not see in a lease.  The lessor is looking for

16  something to incentivize the lessees to return

17  airplanes in a timely fashion because they'd like

18  to keep the airplane moving onto the next customer

19  basically.

20          And I understand that because I've been

21  in that -- the lessor's shoes and I try to create

22  incentives as well.  But also -- I also know that

23  there's a technical aspect of returning the

24  airplane that doesn't always mirror the real

25  world.  And then it's just a matter of

46

1  reasonableness between the lessor and the lessee

2  to try to find a balance, and in some cases I

3  think double rent is not called for.

4      Q.   And when trying to reach that balance

5  during the contractual negotiation process, you

6  believe you would have pushed back and obtained a

7  different provision if you could have?

8      A.   Yes.

**EXHIBIT A**

**12**

James Flynn - April 5, 2010.txt

12   not.

13        Q.   But sometimes it does, correct?

14        A.   In some cases it can, but in many cases

15   it doesn't.  Obviously there's some latitude on

16   delivery.  And the next lessee understands that --

17   the redelivery process that's going on, and

18   they're very much in tune with what's going on.

19   Obviously they've got a schedule to meet with the

20   equipment as well; very important for them to meet

21   their schedules.  But they try to build in flex in

22   their program as well in order to operate

23   alternative aircraft or meet their needs in a

24   different fashion.  So normally the lessor will

25   not take any of those consequential damages ever.

                                                    48

1   We never did as a leasing company.  We just

2   wouldn't do it.  And we were late many times, many

3   times.  Most aircraft deliveries are typically

4   late in some fashion or another, unless you start

5   so far in advance that -- that, you know, the

6   airplanes are always on time or a week ahead of

7   time.  But it's -- you know, you try to -- you try

8   to time everything as best you can.  In some cases

9   it just doesn't work.

10        I think more than anything it's the

11   intent of the parties, how they're working to get

12   the aircraft returned in a timely fashion.  And I

13   think that in this particular case there was a lot

14   of effort being made at Coopesa to effect the

**EXHIBIT A**
**13**

James Flynn - April 5, 2010.txt

15  return and delivery of this aircraft.  The thing

16  that slowed it up was this engine.  And then that

17  engine created a -- the side letter basically and

18  that created a further delay.  But --

19       Q.  Triton and Wells Fargo were not

20  responsible for that delay of the return of the

21  aircraft, correct?

22       A.  No, I don't believe Wells Fargo was

23  responsible for that delay.

24       Q.  And you don't believe Triton was

25  responsible for that delay or ILFC was responsible

49

1   for that delay, correct?

2        A.  No.  But -- but they were there to make

3   sure that the airplane was as close to a

4   redelivery date as humanly possible based upon

5   what events had to occur at the end of the lease,

6   which was the C check and the other return

7   delivery conditions.

8        Q.  Let me get you focused on my question

9   again.

10       A.  Okay.

11       Q.  Do you believe that Triton, ILFC, or

12  Wells Fargo was responsible for the delay of the

13  return of the aircraft?

14       A.  No, they were not responsible for the

15  return of the aircraft per se, no.

16       Q.  I'm asking whether they were responsible

17  for the delay of the return of the aircraft.  So

Page 44

James Flynn - April 5, 2010.txt

15    Ryan has incurred in connection with the temporary

16    engine that are owed by plaintiffs to Triton; is

17    that correct?

18        A.    Yes.

19        MR. LESTER:  Owed by plaintiffs to Ryan.

20        MR. MALZAHN:  To Ryan, sorry.  Yes.

21        THE WITNESS:  Yes.  To Ryan.

22    BY MR. MALZAHN:

23        Q.    Right.  So I'd like to go through.  And

24    you talked about the costs of the repair to the

25    motor, the condition of the temporary engine,

91

1    shipping costs, bills with Ameco.

2            I'm not testifying for you here.  I'm

3    just trying to refresh your recollection.  So I'd

4    like to go through those different items and, you

5    know --

6        A.    Understand what they --

7        Q.    (Continuing) -- understand what they

8    are.

9        A.    Understand what they potentially are,

10    okay.

11        Q.    So let's start with the condition of the

12    engine -- temporary engine at the time of

13    redelivery --

14        A.    Right.

15        Q.    (Continuing) -- and any alleged repairs

16    that needed to be done to it.

17        A.    Correct.

**EXHIBIT A**
**15**

James Flynn - April 5, 2010.txt

18    Q.    Can you describe, you know, the factual
19  basis for that claim?
20    A.    Rolls-Royce inspected the engine on
21  return of the engine at AT Lasham.  So we asked
22  Rolls to come back in and complete the borescope
23  inspection on the engine for us at that point in
24  time.  And they had discovered the sleeve damage
25  that was beyond normal wear and tear that needed

                                                        92

1   to be rectified.  That was then made part of
2   the -- an attachment to our delivery and return
3   conditions.
4          And Rolls-Royce gave us a cost to repair
5   that sleeve damage.  So that would be an offset or
6   a claim of Ryan along with any other associated
7   costs of physically moving the engine and the time
8   period it took to actually restore the engine.
9   So, in other words, the movement of the engine and
10  the time that it took to restore the engine
11  because remember now, I -- Ryan is without its
12  engine and it's incurring costs as well of leasing
13  a motor for every day that it leases a motor on
14  the wing for the period of time for the effect of
15  that repair by Rolls-Royce.
16    Q.    Okay.  Let's focus just first on the
17  sleeve damage.
18    A.    All right.  Okay.
19    Q.    So under the parties' agreement it is
20  your understanding that the plaintiffs are not

**EXHIBIT A**
**16**

James Flynn - April 5, 2010.txt

21    liable for normal wear and tear on the temporary
22    engine owned by Ryan?
23        A.   Yeah.  I think the agreement specifies
24    that it would only -- they would return the engine
25    with normal wear and tear, and it was beyond

93

1     normal wear and tear, yes.
2         Q.   So I guess the answer to my question is
3     yes, correct?
4              So under the parties' agreement it is
5     your understanding that the plaintiffs are not
6     liable for normal wear and tear on the temporary
7     engine owned by Ryan?
8         A.   If it was normal wear and tear, yes.
9         Q.   Now, you testified that Rolls-Royce
10    inspected the engine at the time of the return?
11        A.   They actually performed the initial
12    inspection for ILFC.
13        Q.   Correct.
14        A.   They also performed the inspection for
15    us.
16        Q.   Okay.  Let's talk about the first
17    inspection conducted by Rolls-Royce for ILFC.
18        A.   Right.
19        Q.   You've reviewed the paperwork in
20    connection with that job?
21        A.   I reviewed the -- the initial
22    paperwork -- I reviewed the initial paperwork as
23    the engine was received back at ATC Lasham.  And

**EXHIBIT A**
**17**

James Flynn - April 5, 2010.txt

1    inspection conducted by Rolls-Royce.

2        A.   Yes.

3        Q.   Was this inspection conducted after the

4    parties had executed the --

5        A.   Acceptance certificate?

6        Q.   Yes, the return acceptance receipt.

7        A.   No.  It was done before.

8        Q.   It was done before, okay.  That's right.

9    Okay.

10            So that's when Ryan sent its technical

11   representative out to ATC Lasham to take a look at

12   the engine for itself; is that right?  I think a

13   guy by the name of Carwyn Evan from TES went --

14       A.   TES went to inspect the engine

15   physically, to take photographs to determine the

16   condition of the engine where it was at ATC

17   Lasham.  And then TE- -- TES requested that Rolls

18   come in and conduct this inspection, borescope.

19   Then it was determined that the sleeve was beyond

20   normal wear and tear.  There was damage to the

21   sleeve.  It did not change the condition of the

22   engine.  Engine was still classified as

23   serviceable.  But it did focus on the damage that

24   had occurred to the sleeve, which is not normal

25   wear and tear.

97

1        Q.   I'd like you to take a look at Exhibit

2    2, which is the return acceptance receipt.  You

3    should have it before you there.

**EXHIBIT A**

**18**

James Flynn - April 5, 2010.txt

4      A.   Right.  Right.

5      Q.   Just so that I'm following.  If you take

6  a look at the page Bates-stamped ILFC 9666 --

7      A.   9666.  Okay.  Yes.  Okay.

8      Q.   Is this the part of the --

9      A.   Yeah, Teflon sleeve.

10     Q.   (Continuing) -- reports about the Teflon

11  sleeve?

12     A.   Yes.

13     Q.   Okay.  Now, I've noticed that other

14  parts of Exhibit 2 also purport to list damage,

15  whether normal wear and tear or not, to the

16  engine; is that right?

17     A.   No, I think that -- I mean, you'll have

18  findings, okay, that you'll find on an engine.

19  You'll have findings on an engine.  But they will

20  either be within limits -- within the AMM limits,

21  manufacturer limits, or they will not be and then

22  they require further action.  Those -- typically

23  you don't see sleeve damage like this on a fresh

24  engine like this.  This would be unusual.

25     Q.   Well, it's not a new engine, correct?

98

1      A.   Not a new engine, but it had gone

2  through extensive renovation prior to going away

3  to Zoom.

4      Q.   Correct.  But there is other damage

5  listed that is purported to be listed in Exhibit

6  2, correct, in addition to the Teflon sleeve

EXHIBIT A
19

James Flynn - April 5, 2010.txt

7    damage?

8        A.   Well, let me see.  It just says that a

9    screen was found damaged.  It was acceptable

10   within manufacturer limits though.

11       Q.   Right.  So there's other damage besides

12   the Teflon sleeve listed in Exhibit 2?

13       A.   There is some other things that were

14   noted, yes, during the inspection of damage that

15   was noted.

16       Q.   And all that other damage besides the

17   Teflon sleeve, does Ryan agree that the plaintiffs

18   don't owe additional amounts for that purported

19   damage?

20       A.   They paid for it when they pay the

21   reserves.  That would be customary.  You receive

22   the compensation for the use of the motor for

23   those other related items.

24       Q.   All the other damage reflected in

25   Exhibit 2 is normal wear and tear.  It's covered

99

1    by the parties' agreement already?

2        A.   Yes.

3        Q.   Okay.

4        A.   Yes.

5        Q.   Just the Teflon sleeve is all we're

6    talking about?

7        A.   That's all we're talking about and the

8    associated costs around that Teflon sleeve,

9    whether it be shipping and handling or stands and

**EXHIBIT A**
**20**

James Flynn - April 5, 2010.txt

10  who knows what else is surrounding that Teflon

11  sleeve repair.  The use of a motor on our -- on

12  our aircraft.

13      Q.   Now, I might be getting my technical

14  terminology mixed up here.

15      A.   That's okay.

16      Q.   Would you consider this damage to Teflon

17  sleeve to be beyond aircraft maintenance limits?

18      A.   It's beyond -- the engine is still

19  serviceable with that damage, but it now is

20  elevated to an elevation of higher level of

21  awareness on it requiring certain events to be

22  done at specific intervals so that it doesn't

23  create further damage to the engine, which it can

24  easily do, so --

25      Q.   I understand.

100

1       A.   But it's -- but technically the engine

2   is -- you can still run the engine.  I can run the

3   engine today.  But now I've got to be aware that

4   certain interval I've got to take that engine and

5   I've got to relook at that sleeve again to see

6   what additional deterioration occurred since the

7   last time I looked at it when Rolls looked at it.

8   And since the engine was off, you're better off to

9   address the problem now to eliminate the damage

10  and then you have a baseline at which to move

11  forward with the engine.

12      MR. MALZAHN:  I think we are on Exhibit 7.

Page 90

**EXHIBIT A**
**21**

James Flynn - April 5, 2010.txt
19    return of their aircraft.  Let me see here.

20    Trying to figure out the date, the sequencing of

21    dates.

22         Q.   And I don't want you to guess.

23         MR. LESTER:  Yes, don't guess.  I mean, if

24    you don't know, you don't know.

25         THE WITNESS:  As I sit here precisely, I

103

1    don't know the precise date.

2    BY MR. MALZAHN:

3         Q.   So let me phrase the question this way:

4    So this leased engine that you want to get off

5    Aircraft 526 has been on that aircraft for at

6    least a year?

7         A.   It was installed -- the engine as -- it

8    was installed on this particular aircraft.  This

9    leased engine was installed as we delivered the

10    aircraft back to ILFC.

11         Q.   Okay.

12         A.   That's when it was done.

13         Q.   Okay.  That makes sense.

14              And who are you leasing that engine

15    from?

16         A.   Total Engine Solution.

17         Q.   And the reason you had to lease that

18    engine in the first place from Total Engine

19    Solution was because you wanted to continue to use

20    the plaintiffs' engine on your aircraft?

21         A.   We used the plaintiffs' engines on the

-

James Flynn - April 5, 2010.txt

22  aircraft until November, December of that year

23  when it was shipped to Ameco.  This engine -- this

24  Total Engine Solution engine was leased and

25  installed to replace the original engine from the

104

1  ILFC aircraft, and this is when the leased motor

2  was installed on the wing of the 526.

3      Q.  Let's start over just so I get the

4  chronology straight.

5      A.  Okay.

6      Q.  So all right.  Exhibit 6 is the aircraft

7  lease agreement between Ryan and the plaintiffs,

8  correct?

9      A.  Yes, yes.

10      Q.  And that lease agreement is dated

11  January 10th, 2005?

12      A.  Right.

13      Q.  And shortly after that an aircraft was

14  delivered pursuant to this lease agreement to Ryan

15  with two engines installed on it, correct?

16      A.  Correct.

17      Q.  Okay.  And those engines were 30751 and

18  30752?

19      A.  Correct.

20      Q.  Okay.  You know, this lease agreement

21  provided for an initial lease term of 36 months?

22      A.  Yes.

23      Q.  Three years?

24      A.  Right.

**EXHIBIT A**
**23**

James Flynn - April 5, 2010.txt

3    say, March time period.  And then Ryan continued

4    to operate 752 -- Engine 752 until November or

5    December, at which time it took the engine off of

6    the wing and sent it to Ameco for repairs.

7         Q.   So my question is when did Ryan lease

8    another engine from Total Engine Solutions?

9         A.   It probably was that November, December

10   of that year, which would have been 2008

11   approximately.

12        Q.   So it leased that engine months ahead of

13   the time that the temporary engine should have

14   been returned to Ryan?

15        A.   No.  After, it leased it after.  The

16   engine should have been returned with the

17   aircraft, but it needed further engine work before

18   it could be returned to -- returned delivery

19   conditions.

20        Q.   Okay.  So all right.  I just want to

21   find out, you know, what is the time period that

22   Ryan believes that, you know, there are

23   outstanding amounts because they had to return

24   this engine from Total Engine Solutions.

25             What time period are we talking about?

                                                      108

1         A.   The time period that would -- would have

2    transpired from the time that the engine was at

3    ILFC had taken over, that it was completely

4    renovated and ready for shipment back to -- made

5    up with its airframe until the engine was -- until

**EXHIBIT A**
**24**

James Flynn - April 5, 2010.txt

6    our engine was returned to us.

7        Q.    Okay.  Let me make sure I understand

8    that.

9              So you're saying the start date would be

10   when the temporary engine owned by Ryan was -- I'm

11   sorry.  Can you give it to me again?

12       MR. LESTER:  Can we go off the record for a

13   minute, please?

14       MR. MALZAHN:  Sure.

15                  (Discussion off the record.)

16   BY MR. MALZAHN:

17       Q.    So we just had a discussion off the

18   record to hopefully clarify things a little bit.

19   I'd like you to describe now for the purpose of

20   the record, you know, what is the factual basis

21   for Ryan's counterclaim that certain amounts are

22   owed to it from -- for the rental of an engine by

23   Total -- of an engine owned by Total Engine

24   Solutions and for what time period are we talking

25   about?

                                                    109

1        A.    We're talking about a time period that

2    would have -- would have encompassed approximately

3    seven months for the use of an engine by Total

4    Engine Solution.  Because the engine was not

5    returned in a timely fashion from the repairs at

6    Ameco and reinstalled on your aircraft.

7              And we felt as though it's unreasonable

8    to -- if the lessor is in control of the engine,

**EXHIBIT A**
**25**

James Flynn - April 5, 2010.txt

9  it's unreasonable for them to continue using our

10  motor while we're paying for a leased engine while

11  their engine is sitting at Ameco for some

12  unreasonable length of time, now a year, where

13  they had total control of it and we're out here

14  spending $60,000 plus additional reserves every --

15  every month on the engine.  I would just think

16  that's unreasonable.

17      Q.  So when do you believe the work should

18  have been started and completed on the temporary

19  engine, to the best of your knowledge?

20      A.  Well, the best of my knowledge is that

21  the work scope was completed in early March.

22  Ameco had originally committed to turning the

23  engine in a 90-day period to us and delivering it

24  back to us subject to induction slots.  And there

25  was an induction slot for the engine in April that

110

1  should have restored the engine based on the work

2  scope that we had given -- that we had initially

3  submitted, returned the engine by June, June or

4  early July.  And the engine should have been

5  restored in a condition to meet the return

6  delivery conditions at which it could have then

7  been shipped to London and coordinated with Air

8  Slovakia to do an engine change over a three-day

9  period of time.  We think that was reasonable.

10      Q.  Did Ryan ever make any inquiries about

11  why the engine repairs weren't completed on a

EXHIBIT A
26

James Flynn - April 5, 2010.txt

116

1    special stands and so forth versus bringing the
2    engine into another facility that already had the
3    stands.  So it would be a backwards shipping of
4    additional stands because we had -- we had to
5    create very specialized work stands because you
6    can't do it on a shipping stand, the work.
7            You have to brake the engine and open
8    it, and so that's a special work stand they do
9    that on.  So it had to actually be removed from
10   the shipping stand and put on another special work
11   stand.  So if ATC Lasham didn't have that work
12   stand, then that would have been shipped into ATC
13   Lasham.  TES had that special work stand and
14   equipment needed to accomplish the work.
15       Q.   Okay.  I understand.
16            Do you have an approximate estimate as
17   to how much these shipping costs amount to?
18       A.   My estimate was probably under $2500.
19       Q.   Okay.  And do you have an estimate as to
20   the leasing costs, you know, the costs associated
21   with leasing another engine from TES?
22       A.   $60,000 a month.
23       Q.   And I know you testified to this before,
24   but what do you believe the end date is?
25       A.   The end date on the obligation would be

117

5

EXHIBIT A
27

James Flynn - April 5, 2010.txt

1   the date at which time the -- that we have

2   accepted the engine, but then there's an interim

3   period for the period of time that the damage has

4   been actually corrected.  And we've allocated, I

5   think, 45 days for the damage period, not to

6   exceed 45 days.  Anything beyond that is at our

7   expense.

8       Q.   When were you first notified by ILFC

9   that the temporary engine was available for

10  pickup, if you recall?

11      A.   Well, they had indicated it in December

12  that the engine was now off wing.  And, of course,

13  I think it was before Christmas or middle of

14  December I think we were notified.  And then we

15  were -- we finally coordinated -- I think the

16  inspection took place in that first week of

17  January or second week of January, and then we had

18  the borescope accomplished.  That was coordinated.

19      I think TES went down and did the

20  initial inspection.  Then Rolls came into the

21  borescope.  And then once we had the damage

22  determined, then we were back and forth for almost

23  a month and a half trying to incorporate that in

24  the acceptance document in a form that was

25  acceptable to both parties.  That took us until, I

118

1   think, the 26th or something to have both parties

2   agree to the insertion of that and the attachment

3   to that -- that return acceptance receipt.

EXHIBIT A
28

James Flynn – April 5, 2010.txt

1  you know, while ILFC will take over the engine

2  Ryan is still responsible for all the costs

3  relating to the repairs on the engine?

4      A.  I don't recall that specifically, no.

5      Q.  Okay.  So after our last break, your

6  attorney, Mr. Lester, provided me with a document

7  that had not been previously produced in this

8  lawsuit.

9          I understand that this is a document

10  you, Mr. Flynn, prepared either in part or in

11  whole.  Is that accurate?

12      A.  Yes.

13      Q.  Could you describe to me what --

14  actually I will first Bates stamp this document or

15  get an exhibit number.  It's Exhibit 21.

16                  (Exhibit No. 21 marked as

17                   requested.)

18  BY MR. MALZAHN:

19      Q.  Could you describe what this document is

20  and how it was created?

21      A.  The first column basically is --

22      MR. LESTER:  He asked what the document is

23  and how it was created.  Let's do that before you

24  get into specifics.

25      THE WITNESS:  The document is basically a

181

1  summary of your charges from the letter -- demand

2  letter of February 26th.  It summarizes those

3  charges basically.

EXHIBIT A
29

James Flynn - April 5, 2010.txt

4    BY MR. MALZAHN:

5        Q.   So that's the first column on the left?

6        A.   Yes.  So it's a summary of the charges

7    that are taken from your demand letter of February

8    26th.

9            The -- the second column was basically

10   to look at those numbers and to determine what

11   amounts of those under the demand were -- should

12   be applied or not applied.  And that's what we

13   did.  We generated an additional column.

14       Q.   And what's the third column on the far

15   right where text appears?

16       A.   Just comments on how the number was

17   actually arrived at or the basis for the removal

18   of a number.  As you can see, your Item 1 was

19   87,097.  And so what we did is to arrive at that

20   number, there was a calculation or formula that

21   was applied in the column that showed you how you

22   arrived at it; and basically it is double rent.

23   It was an application of double rent that was

24   applied between March 8th and March 17th.

25       Q.   Okay.

                                                    182

1        A.   What I simply did is removed the double

2    rent portion of it from the calculation.

3        Q.   Okay.

4        A.   The next was a rent -- a double rent

5    charge from February 8th through March 7th, 2008,

6    in the amount of $270,000.  And I believe that

EXHIBIT A
30

James Flynn - April 5, 2010.txt

10  necessarily mean we're agreeing they have a right

11  to reserve their rights.

12        Prior to going on we had a discussion

13  about what this document was.  It was prepared at

14  the request of counsel and just provided to

15  counsel over the weekend.  So we just saw it this

16  morning and after discussions decided to waive the

17  attorney/client privilege because this document

18  got prepared at our request.  It's not a document

19  that existed three or four months ago and wasn't

20  turned over in discovery.  So I don't want there

21  to be any insinuation about that either.

22      MR. MALZAHN:  Okay.

23      MR. LESTER:  But I do admit that counsel did

24  just receive a copy of it earlier today.

25        Can we go off the record for a minute?

                                                    184

1       MR. MALZAHN:  Yes, why don't we do that.

2                   (Discussion off the record.)

3       MR. MALZAHN:  So let's go back on the record

4   and take a look at this.

5       THE WITNESS:  Okay.

6   BY MR. MALZAHN:

7       Q.   So Exhibit 21, you know, lays out the

8   contentions made by Ryan as to the amounts Ryan

9   owes to plaintiffs and the amounts plaintiff owes

10  to Ryan, correct?

11      A.   Correct.

12      Q.   Nothing in this document, Exhibit 21, is

**EXHIBIT A**
**31**

James Flynn - April 5, 2010.txt

13    inconsistent with your earlier testimony today?

14        A.    No.

15        Q.    One thing that I have noticed in Item

16    No. 3 --

17        A.    Item No. 3, the 164, yes.

18        Q.    (Continuing) -- this is for the double

19    engine rent on the original engine, correct?

20        A.    Correct.

21        Q.    You've modified the end date to be March

22    31st, 2009?

23        A.    Yes, I did.

24        Q.    And that's different than the November

25    12th, 2009, date stated in the February 26th

                                                                185

1    letter, correct?

2        A.    That is correct.

3        Q.    And the reason you've modified that date

4    is because plaintiffs took possession of the

5    original engine on or about March 31st, 2009?

6        A.    Yes.  They terminated the lease and took

7    possession, yes.

8        Q.    And at the time ILFC terminated the

9    lease and took possession of the engine, the

10    original engine was not in the return condition

11    required by the lease, correct?

12        A.    It was not.

13        Q.    So Ryan had not complied with its

14    contractual obligations to complete the necessary

15    repairs on that engine to complete delivery?

**EXHIBIT A**

**32**

James Flynn - April 5, 2010.txt

16    A.    Right.

17    Q.    So you knew when Ryan gave up or when

18    the lease for the original engine was terminated,

19    that ILFC and the plaintiffs would have to spend

20    some of their -- would have to complete those

21    repairs on the original engine in order to return

22    the engine in compliance with the lease

23    conditions, correct?

24    A.    Yes.  They should have spent 75 days,

25    yes.

186

1    Q.    So now your contention is that they

2    should have spent 75 days past March 31st, 2009,

3    to complete those necessary repairs; is that

4    correct?

5    A.    They should have spent at least 75 days.

6    Q.    At least 75 days.

7    MR. LESTER:  Wait a minute.

8    BY MR. MALZAHN:

9    Q.    So would you add now to Item No. 3 --

10    you would change Item No. 3 --

11    A.    Yes.  Remove engine rent date March

12    31st, right.

13    Q.    Right now you have it -- the end date as

14    March 31st, 2009.  Now you would change that date

15    to be at least 75 days after March 31st, 2009,

16    correct?

17    A.    I think the way I read the Letter No. 2

18    is that it had to be installed on the aircraft --

EXHIBIT A
33

James Flynn - April 5, 2010.txt

19    Q.   Let me first get an answer to the

20    question I asked.  So let me make sure you have

21    the question in mind, okay?

22             Exhibit 21 in Item No. 3 has an end date

23    now of March 31st, 2009, correct?

24    A.   Yes.

25    Q.   Now you had changed that date to be at

187

1    least 75 days after March 31st, 2009, correct?

2    A.   There was a reason I put it at March

3    31st.

4    Q.   Well, let me just get an answer to that

5    question.  Is it a yes or a no?

6    A.   No.  I mean, I put March 31st as the end

7    date because of a very specific reason on the

8    termination letter and the side letter agreement

9    No. 2.

10    Q.   You can take a minute to think about it,

11    but it's a yes or no question.

12    A.   Okay.

13    Q.   So I want a yes or no answer.

14    A.   All right.  Okay.  Let me just look at

15    one thing, which was this Letter No. 2 because it

16    required two things to be done by --

17    Q.   You can do that and then I will ask the

18    question again so the record is clear.

19    A.   Okay.  Let's see here where was it.

20             Okay.  Ask the question again.

21    Q.   So Exhibit 21 in the row for Item 3 --

**EXHIBIT A**

**34**

James Flynn - April 5, 2010.txt

22      A.   Yes.

23      Q.   (Continuing) -- currently has an end

24 date --

25      A.   Yes.

188

1       Q.   (Continuing) -- according to your notes

2  of March 31st, 2009?

3       A.   Correct.

4       Q.   You would now change that date -- that

5  end date to be at least 75 days after March 31st,

6  2009, correct?

7       A.   No.

8       Q.   Okay.  Why not?

9       A.   Because the engine -- the original

10 engine -- the original engine has been removed

11 from my aircraft, which was a condition of even

12 paying the $5,000; and it's not installed on any

13 other aircraft and it is returned to the lessor.

14      Q.   It was -- okay.

15      A.   Well, it was terminated by the lessor.

16 He had possession.

17      Q.   But you acknowledge that the original

18 engine was not returned in the condition required

19 by the lease?

20      A.   That's correct, it was not in the

21 condition.

22      Q.   And you believe that it should have

23 taken at least 75 days after the return of the

24 engine for the necessary repairs to be completed?

James Flynn - April 5, 2010.txt

25    A.    Yes.

189

1    Q.    And that it could have taken longer?

2    A.    Possible, yes.

3    Q.    I'd like you to now take a look at

4    Exhibit 5, which is Side Letter No. 2.

5    A.    Okay.

6    Q.    Paragraph 4 entitled "Original Engine."

7    I'd like you to read that entire sentence to

8    yourself, 4(a).

9                    (Witness examining document.)

10    THE WITNESS:  Yes.

11    BY MR. MALZAHN:

12    Q.    So it is your understanding under this

13    lease that two things have to happen in order for

14    the original engine return date to be triggered or

15    satisfied.  First, the shop visit for the original

16    engine has to be completed.  And second, the

17    original engine is returned to lessor in

18    accordance with the provisions of the lease in

19    this later agreement.

20                    Is that your understanding?

21    A.    That's my understanding.  We had to --

22    yes, that is my understanding.  We had to return

23    the engine finished.

24    Q.    And it is also your understanding that

25    rent would continue to accrue on the original

190

James Flynn - April 5, 2010.txt

1    engine until both of those conditions are

2    satisfied?

3        A.    No.

4        Q.    What is your factual basis for that?

5        A.    Well, if you go to (b), it says, The

6    lessee -- In consideration of the lessees using

7    the original engine on an aircraft other than the

8    aircraft until the original engine is returned,

9    that the lessee will pay lessor 5,000.  So that

10   was for the use.

11           Well, right now it's been terminated.

12   They took the engine and I have taken it off the

13   aircraft.  I'm not using it any longer.

14       Q.    I'd like you to look at Paragraph 4(g)

15   on Exhibit 5.

16       A.    Yes; yes.

17       Q.    So if you focus on the third sentence,

18   I'll read it for the record.  "In addition, after

19   June 29th, 2008, and continuing until such time as

20   the Original Engine is redelivered to LESSOR and

21   is put into the condition required by Article 22

22   of the Lease, instead of paying the Engine Rent

23   specified in Paragraph 4(b) above" -- which is the

24   regular normal rent -- "LESSEE will pay twice the

25   amount of Engine Rent for each day from the

                                                    191

1    Original Engine Return Date until the Termination

2    Date."

**EXHIBIT A**
**37**

# EXHIBIT

# A

## EXHIBIT A

| Item No. | Item | Amount |
|---|---|---|
| 1 | Pro-rated and unpaid rent on the Aircraft (MSN 24544) for the time period March 8, 2008 through March 17, 2008 | $87,097.00 |
| 2 | Monthly rent on the Original Engine (ESN 30752) for the time period March 18, 2008 through June 29, 2008 | $17,000.00 |
| 3 | Pro-rated double rent on the Original Engine (ESN 30752) for the time period June 30, 2008 through November 12, 2009 | $164,387.00 |
| 4 | FAA filing fee | $561.25 |
| 5 | Compensation for Boeing kit and technical buyout for non-flush repairs | $87,982.00 |
| 6 | Advance payment for repair of the Original Engine (ESN 30752) | $1,181,893.00 |
| 7 | Credit for difference between advance payment and final invoice for the repair of the Original Engine (ESN 30752) | ($39,208.20) |
| 8 | Cost of visit by Gus Merizalde to Ameco Beijing for the purpose of completion of the repair on the Original Engine (ESN 30752) | $12,807.69 |
| 9 | Cost of shipping the Original Engine (ESN 30752) from the MRO in China to Air Slovakia in Frankfurt | $52,500.00 |
| 10 | Cost of visit by Gus Merizalde to ATC Lasham Southend to monitor engine swap | $8,753.35 |
| 11 | Cost of shipment of records for Original Engine (ESN 30752) to ATC Lasham | $388.23 |
| 12 | Rent abatement that Triton will owe to Air Slovakia in connection with the engine swap | $30,833.00 |
| 13 | Default interest accrued as of February 12, 2010 | $114,217.18 |
| 14 | Credit for reserves reconciliation | ($401,123.80) |
|  | Attorneys' fees and costs accrued as of February 12, 2010 | $105,200.99 |
|  | **Total as of February 12, 2010** | **$1,423,288.69** |

Exhibit
A

0288

ILFC 0009535

**EXHIBIT A**

**39**

# EXHIBIT

# 2

**EXHIBIT A**
**40**



# ENGINE RB211-535E4
# ESN 30746

# Technical Inspection Report
# For
# Ryan International

Report Prepared by:

*Carwyn Evans*

Carwyn Evans
Program Manager

Approved by:

Paul Smith
Team Leader

TES report reference: ENG/9.2010
Dated 9th January 2010

Engine inspection performed by: Carwyn Evans

*Exhibit 2*



Total Engine Support Limited
Aviation House, Beaufort Avenue
...
...
...

+44 (0) ...
...

Total Engine Support
Registered in England ...
Registered No. 501 6203

A subsidiary of TES Aviation Group

ILFC 0009660

## Report Contents

1.1  ENGINE LOCATION ................................................................................................. 1
1.2  ENGINE DATA PLATE ............................................................................................. 1
1.3  PRESERVATION STATUS ........................................................................................ 2
1.4  WALK-AROUND CHECK .......................................................................................... 5
1.5  TRANSPORTATION STAND ..................................................................................... 8
1.6  DOCUMENTATION .................................................................................................. 8
1.7  APPENDIX A – LRU LISTING ................................................................................. 9

ILFC 0009661

EXHIBIT A
42

## 1.1   Engine Location

The engine was located at ATC Lasham, Southend Airport, Southend on Sea, UK.

The engine was located in a hanger, mounted in a transportation stand (Figure 1). It was covered in polythene wrap (shown in process of being partially removed to allow inspection).



Figure 1

## 1.2   Engine Data Plate

The engine was confirmed as being 30746 (Figure 2).



Figure 2

Page 1 of 10

ILFC 0009662

EXHIBIT A

43

### 1.3   Preservation Status

According to attached preservation tags the engines fuel and oil systems were inhibited for 30 - 365 days on 12th November 2009 in accordance with AMM task 71-00-03 (also ref EM task 72-00-00).

Preservation tags had been attached to the engine (Figure 3 and Figure 4). Desiccant was placed in the engine.



Figure 3



Figure 4

Page 2 of 19

ILFC 0009663

## 1.4    Walk-around Check

The polythene wrap was partially removed from various areas to allow inspection. At the end of the inspection the engine was left in this configuration for ATC Lasham to re-wrap.

The following points were noted during the inspection:

- The CNA was installed on the engine.
- There was no inlet cowl installed on the engine.
- The LP system was free to rotate.
- There were no missing LRU's (see Appendix A for full listing).
- No proprietary blanks were in place, but all openings were taped over with polythene (see Figure 5 for typical example).



Figure 5

ILFC 0009664

EXHIBIT A
45

- Desiccant was placed in the fan case (Figure 6) and exhaust (Figure 7).



Figure 6



Figure 7

- The fan blades and spinner were in an as expected condition

Page 4 of 19

ILFC 0009665

EXHIBIT A

46

- The Teflon sleeve was found damaged at the 8 o'clock position (Figure 8 and Figure 9). The underlying Kevlar wrap appeared dirty but otherwise in good condition. Holes or cuts to the Teflon sleeve require repair within 1000 hours or if they can not be repaired a repeat inspection at 1000 hours to ensure no damage to the underlying Kevlar wrap (AMM Task 72-34-10-216-036-R00, Subtask 3 036-046-R00).



Figure 8



Figure 9

Page 5 of 19

ILFC 0009666

EXHIBIT A
47

- There was condensation under the Teflon sleeve (Figure 10). This is acceptable as per the AMM (Task 72-34-10-216-038-R00, Subtask G 216-040-R00).



Figure 10

- There was some evidence of staining/discolouration to the inner surface of the ONA (Figure 11), although it was not wet with oil. The origin of the stain was not confirmed. Oil consumption trend data was reviewed and found to be low and therefore this is not thought to be of concern.



Figure 11

Page 6 of 10

ILFC 0009667

- One of the IPC attenuation screens was found damaged (Figure 12). It is acceptable to AMM limits (TASK 75-82-10-206-006-R00). The other two screens were in good condition. A spare attenuation screen (damaged) was attached to the engine



Figure 12

- The abradable fan track showed typical wear that is to be expected (Figure 13).



Figure 13

Page 7 of 10

ILFC 0009668

- The 'A'-Frames showed evidence of repair (Figure 14), confirmed by an EASA Form 1 for the work.



Figure 14

## 1.5    Transportation Stand

No inspection of the transportation stand was carried out. It is believed the stand is not being supplied with this engine, although this is yet to be confirmed.

## 1.6    Documentation

The following certification was with the engine:

| | | | |
|---|---|---|---|
| EASA Form 1 | 12th Nov 09 | RR OWO | Borebiending of HPC blades |
| EASA Form 1 | 21st Nov 09 | IMT Aviation | 'A'-Frame repair |
| EASA Form 1 | 25th Nov 09 | ATO Lasham | Serviceable removal |

All other documentation had been shipped by ATO Lasham to ILFC. These have been reviewed separately by TES and issues communicated to Ryan International.

ILFC 0009669

EXHIBIT A
50

## 1.7   Appendix A – LRU Listing



Page 9 of 10

ILFC 0009670



Page 10 of 10

ILFC 0009671

# EXHIBIT

# 5

## LETTER AGREEMENT NO. 2 TO AIRCRAFT LEASE AGREEMENT
### (Boeing B757-28AER — MSN 24544)

THIS LETTER AGREEMENT NO. 2 TO AIRCRAFT LEASE AGREEMENT ("**Letter Agreement**") is made as of this 13th day of February, 2008, by and between WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION ("**LESSOR**") and RYAN INTERNATIONAL AIRLINES, INC. ("**LESSEE**").

### RECITALS

A    WHEREAS, LESSOR and LESSEE have entered into that certain Aircraft Lease Agreement dated as of January 10, 2005 (as supplemented, the "**Lease**"), pursuant to which LESSOR has agreed to lease to LESSEE one (1) Boeing B757-2A8ER aircraft bearing manufacturer's serial number 24544 together with two (2) Rolls-Royce RB211-535E4 engines (the "**Engines**") bearing manufacturer's serial numbers 30751 and 30752 (collectively, the "**Aircraft**"); and

B    WHEREAS, LESSEE has advised LESSOR that the Engine bearing manufacturer's serial number 30752 (the "**Original Engine**") which LESSEE was required to redeliver to LESSOR installed on the Aircraft pursuant to the Lease will not be in the condition required for redelivery on February 24, 2008, the scheduled redelivery date of the Aircraft (the "**Scheduled Redelivery Date**"). Rather than wait for the repair of the Original Engine to be completed prior to redelivery of the Aircraft, LESSEE has proposed (and LESSOR has agreed) that LESSEE will (a) redeliver the Aircraft to LESSOR on the Scheduled Redelivery Date with a temporary engine (the "**Temporary Engine**") for use by the next lessee of the Aircraft, Zoom Airlines Incorporated ("**Zoom**") which Temporary Engine is installed in lieu of the Original Engine, (b) operate the Original Engine on another aircraft owned by LESSEE for no more than two (2) months after which time LESSEE will ship the Original Engine for a shop visit to an engine maintenance facility and (c) ensure that the Original Engine will continue to be an "Engine" for all purposes under the Lease (including indemnity and insurance purposes) until the shop visit for the Original Engine is completed and the Original Engine is returned to LESSOR at the Original Engine Return Location (as hereinafter defined) in accordance with the provisions of the Lease.

C    WHEREAS, LESSOR and LESSEE have agreed to the following supplemental agreements in respect of the Lease in accordance with the terms and conditions set forth below;

NOW, THEREFORE, LESSOR and LESSEE hereby agree as follows:

### AGREEMENT

1.    **Definitions.**  Capitalized terms not otherwise defined herein have the meanings given to them in the Lease.

1

EXHIBIT 5

ILFC 0000377

**EXHIBIT A**
**54**

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-2002BA (MSN 24544)

2. **Construction.** Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the terms "include" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or". The words "hereof," "herein," "hereby," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, exhibit and schedule references are to this Agreement unless otherwise specified. All article and paragraph headings and captions are purely for convenience and will not affect the interpretation of this Agreement. Any reference herein to this Agreement, the Lease or any other agreement, instrument or document includes any and all alterations, amendments, changes, extensions, modifications, renewals, or supplements thereto or thereof, as applicable.

3. **Redelivery of Aircraft.** LESSOR agrees to accept redelivery of the Aircraft with the Engine bearing manufacturer's serial number 30751 as well the Temporary Engine installed. At the return of the Aircraft, LESSEE and LESSOR will execute a Return Acceptance Receipt in the form attached hereto as Exhibit A, and the Lease will terminate with respect to the Airframe and the Engine bearing manufacturer's serial number 30751 (except for those provisions of the Lease which survive termination).

4. **Original Engine.** LESSEE will continue leasing the Original Engine as follows:

(a)     Notwithstanding the termination of the Lease in respect of the Airframe and the Engine bearing manufacturer's serial number 30751 and notwithstanding any filing with the FAA in respect of the Aircraft and the Engines, all of the provisions of the Lease (including provisions of the Lease pertaining to indemnification and insurance) will continue in full force and effect in respect of the Original Engine until the shop visit for the Original Engine has been completed and the Original Engine is returned to LESSOR in accordance with the provisions of the Lease and this Letter Agreement (the "**Original Engine Return Date**").

(b)     In consideration of LESSEE using the Original Engine on an aircraft other than Aircraft (the "**Temporary Aircraft**") until the Original Engine is returned to LESSOR, notwithstanding Article 4.3 of the Lease and Exhibit C, Paragraph 3(a) of the Lease, LESSEE will pay to LESSOR Five Thousand U.S. Dollars (US$5,000) monthly in advance as rent for the Original Engine ("**Engine Rent**").

(c)     Title to the Original Engine shall at all times remain with LESSOR free from all Security Interests (except Permitted Liens) regardless of the location of the

2

C:\DOCUMENTS AND SETTINGS\JOHN FREZZA\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\KOKJMEQR\LETTER AGREEMENT #02 E – ACL 01 220 (RYAN INTERNATIONAL 24544) [2].WPD

ILFC 0000378

**EXHIBIT A**

**55**

Engine.    If the Temporary Aircraft does not belong to LESSEE, LESSEE will obtain a letter from the owner of the Temporary Aircraft in form and substance of Exhibit B attached hereto.

(d)    LESSEE shall provide insurance acceptable to LESSOR with respect to the Original Engine until such time as it is reinstalled on the Aircraft in accordance with the provisions of the Lease and this Letter Agreement for an agreed value of US$6,000,000 (the "Original Engine Agreed Value").

(e)    LESSEE shall ensure that the identification plate referred to in Article 14 of the Lease remains affixed to the Original Engine at all times.

(f)    No later than fifteen (15) Business Days after execution of this Letter Agreement, LESSEE will provide written notice to LESSOR evidencing the input date for the Original Engine to undergo the required shop visit to put the Original Engine in the condition required for return of the Original Engine to LESSOR pursuant to the terms and conditions of the Lease (the "Shop Visit").

(g)    LESSEE will ensure that the Original Engine Return Date is no later than June 29, 2008.    In the event that LESSEE does not return the Original Engine by June 29, 2008, LESSEE will fully indemnify LESSOR on demand for all losses (including consequential damages), liabilities, actions, proceedings, costs and expenses thereby suffered or incurred by LESSOR. In addition, after June 29, 2008 and continuing until such time as the Original Engine is redelivered to LESSOR and is put into the condition required by Article 22 of the Lease, instead of paying the Engine Rent specified in Paragraph 4(b) above, LESSEE will pay twice the amount of Engine Rent for each day from the Original Engine Return Date until the Termination Date.    Engine Rent payable under Paragraph 4(b) hereunder will be prorated based on the actual number of days in the applicable month. Payment will be made upon presentation of LESSOR's invoice. Furthermore, to accommodate Zoom, under no circumstance may the Original Engine be returned by LESSEE between June 30, 2008 and September 15, 2008.    In the event that LESSEE does not return the Original Engine to Zoom by June 29, 2008 and the Original Engine completes the shop visit contemplated herein between June 29, 2008 and September 15, 2008, LESSEE will store the Original Engine after such shop visit at LESSOR's instruction and at LESSEE's sole cost and expense and in no event will LESSEE operate the Original Engine.

3

ILFC 0000379

EXHIBIT A
56

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-200228A (MSN 24544)

(h)    LESSEE will deliver the Original Engine to LESSOR at a location designated by LESSOR, which may be the location of the Aircraft at the time of the return of the Original Engine (the "Original Engine Return Location").

(i)    Zoom will be responsible for obtaining any required customs authorizations in Canada with respect to the import, use in and export from Canada of the Temporary Engine and the Original Engine, at LESSEE's cost.

(j)    On the Original Engine Return Date, LESSOR and LESSEE will execute a Return Acceptance Receipt in similar form and substance to Exhibit A but applicable only to the Original Engine, and the Lease will terminate in full (except for those provisions of the Lease which survive termination).

5.    Temporary Engine.    LESSOR hereby agrees to accept redelivery of the Aircraft with the Temporary Engine installed thereon, subject to the following terms and conditions:

(a)    The Temporary Engine shall not be installed upon the Airframe until LESSOR has approved of its condition, provided that:

(i)    LESSOR has been afforded the opportunity to accomplish (A) a full and complete hot and cold section videotape borescope on the Temporary Engine and its modules in accordance with the manufacturer's maintenance manual and (B) a power assurance run, all at LESSEE's sole expense; and

(ii)    the Temporary Engine: (A) is of the same type and has the same thrust rating as the Original Engine and (B) is airworthy and in compliance with all of operating requirements of FAR Part 121.

(b)    The Temporary Engine shall be owned by LESSEE, and its installation upon the Aircraft shall not violate the terms of any contract to which LESSEE or Zoom is a party.

(c)    In the event of a Total Loss of the Aircraft (even if the Temporary Engine or another third party engine is installed thereon at the time of loss), LESSOR is entitled to receive insurance proceeds from Zoom's insurers or reinsurers in an amount specified in that certain Aircraft Lease Agreement dated as of August 31, 2007 between LESSOR and Zoom (the "LESSOR/Zoom Agreed Value").    As between LESSOR and Zoom, Zoom has agreed to increase the LESSOR/Zoom Agreed Value by US$6,000,000; the ("Temporary Engine Agreed Value").    As between LESSOR and LESSEE, LESSOR will have first priority to any insurance proceeds up to the LESSOR/Zoom Agreed Value

4

ILFC 0000380

EXHIBIT A

57

in such a Total Loss situation; any excess will then be refunded to LESSEE up the amount of the Temporary Engine Agreed Value.    Similarly, if the Temporary Engine at any time is installed on another LESSOR-owned or International Lease Finance Corporation ("ILFC")-owned aircraft leased to Zoom which suffers a total loss, LESSOR or ILFC, as applicable, will have first priority to insurance proceeds up to the amount agreed to pursuant to the applicable aircraft lease agreement between Zoom on the one hand and LESSOR or ILFC on the other hand and any excess will then be refunded to LESSEE up the amount of the Temporary Engine Agreed Value.

(d)    The Temporary Engine will be returned to LESSEE at the location at which the Original Engine is redelivered by LESSEE to LESSOR.    The Temporary Engine will be delivered in the same condition as the condition of the Temporary Engine when it is delivered to Zoom, (as noted on the Estoppel and Acceptance Certificate executed by Zoom upon acceptance of the Aircraft), less ordinary wear and tear, and less the number of hours and cycles used by Zoom.    Upon return of the Temporary Engine, Zoom, at LESSEE's sole cost and expense, will perform (i) a full and complete hot and cold section videotape borescope on the Temporary Engine in accordance with the Engine manufacturer's maintenance manual as well as (ii) a power assurance run on the Temporary Engine.    LESSOR will be responsible for the correction of any deterioration of the Temporary Engine beyond aircraft maintenance manual limits.

(e)    So long as no Default or Event of Default has occurred and is continuing, LESSOR will recognize LESSEE's and its creditors' rights and interests in the Temporary engine installed on the Aircraft and will not claim or assert, as against LESSEE or its creditors, any right, title or interest in the Temporary Engine arising by virtue of the installation of the Temporary Engine on the Aircraft.

6.    Reserves Reconciliation.    As of the delivery date of the Aircraft by LESSOR to Zoom (the "Zoom Delivery Date"), LESSEE will cease paying Engine Performance Restoration Reserves and Engine LLP Reserves to LESSOR for the Original Engine.    Zoom will pay engine performance reserves and engine LLP reserves for the Temporary Engine to LESSOR.    After the Original Engine Return Date, for the period from the Zoom Delivery Date until the Original Engine Return Date, LESSOR will pay LESSEE: (i) the number of flight hours consumed on the Temporary Engine less the number of flight hours consumed on the Original Engine multiplied by US$107, and (ii) the number of engine cycles utilized on the Temporary Engine less the number of engine cycles utilized on the Original Engine multiplied by US$176.

7.    Installation Costs.    All costs of the removal, installation, shipment and packaging of the Original Engine and the Temporary Engine will be borne by LESSEE.    Without limiting the

5

ILFC 0000381

EXHIBIT A
58

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-200Z8A (MSN 24544)

foregoing, within ten (10) Business Days after receipt of LESSOR's invoice, LESSEE will pay LESSOR the following amounts: (a) the amount billed by Zoom to LESSOR to (i) ferry the Aircraft at the maintenance facility where the Temporary Engine will be removed and the Original Engine will be installed for the purpose of removing the Temporary Engine and replacing it with Original Engine (including airport landing costs, costs of pilots, fuel, maintenance and ground handling), (ii) remove the Temporary Engine, (iii) perform required maintenance on the Temporary Engine prior to storage and (iv) ship the Temporary Engine to LESSEE's storage facility; (d) the amount billed by Zoom to LESSOR in compensation of the time that the Aircraft will be grounded for the removal of the Temporary Engine and the installation of the Original Engine; (e) the amount billed by Zoom to LESSOR to install the Original Engine on the Aircraft; and (f) the amount billed by Zoom to LESSOR for any increased cost to maintain the Temporary Engine Agreed Value. For avoidance of doubt, pursuant to the Lease, LESSEE will bear all responsibility for and all costs associated with shipping the Original Engine from the location of the shop visit to the Original Engine Return Location. LESSOR will provide LESSEE with appropriate invoices and documentation to substantiate all such costs. LESSOR will work with Zoom and use reasonable commercial efforts to keep all costs detailed in this Paragraph 6 as reasonable as possible under the circumstances.

8.  **Miscellaneous.**

(a)  **No Other Modifications.** Except as expressly modified by this Letter Agreement, all of the terms and conditions of the Lease remain unchanged and are in full force and effect, and the parties hereby ratify the same.

(b)  **Counterparts.** This Letter Agreement may be executed in any number of identical counterparts, each of which will be deemed to be an original and all of which together will be deemed to be one and the same instrument.

(c)  **Delivery by Fax or E-Mail.** Delivery of an executed counterpart of this Letter Agreement by fax or e-mail will be deemed as effective as delivery of an originally executed counterpart. Any party delivering an executed counterpart of this Letter Agreement by fax or e-mail will also deliver an originally executed counterpart, but the failure of any party to deliver an originally executed counterpart of this Letter Agreement will not affect the validity or effectiveness of this Letter Agreement.

(d)  **Governing Law.** This Letter Agreement is being delivered in the State of California and will in all respects be governed by and construed in accordance with the Laws of the State of California (notwithstanding the rules pertaining to conflict of laws under California Law).

6

ILFC 0000382

**EXHIBIT A**
**59**

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-2902BA (MSN 24544)

IN WITNESS WHEREOF, LESSOR and LESSEE have caused this Letter Agreement to be executed by their respective officers as of the day and year first written above.

WELLS FARGO BANK NORTHWEST,           RYAN INTERNATIONAL AIRLINES, INC.
National Association, not in its individual
capacity but solely as Owner Trustee under the
Trust Agreement

By:                                    By:

Its:                                   Its:

7

ILFC 0000383

EXHIBIT A
60

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-20028A (MSN 24544)

WELLS FARGO BANK NORTHWEST,
National Association, not in its individual
capacity but solely as Owner Trustee under the
Trust Agreement

RYAN INTERNATIONAL AIRLINES, INC.

By: _H. Russell Hatting_

Its: _____

Vice President

By: _____

Its: _____

7

ILFC 0000384

EXHIBIT A
61

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-20028A (MSN 24544)

## EXHIBIT A

## RETURN ACCEPTANCE RECEIPT

Date: _____, _____

1.    RYAN INTERNATIONAL AIRLINES, INC. ("LESSEE") and WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its individual capacity but solely as Owner Trustee pursuant to the Trust Agreement ("LESSOR") have entered into an Aircraft Lease Agreement dated as of January 10, 2005 (the "Lease").   Words used herein with capital letters and not otherwise defined will have the meanings set forth in the Lease.

2.    LESSOR has this ____ day of _____, _____ (Time: _____) at _____ received from LESSEE possession of:

     (a)    One (1) B757-20028A Aircraft bearing Manufacturer's serial number 24544, together with one (1) RB211-535-E4 Engine bearing manufacturer's serial number 30751, an APU bearing manufacturer's serial number ____, and all Parts attached thereto and thereon in an airworthy condition and

     (b)    All Aircraft Documentation, including the usual and customary manuals, logbooks, flight records and historical information regarding the Aircraft, Engines, APU and Parts, as listed in the Document Receipt attached hereto.

3.    The Aircraft had the following seating configuration at return:

     _____ first          _____ business          _____ coach

4.    Lower crew rest (LD MCR) is / is not installed (circle one) at return.

5.    The Airframe, Engine, APU and Parts had the following hours/cycles at return:

     (a)    Airframe:

          Maximum gross takeoff weight: _____ pounds/kilos (circle one)

          Total hours: _____    Total cycles: _____

     (b)    Engine Information:

8

C:\DOCUMENTS AND SETTINGS\JOHN FREZZA\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OST\LODX0CUME0\LETTER AGREEMENT 802 E ~ ACL 04 220 (RYAN INTERNATIONAL 24544) (2).WPD

ILFC 0000385

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-2002BA (MSN 24544)

| Serial No | Total Hours | Total Cycles |
|---|---|---|

ENGINE #1:

| ENGINE LIFE LIMITED PART NAME | Part Number | Cycles Remaining to Next Life limited Part Removal |
|---|---|---|

   (c)   APU:

        Part number _____

        Serial number _____

        Total hours: _____

        Total cycles: _____

        _____ hours/_____ cycles since last hot section refurbishment

        _____ hours/_____ cycles remaining on APU life limited Parts

   (d)   Landing Gear:

| Position | Serial No. | Total Hrs/Cycles/Days | Hrs/Cycles/Days since last Overhaul | Date of last Overhaul |
|---|---|---|---|---|
| Nose | | | | |
| Left Main | | | | |
| Right Main | | | | |

9

ILFC 0000386

EXHIBIT A

63

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-20022A (MSN 24544)

6.     The amount of fuel on board at return is _____ pounds/gallons/kilos of fuel (circle one).

7.     Other technical information regarding the Aircraft and its components are correctly set forth on the Technical Evaluation Report (in the form of Exhibit M) attached hereto.

8.     With reference to Article 12.9 of the Lease regarding reimbursement from the Reserves after return of the Aircraft:

_____     There are no claims for reimbursement from the Reserves which will be submitted after the date hereof.

or

_____     Claims for reimbursement from the Reserves will be submitted after the date hereof for the following:

Type of Work                                        Estimated Invoice Amount

9.     LESSEE confirms that it has delivered to LESSOR all free of charge kits for the Aircraft received by LESSEE and not installed on the Aircraft.

10.     The above specified aircraft, engines and documentation are hereby accepted by LESSOR subject to (a) the provisions of the Lease and (b) correction by LESSEE (or procurement by LESSEE at LESSEE's cost) as soon as reasonably possible of the discrepancies specified in the list attached.

11.     Subject to the following paragraph, the leasing of the Aircraft (excluding LESSOR's Engine bearing serial number 30752) by LESSOR to LESSEE pursuant to the Lease is hereby terminated without prejudice to LESSEE's continuing obligations under the Lease including, without limitation, paragraph 10(b) above and Articles 4, 9.5, 15, 16 and 17 of the Lease.   For the avoidance of doubt, the Lease remains in full force and effect with respect to the Engine bearing serial number 30752 until a Return Acceptance Receipt is executed with respect to such equipment. In addition, the Engine bearing serial number 30752 has the following useage:

Serial No                 Total Hours                 Total Cycles

10

CADOCUMENTS AND SETTINGS\JOHN FREZZA\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\KOU.ME\ORLETTER AGREEMENT 602 E ~ ACL 04 220 (RYAN INTERNATIONAL 24544) (2).WPD

ILFC 0000387

**EXHIBIT A**

**64**

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-20028A (MSN 24544)

ENGINE MSN 30752:

| ENGINE  LIFE LIMITED PART NAME | Part Number | Cycles Remaining to Next Life limited Part Removal |
|---|---|---|

12.    This Return Acceptance Receipt is executed and delivered by the parties in
_____ [place].

IN WITNESS WHEREOF, the parties hereto have caused this Return Acceptance Receipt to be executed in their respective company names by their duly authorized representatives as of the day and year first above written.

WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, not in its

RYAN INTERNATIONAL AIRLINES, INC.

By:                                                    By:

Printed Name: _____            Printed Name: _____

Its: _____                          Its: _____

ATTACHMENTS:
1.    List of discrepancies
2.    List of Aircraft Documentation
3.    Current Aircraft layout passenger arrangement (LOPA)
4.    Incident/accident letter
5.    Dent and damage chart

11

ILFC 0000388

EXHIBIT A
65

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B737-20028A (MSN 24544)

6.   List of loose equipment
7.   List of free of charge kits
8.   Engine disk sheets
9.   Engine power assurance test conditions and results
10.  Engine trend data
11.  Technical Evaluation Report (in the form of Exhibit M)

12

C:\DOCUMENTS AND SETTINGS\JOHN FREZZA\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\OXK\MEDN LETTER AGREEMENT 400 S – ACL 04 22D
(RYAN INTERNATIONAL 24544) (2).WPD

ILFC 0000389

EXHIBIT A
66

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-20022A (MSN 24544)

## EXHIBIT B

## ORIGINAL ENGINE RECOGNITION LETTER

December 21, 2007

OWNER OF TEMPORARY AIRCRAFT
[address]

Ladies and Gentlemen:

We the undersigned are the owner of a Rolls Royce RB211-535E4 engine bearing manufacturer's serial number 30752 (the "**Engine**") which is leased to Ryan International Airlines, Inc ("**Ryan**") pursuant to an Aircraft Lease Agreement dated as of January 10, 2005 between Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement ("**Wells Fargo**") and Ryan (the "**Lease**").

We understand that you have leased to Ryan one (1) _____ aircraft bearing manufacturers serial number _____ (the "**Aircraft**").

You agree that you will recognize Wells Fargo's rights and interests in the Engine and you will not claim as against us, any right, title or interest in the Engine as a result of such Engine being installed on the Aircraft or any other aircraft owned by you and leased to Ryan.

Similarly, Wells Fargo agrees that it will recognize _____'s rights and interests in the engines owned by _____ and leased by _____ to Ryan (whether leased as part of an aircraft lease or as spare engines) and Wells Fargo will not claim, as against you, any right, title or interest in such engines.

This letter shall be governed by and construed in accordance with the laws of the State of California.

This letter will become effective only upon signature by both you and Wells Fargo and delivery of the completely executed version of this letter to Wells Fargo.  Please indicate your agreement to the above by signing in the space provided below and returning a copy of this letter

13

C:\DOCUMENTS AND SETTINGS\JOHN FREZZA\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\KXJ.4HEO8\LETTER AGREEMENT #02 E ~ AGL D4 229 (RYAN INTERNATIONAL 24544) (2).WPD

ILFC 0000390

**EXHIBIT A**

**67**

Letter Agreement No. 2 to Aircraft Lease Agreement
Boeing B757-2002EA (MSN 24544)

to us by fax or electronic mail.   Execution and delivery of this letter by fax or e-mail will be deemed as valid as if we each had executed and delivered originals of this letter.

Very truly yours,

WELLS FARGO BANK NORTHWEST, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement, as Lessor

By:_____

Title:_____

_____
hereby agrees with the foregoing.

By:_____

Title:_____

14

C:\DOCUMENTS AND SETTINGS\JOHN FREZZA\LOCAL SETTINGS\TEMPORARY INTERNET FILES\CONTENT.OUTLOOK\J0KJME08\LETTER AGREEMENT #02 E ~ ACL 04 220 [RYAN INTERNATIONAL 24544] (2).WPD

ILFC 0000391

# EXHIBIT

# 21

**Prepared at the request of counsel in conjunction with litigation**

Corrected: April 17, 2010

ILFC Exhibit per Letter 2/10/2010

Ryan International Airlines
Corrected Amounts

| | | | | |
|---|---|---|---|---|
| $87,097.00 | Item 1 | $43,548.39 | | Aircraft Double Rent removed  3/8/2008 to 3/17/2008 |
| | | | | $135,000 / 31 Days = $4354.84 per day x 10 days = $43,548.39 x 2 double rent = $87,096.78 |
| | | ($135,000.00) | | Aircraft Double Rent removed 2/6/2008 to 3/7/2008 |
| | | | | $135,000 x 2 double rent = $270,000      PAID 2/5/2008 |
| $17,000.00 | Item 2 | $17,000.00 | OK | Engine Rent 3 mos. x $5000 per month = $15,000 |
| | | | | $5000 / 30 = $166.67 x 12 days = $2,000 |
| | | | | 3/18/2008 thru 8/29/2008 |
| $164,367.00 | Item 3 | $45,000.00 | | Engine double Rent removed 6/30/2008 thru 3/31/2009 |
| | | | | 6/30/2008 to March 31, 2009 |
| | | | | $5000 x 9 mos. = $45,000 |
| | | | | Remove all engine rent from March 31, 2009 thru Nov 12, 2009 |
| | | | | Engine was not installed on Ryan aircraft and ILFC terminate lease on 3/31/2009 |
| $561.25 | Item 4 | $561.25 | OK | FAA Filing |
| $87,983.00 | Item 5 | $87,983.00 | OK | Boeing Kit and Buy Out for non flush repairs |
| $1,142,684.80 | Items 5 and 6 | $1,142,684.80 | | ILFC Paid Ameco on |
| | | | | June 30,2009      Payment $1,181,893 less credit of $39,208.20 |
| $12,807.69 | Item 8 | $12,807.69 | OK | Technical expense to visit Ameco |
| $62,500.00 | Item 9 | $62,500.00 | | Engine not shipped to ATC until 11/4/2009 |
| | | | | Engine arrived ATC on 11/24/2009 |
| $39,974.58 | Items 10, 11 ,12 | $39,974.58 | OK | Technical expense to visit ATC Lashern and shipping of records |
| | | | | abatement of rent Air Slovakia |
| 1,804,999.32 | Sub Total | $1,367,059.71 | | Sub Total |
| | | $0.00 | | Aircraft Delivery was 2/8/2005 Paid Rent from 2/5/2005 |
| | | | | $135,000 / 28 days = $4,821.43 x 3 days = $14,464.25  Over PAID 3 days |
| (401,123.80) | Credit MR | (401,123.80) | | Maintenance Reserve Credit for |
| | | (90,240.00) | | Rolls Royce Engine repairs to man 30746 after return on 2/26/2010 |
| | | (8,660.00) | | Tes Shop Stand and Equipment per Pro Forma # 13386 |
| | | (90,000.00) | | Lease engine from TES for 45 days during repairs |
| | | (247,800.00) | | Ameco Engine ready to ship and install on 6/30/2009 held until 11/4/2009 |
| | | $0.00 | | Lease TES engine from July 1, 2009 until November 4, 2009 when engine shipped to ATC |
| | | $0.00 | | Engine man 30752 installed between 11/24/2009 and 11/30/2009 |
| | | (173,400.00) | | No  Leased engine from 11/4/2009 until November 30, 2009 |
| | | | | Lease Tes engine December 1, 2009 until February 25, 2009 when Ryan received man 30746 |
| 105,200.09 | ILFC Legal Expense Feb 12, 2009 | | | |
| 114,217.18 | Default Interest until Feb 12, 2010 | ($300,000.00) | | Security Deposit under Lease $300,000 |
| | | ($56,742.80) | | See worksheet calculations |
| | | | | Maintenance reserves adjusted see 2/26/2010 ILFC letter vesus Jim Briscoe summary |
| $1,423,288.79 | Per ILFC Amount Due per Exhibit | -$56,786.89 | | Amount Due Prior to Legal and Default interest |

*Exhibit*
*21*

Slevin 7-15-10.txt

1

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4                ---oOo---

5    WELLS FARGO BANK NORTHWEST,
     NATIONAL ASSOCIATION, a Utah
6    corporation, not in its individual
     capacity, but solely as Owner
7    Trustee, and TRITON AVIATION
     INTERNATIONAL LLC, a Nevada
8    limited liability company,
              Plaintiffs,
9    vs.
                              No. CV09-3489AHM(JWJx)
10   RYAN INTERNATIONAL AIRLINES, INC.,
     a Kansas corporation,
11            Defendants.

12   _____/

13

14

15          DEPOSITION OF GARRETH T. SLEVIN

16

17

18        Taken before TARA A. LOHMAN

19            CSR No. 13428

20           July 15, 2010

21

22

23

24

25

2

1              I N D E X

2                              PAGE

Page 1

EXHIBIT B
71

Slevin 7-15-10.txt

25        A.  Would have reviewed the lease for commercial


Aiken Welch Court Reporters    G. Slevin    7/15/2010

14

1    terms and for any, basically, agreed commercial terms

2    with ILFC -- or not with ILFC.  But to approve commercial

3    terms.  Then ILFC would have negotiated with Ryan.

4         Q.  Do you review every lease agreement that Triton

5    enters into?

6         A.  I review sections of lease agreements, yeah.

7         Q.  Do you review -- well, what sections?

8         A.  Rent, insurance values, maintenance reserve

9    rates, the monetary commercial terms.

10        Q.  Do you do that for every lease that Triton

11   enters into?

12        A.  I -- not necessarily every lease.  If a

13   colleague of mine happens to review it, he happens to

14   review it and Sean O'Connor.

15        Q.  Do you have any personal recollection of

16   specifically reviewing --

17        A.  I believe --

18        Q.  -- the aircraft lease in question here?

19        A.  I believe I did.

20        Q.  When did you review it?

21        A.  Sometime before the lease was executed.

22        Q.  Who provided you with a copy of the lease?

23        A.  ILFC.

24        Q.  Do you know who at ILFC?

25        A.  I can't recall.


Page 13

**EXHIBIT B**

**72**

Slevin 7-15-10.txt

2  somebody; is that correct?

3      A.  I can't recall.  I mean --

4      Q.  I know.  I'm not trying to fool anybody, I just

5  want to make sure we got it.  Now, the question is:  Did

6  you communicate with anybody directly at Triton?

7      A.  Yes, I would have.

8      Q.  Who did you communicate with at Triton?

9      A.  Mostly likely with Raquel Brinkman.  She's the

10  Director of Accounting and Finance at Triton.  I may have

11  communicated directly with Steve White.  He's the

12  Managing Director at Triton.

13      Q.  Okay.  Do you have any recollection of what you

14  said to Raquel or what she said to you?

15          MR. MALZAHN:  Objection.  Vague.

16          THE WITNESS:  I don't have a recollection of any

17  particular conversations.  But I would have gone over

18  commercial terms covenants.

19  BY MR. LESTER:

20      Q.  But you don't recall exactly what you said to

21  her and what she may have said to you?

22      A.  No --

23          MR. MALZAHN:  Objection.  Misstates the

24  testimony.

25          THE WITNESS:  -- I don't.


Aiken Welch Court Reporters    G. Slevin    7/15/2010

18

1          MR. MALZAHN:  Vague.

2  BY MR. LESTER:

3      Q.  Okay.  Do you have any recollection of what you

Page 16

**EXHIBIT B
73**

Slevin 7-15-10.txt

4   said to the in-house counsel at ILFC?

5         MR. MALZAHN:  Objection.  Vague.

6         THE WITNESS:  Sorry, I don't know what happens

7   now.

8   BY MR. LESTER:

9         Q.  Do you understand the question?

10        A.  I understand the question.

11        Q.  You understand we're talking about the time

12   frame, late 2004, early 2005, before the lease was

13   executed?

14        A.  Yes.

15        Q.  Or in that time frame.  And you previously

16   testified that you discussed this lease --

17        A.  Yeah.

18        Q.  -- with some in-house counsel at ILFC.

19        A.  Right.

20        Q.  So do you recall, during that conversation or

21   conversations, what you said to the in-house counsel for

22   ILFC, and what --

23        A.  No.  I don't recall the conversation.  I

24   don't --

25        Q.  Okay.  And did you ever have any contact, or


Aiken Welch Court Reporters    G. Slevin    7/15/2010

19

1   have you ever had any contact with anybody at Ryan

2   International Airlines?

3         A.  Any contact with people at Ryan?

4         Q.  Right.

5         A.  Yeah.  I have met some of the management of Ryan

Page 17

Slevin 7-15-10.txt

6    at industry conferences.

7        Q.  And do you recall who those individuals may have

8    been?

9        A.  No.  I'd have to look at my Rolodex or my

10   contact list.

11       Q.  Okay.

12       A.  I can see his face.

13       Q.  Have you had any contact with any individual at

14   Ryan in regards to this aircraft in this lease?

15       A.  No.

16       Q.  Okay.  Who negotiated this lease agreement

17   between Ryan and Wells Fargo/Triton to the best of your

18   knowledge?

19       A.  I believe John Pleuger, P-l-e-u-g-e-r. He is an

20   ILFC -- he was the President of ILFC.

21       Q.  Okay.  When you say, "He was the President of

22   ILFC," do you know -- is he no longer with --

23       A.  He's no --

24       Q.  -- ILFC?

25       A.  He no longer works for ILFC.


Aiken Welch Court Reporters   G. Slevin    7/15/2010

                                                    20

1        Q.  Do you know where he works?

2        A.  Airlease LLC.

3        Q.  And where is that located?

4        A.  Until Century City, LA.

5        Q.  All right.  Were there any -- and then to the

6    best of your knowledge was the lease agreement we're

7    talking about executed by Wells Fargo/Triton and Ryan
                        Page 18

Slevin 7-15-10.txt

8      some time in early 2005?

9          A.  Yes.

10         Q.  Okay.  And did you have any other -- other than

11     what you've described here today, do you have any other

12     involvement with the negotiation and the execution of

13     that lease that we haven't talked about?

14             MR. MALZAHN:  Objection.  Vague.

15             THE WITNESS:  No, I don't believe so.

16     BY MR. LESTER:

17         Q.  Okay.  Then what was your next involvement with

18     this lease or aircraft when were you next contacted,

19     assuming you were?

20             MR. MALZAHN:  Objection.  Vague.

21             THE WITNESS:  At return I -- at the return of

22     the aircraft, one of the engines failed delivery

23     commissions, and the Side Letter had to be raised, and

24     the issue was communicated through Triton.

25


       Aiken Welch Court Reporters    G. Slevin    7/15/2010

                                                            21

1      BY MR. LESTER:

2          Q.  So when -- how did you hear about this?

3          A.  Well, when I say "Triton" I would have been

4      involved in that communication as well.

5          Q.  *Well, you don't receive a communication from

6      anybody at Ryan, did you?

7          A.  No.

8          Q.  Okay.

9              MR. MALZAHN:  Counsel, could I ask since, you

                           Page 19

Slevin 7-15-10.txt

20        MR. LESTER: I believe I am.

21        MR. MALZAHN: I'll let the question proceed.

22        THE WITNESS: So the question is?

23        MR. MALZAHN: Can you just reread the question?

24        THE COURT REPORTER: Sure.

25              (*Question was read back.)


Aiken Welch Court Reporters   G. Slevin   7/15/2010

27

1         MR. MALZAHN: Objection. Calls for speculation.

2         THE WITNESS: If Ryan notified Triton, I'm

3    unaware of it.

4    BY MR. LESTER:

5         Q. Okay. Were you involved with the negotiations

6    of what you refer to in your Affidavit as the Side Letter

7    Agreement, too?

8         A. Sorry, could you say it -- was I involved or --

9         Q. Yes. Were you --

10        A. In the negotiation?

11        Q. In the negotiation.

12        A. Side Letter No. 2 would have been drafted by

13   ILFC. And the resolution of the issue that -- the return

14   issue that Side Letter No. 2 addressed would have been

15   explained to myself, and I would have communicated that

16   back to Triton. We would have taken the recommendation

17   of ILFC to execute an outside letter agreement.

18        Q. When you say "we" --

19        A. When I say "we" I mean Triton and I.

20        Q. Okay. And Triton pays you or for your advice?

21        A. Correct.

Page 25

**EXHIBIT B**
**77**

Slevin 7-15-10.txt

10    Q.  If we point to -- or you look at the last

11  sentence in Paragraph 2 of the Affidavit where I'm

12  referring to.  It says you have, "personal knowledge of

13  the facts set forth herein."

14        What's your understanding of the terms you have

15  "personal knowledge of the facts"?

16    A.  That I have knowledge about this Affidavit.

17    Q.  Okay.  Was it knowledge because certain people

18  have told you certain things, or knowledge because you

19  participated in it and you have --

20    A.  Because I would have had experience of the issue

21  at hand.

22        MR. MALZAHN:  If you want to ask him about

23  particular paragraphs, maybe that would --

24        MR. LESTER:  I'm just trying to get what he --

25        MR. MALZAHN:  -- be easier.


Aiken Welch Court Reporters    G. Slevin    7/15/2010

                                                            38

1        MR. LESTER:  I appreciate your help, but it

2   would be a lot quicker if you just let me go through the

3   deposition.

4     Q.  And you mentioned earlier the issue, if you

5   recall, we talked about the Side Letter Two Agreement; do

6   you recall that?

7     A.  Yes.

8     Q.  And you may have talked to somebody at ILFC

9   about that, but you didn't negotiate that Side Letter

10  Agreement No. 2, did you?

11    A.  No.  I would have talked to somebody at ILFC

                        Page 35

Slevin 7-15-10.txt

Aiken Welch Court Reporters    G. Slevin    7/15/2010

46

1    Q.  Is that correct?  I don't know.  I'm asking you.

2    A.  Yes.

3    Q.  Okay.  Were you involved in the Zoom lease?

4    A.  I would have had the same level of involvement

5    as I explained I had with the Ryan lease.

6    Q.  All right.  So you reviewed it, you know the

7    transaction is going on; is that correct?

8    A.  Correct.

9    Q.  Ryan returns the aircraft to Triton with the

10   substitute engine.  That happened; correct?

11   A.  Correct.

12   Q.  And then Triton went out and leased the

13   substitute aircraft to Zoom?

14   A.  Correct.

15   Q.  I presume at market rates at the time?

16   A.  At the time, yeah.

17   Q.  I mean, they're not shipping this out and

18   leasing it out below market rates.  They're getting the

19   top dollar they can; is that correct?

20   A.  They're getting market rate.

21   Q.  Okay.  So during the time period that the

22   aircraft was leased to Zoom, what damages did Triton

23   incur?

24       MR. MALZAHN:  Objection.  Vague.

25

Aiken Welch Court Reporters    G. Slevin    7/15/2010
Page 43

**EXHIBIT B**
**79**

Slevin 7-15-10.txt

3        If the engine failed, that particular engine

4   failed, there was -- the contract with Air Slovakia

5   placed all of the burden and the costs and the damage and

6   the cost associated with that with the down time of the

7   loss of revenue to Air Slovakia, all of those costs would

8   be on Triton's shoulders.

9        So, you know, I think it will -- to answer your

10  question, I think, you know, it's very difficult to

11  quantify.  But, yeah, absolutely.

12      Q.  That last item you talked about, about down time

13  and all of these tragic events and costs of Triton, that

14  never happened, did it?

15      A.  Could have happened.

16      Q.  All right.  But it didn't happen, did it?

17      A.  It didn't happen.

18      Q.  No. So those costs and those damages were never

19  incurred by Triton?

20      MR. MALZAHN:  Objection.  Vague as to which

21  costs.

22  BY MR. LESTER:

23      Q.  The cost which Mr. Slevin was just talking

24  about, this drastic event of the plane where the engine

25  failed while it was in the possession of Air Slovakia.


Aiken Welch Court Reporters   G. Slevin   7/15/2010

                                              50

1       A.  No, it didn't.

2       Q.  Okay.  And, in fact, the original engine was

3   returned and was put back on the aircraft in question

4   prior to any damages being incurred by Triton because of

                    Page 46

**EXHIBIT B**
**80**

Slevin 7-15-10.txt

17    Q.  -- that they weren't -- well, can you point to

18  any actual damages that Triton incurred as a result of

19  Ryan's failure to not return the original engine with the

20  aircraft?

21    A.  Any actual damages that were not looking for

22  this litigation; is that your question?

23    Q.  Yes.

24    A.  No.  Again, it's a -- we're marketing an

25  aircraft that has an airframe and one engine.  And as to


Aiken Welch Court Reporters    G. Slevin    7/15/2010

57

1  how that, you know, translates to an actual damage, it's

2  a difficult to ascertain.  I do know that -- I believe

3  that Ryan signed the Side Letter No. 2 and agreed to pay.

4    Q.  Sure.

5    A.  Yes.

6    Q.  I understand.

7    A.  So they would have been aware of the -- I think

8  they were aware of what they were signing.

9    Q.  I assume so, too.

10    A.  Yeah.

11    Q.  But as it relates to the actual damages that

12  they incurred as it relates to this, in fact, Triton has

13  sued Ryan in this case to recover its collected actual

14  damages as well as the double rent; would you agree with

15  that?

16    A.  Correct.

17    Q.  Other than the double rent.  If you exclude the

18  double rent, are you aware of any actual damages which

Page 53

**EXHIBIT B**
**81**

Slevin 7-15-10.txt

19    Triton incurred in this case --

20          MR. MALZAHN:  Objection --

21    BY MR. LESTER:

22       Q.  -- that it hasn't --

23          MR. MALZAHN:  Objection.  Asked and answered.

24    BY MR. LESTER:

25       Q.  -- sued for?


       Aiken Welch Court Reporters   G. Slevin   7/15/2010

                                                              58

1        A.  Asked and answered.

2        Q.  Well, you can answer.

3        A.  Okay.  No.

4        Q.  Okay.

5        A.  I don't recall, or would have -- you'd have to

6    give me a bit more time to actually -- if you give me

7    some more time, I might --

8        Q.  I'm just asking you to best of your knowledge as

9    you sit here today --

10       A.  Right here on the spot today, with the minute to

11   think about it, no. You know, perhaps with more time I

12   could --

13       Q.  Okay.

14       A.  -- answer -- have a better answer.

15       Q.  Okay.  But you had advance notice of your

16   deposition being taken today; is that correct?

17       A.  I didn't have a transcript of your questions.

18       Q.  No.  I know that.  But you knew that the

19   deposition was going to be taken today?

20       A.  You called the depositions last week some time,

                    Page 54

EXHIBIT B
82

Slevin 7-15-10.txt

Aiken Welch Court Reporters    G. Slevin    7/15/2010

62

1       Q.  But you don't know for sure in this case?

2       A.  I'm unaware of any particular conversations that

3    ILFC technical had with Ryan technical.

4       Q.  Right.

5       A.  No.

6       Q.  Okay.  You mentioned at one point that one of

7    the damages which Triton could incur related to its

8    bondholders; is that correct?

9       A.  Yes.

10      Q.  Do you recall you made that statement in the

11   Affidavit?

12      A.  I do.

13      Q.  Who owns -- well, how much does Triton have on

14   outstanding bonds on their --

15          MR. MALZAHN:  Objection.  Calls for speculation.

16   BY MR. LESTER:

17      Q.  If you don't know, you don't know.

18      A.  Approximate number?

19      Q.  Yeah.

20      A.  Maybe just do super calculation here.  Somewhere

21   between 4 and 500 million dollars.

22      Q.  Okay.  Do you know -- how many -- is that all

23   one bond issue or multiple different bond issues?

24      A.  The number I just talked about was one issue.

25      Q.  Okay.  Do you know is that --

Aiken Welch Court Reporters    G. Slevin    7/15/2010

Page 58

**EXHIBIT B**
**83**

Slevin 7-15-10.txt

63

1       A.  Multiple troubles, one issue.

2       Q.  Okay.  Is that the publicly-traded bond issue?

3       A.  It's a Ray Gas Rugger 144 (phonetic).

4       Q.  And can you just explain for the record, as well

5   as me, exactly what that means?

6       A.  It's basically a bond issue to sophisticate

7   investors.

8       Q.  It's a private --

9       A.  Private.

10      Q.  There's no market for it?

11      A.  There is a market, but it's not like a public

12  stock.

13      Q.  Very limited market?

14      A.  It's a limited market.

15      Q.  Okay.  And do you know what impact, if any, that

16  the transactions with Ryan and Triton had on those bonds?

17      A.  It would be negative.

18      Q.  Do you know if there was any impact at all --

19      A.  Do I know if --

20      Q.  -- on the bonds?

21      A.  If a particular bondholder traded out of his

22  bond at a price, that may have pulled the bond price down

23  lower.

24      Q.  Yes.

25      A.  Do I know of a particular trade?

Aiken Welch Court Reporters   G. Slevin   7/15/2010

64

Page 59

EXHIBIT B
84

Slevin 7-15-10.txt

1    Q.  Right.

2    A.  No.  I don't know of a particular trade.

3    Q.  If a trade did take place, it would be the

4    bondholder not Tritan who would suffer the loss; is that

5    correct?

6    A.  Indirectly, Triton would also suffer because the

7    bonds are rated by rating agencies SMP.

8    Q.  And what are they currently rated?

9    A.  Triple B minus, I believe.  But, you know --

10   Q.  And what were they rated in 2005, if you know?

11   A.  I can't answer.  I can't remember.

12   Q.  Do you know has their rating changed at all in

13   the last year?

14   A.  Ratings have changed, yeah.

15   Q.  This rating with the rating on the Triton or

16   ratings in general have changed throughout the

17   marketplace --

18   A.  Triton --

19   Q.  -- over the last year?

20   A.  The rating of the Triton bonds have changed.

21   Q.  And how has it changed?

22   A.  In what period?

23   Q.  During the last year.

24   A.  Last year?  You are going to have let me consult

25   my records.


Aiken Welch Court Reporters    G. Slevin    7/15/2010

65

1    Q.  So you don't know whether the bond rating went

2    up or down?

Page 60

EXHIBIT B
85

Slevin 7-15-10.txt

5    the last year.

6        Q.  Okay.

7        A.  Does that answer your question?

8        Q.  But you don't know of any?

9        A.  It wouldn't surprise if I researched if an

10   aircraft lessor bond had been upgraded.

11       Q.  Given the state of the airline industry and the

12   type of Zoom, Air Slovakia -- I mean, we've already

13   talked about two that have gone under --

14       A.  Okay.  You asked specifically about lessor

15   bonds.

16       MR. MALZAHN:  Why don't we allow, for the Court

17   Reporter's sake, let's allow for a question and then an

18   answer and try not to speak over each other.

19       THE WITNESS:  Sure.

20       MR. MALZAHN:  Do you want to start with a new

21   question?

22   BY MR. LESTER:

23       Q.  Yes.  In Paragraph 8 you give a scenario that

24   there's a risk Triton would not be able to fulfill

25   delivery commitments to the next lessee if Ryan failed to


Aiken Welch Court Reporters    G. Slevin    7/15/2010

67

1    return to the aircraft.

2        Well, on this case didn't Triton fulfill its

3    delivery commitments to Zoom?

4        A.  Can you --

5        Q.  Paragraph 8, Page 3.  Do you have that

6    deposition, Exhibit H?

Page 62

**EXHIBIT B**
**86**

Slevin 7-15-10.txt

7          MR. MALZAHN:  I believe the witness is asking to

8  take a break.  Is that what you're asking?

9          THE WITNESS:  Yeah.

10         MR. MALZAHN:  Generally --

11         THE WITNESS:  Two seconds.

12         MR. MALZAHN:  It's generally -- we, you know, if

13  there's a question pending.

14         THE WITNESS:  Okay.

15         MR. MALZAHN:  Now --

16         THE WITNESS:  We can go through this question.

17         MR. LESTER:  If you want to take a break, that's

18  fine.  I'm not that picky about that if you're confused.

19         Off the record.

20             (A break was taken off the record.)

21         THE WITNESS:  Your question is:  Did Triton

22  fulfill its delivery conditions to Zoom?

23  BY MR. LESTER:

24     Q.  Right.

25         MR. MALZAHN:  Objection.  Vague as to "delivery


           Aiken Welch Court Reporters   G. Slevin   7/15/2010

                                                         68

1  conditions".

2          THE WITNESS:  Triton would have fulfilled the

3  delivery conditions as prescribed in the lease, yeah.

4  BY MR. LESTER:

5     Q.  Okay.

6     A.  To Zoom.

7     Q.  And Triton was not forced to restart its

8  marketing efforts on an expedited basis to find another

                    Page 63

**EXHIBIT B**
**87**

Slevin 7-15-10.txt

9  adequate lessee for the aircraft, was it?

10      A.  I'm sorry, repeat the first part, please.

11      Q.  And Triton was not forced to restart its

12  marketing efforts on an expedited basis to find another

13  adequate lessee for the aircraft in question?

14      A.  No.

15      Q.  And Triton was not -- did not incur any

16  additional costs relative to negotiating its lease with

17  Zoom or repaying the plane for Zoom or changing out some

18  avionics?

19          MR. MALZAHN:  Objection.  Asked and answered.

20  BY MR. LESTER:

21      Q.  I don't believe I asked that one.

22      A.  It didn't suffer any additional cost for

23  changing out avionics?

24      Q.  Right.  Do you use those as examples of

25  additional --


        Aiken Welch Court Reporters   G. Slevin   7/15/2010

                                                        69

1       A.  I see --

2       Q.  -- possible damages --

3       A.  I see.

4       Q.  I just want to clarify that Triton did not incur

5   any of those costs that you identify in Paragraph 8,

6   Lines 14 through --

7       A.  Because it was able to deliver to Zoom, yes.

8       Q.  Okay.  You say, starting over on the left-hand

9   side there's numbers for the lines --

10      A.  Sure.

                    Page 64

Slevin 7-15-10.txt

11      Q.   On Line 21.

12      A.   Uh-huh.

13      Q.   "In total, Triton could have suffered more than

14   $1.4 million in damages as a result of Ryan's late return

15   of the aircraft."

16      A.   Yep.

17      Q.   What makes up that $1.4 million?

18      A.   If Zoom didn't accept the aircraft, which they

19   did, but Zoom could have refused to accept the aircraft.

20      Q.   But they didn't; is that correct?

21      A.   You're asking me how I --

22      Q.   I know.  But it would seem to me, then, that you

23   could calculate the damages for the late return of an

24   aircraft, as you did there coming up with $1.4 million?

25      A.   This is an example of what might have happened


Aiken Welch Court Reporters   G. Slevin   7/15/2010

70

1    if we had to suffer, say, a six-month AOG, Aircraft on

2    Ground, as a result of Zoom not accepting the aircraft.

3       Q.   Right.  But you still can measure those damages?

4       A.   You can approximate them.

5       Q.   Right.  Okay.  And then we talk about, and we

6    talked about this slightly a little bit earlier, but I

7    don't think we finished the questions.  We looked at the

8    lease, and the Side Letter No. 2.  The aircraft, when it

9    went to Zoom, had one of Ryan's engines on it; right?

10      A.   Correct.

11      Q.   Okay.  Triton didn't pay Ryan any rent for that

12   engine, did it?

Page 65

EXHIBIT B
89

Slevin 7-15-10.txt

17    correct?

18        A.  I just -- yeah, that they did.

19        Q.  Paragraph 13 of your Affidavit you state,

20    starting at Line 19, "Additionally, Triton's financial

21    exposure to the reserves reconciliation under Paragraph 6

22    of Side Letter No. 2 increased the longer Ryan failed to

23    return the original engine."  Do you see that?

24        A.  Paragraph 8 or --

25        Q.  Paragraph 13, I'm sorry, Line 19.


Aiken Welch Court Reporters    G. Slevin    7/15/2010

                                                        73

1        A.  19.  Okay.

2        Q.  On Page 5.

3        A.  Yep.

4        Q.  See the first sentence of that paragraph?

5        A.  Yeah.

6        Q.  Where I was trying to get at.

7        A.  Yep.

8        Q.  Those reserve reconciliations were actually paid

9    by Zoom to Triton; correct?  As long as Zoom had the

10   plane.

11       A.  No, not -- I don't believe all of it was paid.

12   No.  I mean --

13       Q.  I'm confused -- I'm sorry.

14       A.  I think in the bankruptcy of Zoom, some of these

15   amounts wouldn't have been paid.

16       Q.  But under the agreement with Zoom, had Zoom not

17   gone into liquidation, Zoom was required under its lease

18   to pay these reconciliations costs; is that correct?

                        Page 68

Slevin 7-15-10.txt

19    A.  They're required.  I don't think they paid all

20  of them, no.

21    Q.  Okay.  And do you recall when Zoom filed -- or

22  was liquidated?

23    A.  It was some time in 2007 or 8 -- 8.

24    MR. MALZAHN:  If you don't know --

25

Aiken Welch Court Reporters   G. Slevin   7/15/2010

74

1  BY MR. LESTER:

2    Q.  If you don't, quite frankly, it would be

3  surprising if it was 2000 -- I don't know.  They took the

4  plane some time in March.

5    A.  2008.  Okay.  So some time in 2008, then, I

6  think.

7    Q.  So they didn't make it out a year on the lease?

8    A.  Yes.

9    Q.  Pardon me?

10    A.  Yeah.

11    Q.  Okay.

12    MR. MALZAHN:  Just remember the audible answers

13  for the benefit of the Court Reporter.

14    THE WITNESS:  Yes.

15    MR. LESTER:  Okay.  Just give me one second.

16  That's really all I have.

17    THE WITNESS:  All right.

18    MR. MALZAHN:  I do not have any questions.

19

20        (whereupon, the deposition was concluded
        Page 69

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, a Utah corporation, not in its individual capacity, but solely as Owner Trustee; and TRITON AVIATION INTERNATIONAL LLC, a Nevada limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> RYAN INTERNATIONAL AIRLINES, INC., a Kansas corporation, <br><br> Defendant. | No. CV 09-3489 AHM (JWJx) |

DEPOSITION OF GUSTAVO MERIZALDE, a witness herein,

noticed by HINSHAW & CULBERTSON, LLP, at 11601

Wilshire Boulevard, Suite 800, Los Angeles,

California, at 1:30 p.m., on Tuesday, July 13, 2010,

before Amy J. Marsden, CSR 13067.

Hutchings Number 269068



**HUTCHINGS** ℠
**COURT REPORTERS**
**GLOBAL LEGAL SERVICES**

HEADQUARTERS:
6055 E. WASHINGTON BLVD., 8TH FLOOR
LOS ANGELES, CA 90040-2429

**800.697.3210**  323.888.6300
FAX: 323.888.6333 • www.hutchings.com

**EXHIBIT C**
**92**

1    delivery of the original engine, do you know if that

2    delay caused Triton any actual damage?

3        A.  I do not know.

4        MR. MALZAHN:  Maybe take a minute in about five

14:42    5    minutes or so?  Is that a good point for you?

6        MS. MEYER:  Yeah.  I need to get a new Exhibit A.

7        MR. MALZAHN:  Sure.

8        MS. MEYER:

9        Q.  I'm going to attach this as Exhibit C, which

14:43   10    is -- I'm going to ask that you review -- are you

11    familiar with that document?  [EXH-C]

12        A.  Yes.

13        Q.  Do you know what that -- please tell me what

14    that document is.

14:43   15        A.  This is my Declaration.

16        Q.  Did you draft that document or prepare that

17    document?

18        MR. MALZAHN:  Objection.  I'd caution the witness

19    not to divulge any attorney-client privilege.

14:43   20        THE WITNESS:  Yes.

21        MS. MEYER:

22        Q.  And in paragraph -- I call your attention to

23    paragraph 16 of your Declaration where you said that --

24    where you mentioned the damage in the Teflon sleeve.

14:44   25        A.  Mm-hmm, yes.

· 50

**EXHIBIT C
93**

1          Q.  Where you quote that the technical inspection

2    report about the Teflon sleeve being damaged in the

3    6:00 o'clock position.

4          Do you know what that means?  What was your

14:44  5    understanding of the nature of the damaged Teflon sleeve?

6          A.  It appears to me that this report -- this quote

7    is suggesting that there's wear and tear at the lower

8    position, which is what the 6:00 o'clock position is, of

9    the engine.

14:44  10          Q.  When it says "damage," you equate that to wear

11    and tear?

12          A.  In this case, I equate it to wear and tear.

13          Q.  Can you explain to me what a Teflon sleeve is

14    with reference to the temporary engine?

14:45  15          A.  A Teflon sleeve is a -- in laymen's terms, it's

16    a plastic wrap that goes around the fan portion of the

17    engine.

18          Q.  And what is the Kevlar wrap?

19          A.  The Kevlar wrap is underneath the so-called

14:45  20    plastic wrap or Teflon wrap.

21          Q.  And how is that -- how are -- how is the Teflon

22    sleeve important?  What is the function of the Teflon

23    sleeve with reference to engine?

24          A.  It protects the Kevlar wrap.

14:45  25          Q.  And the Kevlar wrap -- what does it do for the

51

**EXHIBIT C
94**

```
 1          THE WITNESS:  Maybe; maybe not.

 2          MS. MEYER:

 3          Q.  Do you know -- can you tell me from the

 4     documents you attached to this Declaration that this, the

15:19    5     AMM manual and the portion of the technical report that

 6     you mentioned in paragraph 16, what your understanding is

 7     of the exact nature of the damage to the Teflon sleeve in

 8     this particular instance?  Was it a hole?  A cut?  A

 9     dent?  What was it?

15:20   10          A.  Well, this portion of paragraph 16 --

11          Q.  Yes.

12          A.  -- that was pasted in, that was written up by

13     Ryan, not ILFC.

14          Q.  Correct.  But what was your understanding of the

15:20   15     nature of the damage?

16          A.  I -- I don't know specifically.  That there's

17     some type of wear and tear at the 6:00 o'clock position.

18     There were pictures in the Ryan report.  But as you could

19     see, they're not -- can't really determine from these

15:20   20     pictures the exact nature of the damage.

21          Q.  When you drafted your Declaration, are these the

22     same pictures -- when you pointed to pictures, you are

23     pointing to what page of your Declaration?

24          MR. MALZAHN:  I think the witness is referring to

15:21   25     page Bates-stamped ILFC 0009666.
```

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**EXHIBIT C**
**95**

1    would've gone the way it was supposed to, the engine

2    would've repaired before June 2008, Ryan would've

3    returned it to us, we would've returned them their

4    engine, and everybody would've been happy.

15:26    5        Here we are in April 2009, and Ryan still hasn't

6    repaired the engine, and that is what precipitated taking

7    control of the engine.

8        Q.  Did Ryan ever explain why they had not yet

9    repaired the engine?

15:26   10        MR. MALZAHN:  Objection.  Counselor, what does this

11    have to do with damages or Ryan's counterclaims?

12    Remember the scope of this deposition --

13        MS. MEYER:  I'm just trying to set a foundation,

14    Counsel.  I will get there.

15:27   15        Q.  Did Ryan ever explain to you why they had not

16    repaired the engine?

17        A.  Ryan, on a couple of occasions, gave some type

18    of an excuse.  But more so than not, they never conveyed

19    what was going on.

15:27   20        Q.  Was there a discussion at this -- in this

21    meeting, was there a discussion of terminating the lease

22    altogether and including the side letter agreement with

23    Ryan?

24        MR. MALZAHN:  Objection.  Vague.

15:27   25        THE WITNESS:  I don't know -- I'm not sure what you

65

**EXHIBIT C
96**

1    mean by that.  I mean, the aircraft -- I believe the

2    aircraft's already terminated because somebody else is

3    flying the aircraft.  You know what, I'm not sure.

4        MS. MEYER:

15:28    5        Q.  I just want to -- I want to know what was

6    discussed during that meeting.  Was there a discussion

7    about, you know, what the lease is going to look like

8    going forward?  A termination of the lease?  Were they

9    going to --

15:28    10        A.  I don't know -- the discussion was we need to

11    get this engine fixed, you guys want to get it fixed, we

12    want to get it fixed.  For whatever reason, Ryan is not

13    complying with their duties.  Jim acknowledged that, and

14    he asked for our help, and we took over the engine so --

15:28    15    so that we could get this thing going.

16        Q.  And that was the extent of the discussion?

17    There's no -- was there any discussion about continued

18    payment of rent by Ryan?

19        A.  Oh, yes.  All -- all liabilities stayed with

15:28    20    Ryan.  We were just doing the favor of managing it for

21    them since they were unable to handle that on their own.

22        Q.  Was that discussed at that particular meeting?

23        A.  Yes.

24        Q.  What was the nature of the discussion -- what do

15:29    25    you recall was said about the payment of rent?

66

**EXHIBIT C
97**

1    A.  We made it perfectly clear that all liabilities

2    associated with this transaction -- everything,

3    everything -- nothing goes away.  All we're doing is

4    going to get the engine through the shop.  As soon as we

15:29    5    get the engine done and we get it delivered, that's when

6    the liabilities would stop.

7    Q.  Who said -- who in particular said that?  Was

8    that -- did you say that to Ryan?

9    A.  I said it.  Brian said it.  Jim -- Jim Flynn

15:29    10    said it.  Jim con- -- concurred to it.  I concurred to

11    it.  Brian concurred to it.  We all -- we were all on the

12    same page.

13    Q.  And who -- I'm going to show you a document

14    marked Exhibit D and ask that you review it.  Ignore the

15:30    15    top part.  [EXH-D]

16    MR. MALZAHN:  So for the record, this document

17    purports to be --

18    MS. MEYER:  It's a three-page document.

19    MR. MALZAHN:  -- a three-page document.  An e-mail

15:30    20    on top with an attachment with an e-mail on top is dated

21    5/12/2010.

22    MS. MEYER:  And it attaches a -- an e-mail.  The

23    original message from Brian Monkarsh to several parties

24    with a copy to Mr. Merizalde that says -- and the subject

15:30    25    is the "Aircraft Lease Agreement," et cetera.

67

**EXHIBIT C
98**

         1         A.   Sorry.  I wasn't paying attention.

         2         Q.   It's 149.

         3         A.   149?

         4         Q.   Bates-stamped 149.

15:45    5         A.   I got it.  Okay.

         6         Q.   Under the reserve section.

         7         A.   Mm-hmm.

         8         Q.   If you could just read the first paragraph under

         9    Airframe Reserves.

15:45   10         MR. MALZAHN:  So I believe earlier in the day there

        11    was a colloquy on the record about this testimony.  So

        12    I'd like to include it here as well for ease of

        13    reference.

        14         Counsel for plaintiffs and counsel for defendant

15:45   15    have discussed this issue off the record.  It appears

        16    that the defendant is attempting to allege an additional

        17    offset that was not specifically stated in its

        18    counterclaims and has not been disclosed in any of the

        19    interrogatory responses.

15:46   20         So I'll allow some limited questions on the subject.

        21    Although it is position of plaintiffs that it's

        22    inappropriate.

        23         MS. MEYER:

        24         Q.   I call your attention to Article 12.1 under

15:46   25    Airframe Reserves where it says "Lessor will reimburse

                                    76

**EXHIBIT C
99**

1      Lessee from the Airframe Reserves for the actual cost of

2      the structural inspection portions of completed scheduled

3      'S4C' checks or equivalent as described in the MPD and

4      the rectification of any structural deficiencies

15:46  5      resulting from such checks," et cetera.

6          Do you see that?

7      A.   I do see that.

8      Q.   Have you -- are you familiar with that

9      provision?

15:46  10     A.   I am familiar with the provision.

11     Q.   What is a S4C inspection?

12     A.   Now, I just want to preface I'm an engine

13     specialist, not an airframe specialist.

14     Q.   To your understanding.

15:47  15     A.   So an S4C check is a inspection of the airframe

16     that is done on a certain interval as dictated by the

17     manufacturer and the operator's maintenance program.

18     Q.   And what is a -- what -- what, to your

19     understanding, do they mean when they say the "structural

15:47  20     inspection portions"?

21     A.   They're specifically talking about the airframe

22     and -- and the structure of the airframe.

23     Q.   Under -- and under that paragraph, is it your

24     understanding that if -- that Triton would have been

15:47  25     obligated to reimburse Ryan from the airframe reserves

77

EXHIBIT C
100

1    for any actual cost of those structural inspection

2    portion?

3        MR. MALZAHN:  Objection.  Calls for speculation and

4    a legal conclusion.

15:48   5        THE WITNESS:  You're speaking about the air frame;

6    right?

7        MS. MEYER:

8        Q.  Yes.

9        A.  Yes.

15:48   10        Q.  So if they had incurred such a cost, that would

11    have been reimbursable by Triton?

12        A.  Once again, I'm not an airframe specialist.  I

13    do not do airframe claim reimbursements.  I've never done

14    one.  I'm the wrong person to ask about airframe.

15:48   15        Q.  Well, are you familiar with engine performance

16    restoration reserves?

17        A.  Yes.  That is my cup of tea, so to speak.  I'm

18    sorry.

19        Q.  And under 12.2.1 where it says "Lessor will

15:48   20    reimburse Lessee from the Engine Performance Restoration

21    Reserves for the actual cost associated with performance

22    restoration of the Basic Engine during completed Engine

23    shop visits."

24        What -- what do they mean by that?

15:49   25        A.  So what they mean is, if an engine incurs a

78

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**EXHIBIT C**
**101**

1    performance restoration --

2        Q.  Okay.

3        A.  -- and a performance restoration is a level of

4    repair, a certain level of repair -- anything below

15:49   5    performance restoration is not reimbursable.  Everything

6    at performance restoration and above is reimbursable, we

7    would reimburse from the reserves.

8        What's interesting is that this engine -- the

9    original engine did not incur a performance restoration,

15:49   10   so it would not have qualified for reserves.

11       Q.  How do you know that?

12       A.  Because the work scope that Ryan generated and

13   based on my experience suggests that it did not incur a

14   performance restoration nor would any good engineer do a

15:50   15   performance restoration to this engine.

16       Q.  But if they had done a restoration, it would

17   have been a reimbursable event?

18       A.  If they had done a performance restoration, it

19   would've been a reimbursable event.  That is correct.

15:50   20       Q.  Do you know if Ryan had incurred such a cost for

21   this particular engine?  Did you -- did you just

22   testify -- and correct me.  My understanding is that you

23   testified that they did not.

24       A.  They did not do a performance restoration.

15:50   25       Q.  To your knowledge?

79

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**EXHIBIT C
102**

1      A.  Absolutely they did not do a performance

2      restoration.  Unequivocally no doubt.

3          Q.  Why do you -- why are you so sure?

4          A.  Because I have documents from Ameco that

15:50  5      suggests they don't.  Because I have the Ryan work scope

6      that says they're not doing a performance restoration or

7      it suggests they're not because of the work that was

8      called out.

9          Q.  Okay.  What about the 12 -- in Article 12.3 they

15:50  10     talk about the Engine LLP Reserves.

11         A.  Yes.

12         Q.  What is that exactly?

13         A.  So if you replace an LLP -- an LLP is an acronym

14     for life limited parts.  If you replace an LLP, you are

15:51  15     entitled to reimbursement for the cost of the LLP

16     replacement.

17         Q.  Do you know if Ryan incurred that cost in this

18     particular case?

19         A.  There were no LLP replacements during the shop

15:51  20     visit.

21         Q.  And -- and how do you know that?

22         A.  Because I managed the engine.

23         Q.  But had there been, it would've been

24     reimbursable?

15:51  25     A.  If there were LLP replacements, there would've

80

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**EXHIBIT C**
**103**

1    been, but the Ryan work scope clearly says no LLP

2    replacements.

3         Q.  What about Landing Gear Reserves under 12.4?

4         A.  Once again, I'm sorry.  I'm an engine

15:51  5    specialist.  I -- I don't do airframe or landing gear.

6         Q.  Do you know if they had -- do you know if Ryan

7    had incurred any cost that was -- would've been

8    reimbursed by the landing gear reserves?

9         A.  I do not know.  I have no knowledge of that.

15:52  10        Q.  What about the APU Reserves under 12.5?

11        A.  That is my area of expertise.

12        Q.  And what is your understanding of what that

13   provision allows?

14        A.  This provision allows reserve reimbursement if

15:52  15   you do a level of work called a hot section refurbishment

16   or greater.

17        Q.  Or overhaul of the APU?

18        A.  That's correct.

19        Q.  What is an APU?

15:52  20        A.  An APU is an acronym for auxiliary power unit.

21   And basically it's a big generator and a big compressor.

22        Q.  If the APU had been overhauled in this case to

23   the original engine, would that have been reimbursable?

24        A.  It would've been reimbursable as long as they

15:53  25   met their duties.

81

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

**EXHIBIT C**
**104**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACLD4.27DA.wpd

## AIRCRAFT LEASE AGREEMENT

Dated as of January 10, 2005

between

RYAN INTERNATIONAL AIRLINES, INC.

as LESSEE

and

WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION
not in its individual capacity, but solely as Owner Trustee

as LESSOR

| | |
|---|---|
| Aircraft Make and Model: | Used Boeing B757-28AER |
| Aircraft Manufacturer's Serial Number: | 24544 |
| Aircraft Registration Mark: | Per Exhibit H |
| Make and Model of Engines: | Rolls-Royce RB211-535E4 |
| Serial Numbers of Engines: | 30751 and 30752 |

COUNTERPART NO. __ OF 4 SERIALLY NUMBERED, MANUALLY EXECUTED
COUNTERPARTS. TO THE EXTENT THAT THIS DOCUMENT CONSTITUTES
CHATTEL PAPER UNDER THE UNIFORM COMMERCIAL CODE IN EFFECT IN
ANY APPLICABLE JURISDICTION, NO SECURITY INTEREST IN THIS
DOCUMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF
ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

ILFC 0000106

**EXHIBIT D**
**105**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AEA MSN 24544
(Scheduled Delivery Date: January 18, 2005)
ACL04.270h.wpd

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| ARTICLE 1 | | DEFINITIONS | 2 |
| | 1.1 | General Definitions | 2 |
| | 1.2 | Specific Definitions | 8 |
| | | | |
| ARTICLE 2 | | PLACE AND DATE OF DELIVERY | 9 |
| | 2.1 | Place of Delivery | 9 |
| | 2.2 | Scheduled Delivery Date | 9 |
| | 2.3 | No LESSOR Liability | 9 |
| | 2.4 | Total Loss of Aircraft Prior to Delivery | 9 |
| | 2.5 | Cancellation for Anticipated Delay | 9 |
| | 2.6 | Cancellation for Delay | 9 |
| | | | |
| ARTICLE 3 | | LEASE TERM | 10 |
| | 3.1 | Lease Term | 10 |
| | 3.2 | "Lease Term" and "Expiration Date" | 10 |
| | 3.3 | "Termination Date" | 10 |
| | | | |
| ARTICLE 4 | | SECURITY DEPOSIT, TRANSACTION FEE, RENT, RESERVES | |
| | | AND OTHER PAYMENTS | 11 |
| | 4.1 | Security Deposit | 11 |
| | 4.2 | Transaction Fee | 11 |
| | 4.3 | Rent | 11 |
| | 4.4 | Reserves | 11 |
| | 4.5 | Additional Rent for Excess Cycles | 11 |
| | 4.6 | LESSOR's Bank Account | 12 |
| | 4.7 | Default Interest | 12 |
| | 4.8 | No Deductions or Withholdings | 12 |
| | 4.9 | Value Added Taxes | 13 |
| | 4.10 | Wire Transfer Disbursement Report | 13 |
| | 4.11 | Net Lease | 13 |
| | 4.12 | LESSOR Performance of LESSEE Obligation | 14 |
| | 4.13 | Consideration for Rent and Other Amounts | 15 |
| | | | |
| ARTICLE 5 | | DELIVERY CONDITION AND INSPECTION OF AIRCRAFT | 16 |
| | 5.1 | LESSEE Selection of Aircraft | 16 |
| | 5.2 | Condition at Delivery | 16 |
| | 5.3 | LESSEE Inspection of Aircraft | 16 |

i                                    TABLE OF CONTENTS

ILFC 0000107

0200

**EXHIBIT D**
**106**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
AC204.200b.wpd

| 5.4 | Delivery of the Aircraft to LESSEE | 16 |
| 5.5 | LESSEE Acceptance of Aircraft | 16 |
| ARTICLE 6 | PRE-DELIVERY, DELIVERY AND POST-DELIVERY DOCUMENTARY AND OTHER REQUIREMENTS | 17 |
| 6.1 | Pre-Delivery Requirements | 17 |
| 6.2 | Delivery Requirements | 18 |
| 6.3 | Post-Delivery Requirements | 19 |
| ARTICLE 7 | DISCLAIMERS | 20 |
| 7.1 | "As Is, Where Is" | 20 |
| 7.2 | Waiver of Warranty of Description | 20 |
| 7.3 | LESSEE Waiver | 21 |
| 7.4 | Conclusive Proof | 21 |
| 7.5 | No LESSOR Liability for Losses | 21 |
| 7.6 | No Liability to Repair or Replace | 22 |
| 7.7 | No Waiver | 22 |
| ARTICLE 8 | MANUFACTURERS' AND VENDORS' WARRANTIES | 23 |
| 8.1 | Warranties | 23 |
| 8.2 | Reassignment | 23 |
| 8.3 | Warranty Claims | 23 |
| ARTICLE 9 | OPERATION OF AIRCRAFT | 24 |
| 9.1 | Costs of Operation | 24 |
| 9.2 | Compliance with Laws | 24 |
| 9.3 | Training | 24 |
| 9.4 | No Violation of Insurance Policies | 24 |
| 9.5 | Flight and Airport Charges | 24 |
| ARTICLE 10 | SUBLEASES | 26 |
| 10.1 | No Sublease without LESSOR Consent | 26 |
| 10.2 | LESSOR Costs | 26 |
| 10.3 | Any Approved Sublease | 26 |
| 10.4 | Wet Leases | 26 |
| 10.5 | Continued Responsibility of LESSEE | 27 |
| ARTICLE 11 | MAINTENANCE OF AIRCRAFT | 28 |
| 11.1 | General Obligation | 28 |
| 11.2 | Specific Engine Requirements | 28 |

ii                                TABLE OF CONTENTS

ILFC 0000108

0201

EXHIBIT D
107

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-2RAER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220iA.wpd

| 1 | 11.3 | Specific Obligations | 29 |
| 2 | 11.4 | Replacement of Parts | 30 |
| 3 | 11.5 | Removal of Engines | 32 |
| 4 | 11.6 | Removal of APU | 32 |
| 5 | 11.7 | Pooling of Engines, APU and Parts | 32 |
| 6 | 11.8 | No Installation of Engines on Other Aircraft | 33 |
| 7 | 11.9 | Engine Thrust Rating | 33 |
| 8 | 11.10 | Modifications | 33 |
| 9 | 11.11 | Performance of Work by Third Parties | 34 |
| 10 | 11.12 | Reporting Requirements | 34 |
| 11 | 11.13 | Information Regarding Maintenance Program | 35 |
| 12 | 11.14 | LESSOR Rights to Inspect Aircraft | 35 |
| 13 | | | |
| 14 | ARTICLE 12 | USE OF RESERVES | 36 |
| 15 | 12.1 | Airframe Reserves | 36 |
| 16 | 12.2 | Engine Performance Restoration Reserves | 36 |
| 17 | 12.3 | Engine LLP Reserves | 37 |
| 18 | 12.4 | Landing Gear Reserves | 37 |
| 19 | 12.5 | APU Reserves | 37 |
| | 12.6 | Reimbursement | 38 |
| 21 | 12.7 | Reimbursement Adjustment | 38 |
| 22 | 12.8 | Costs in Excess of Reserves | 38 |
| 23 | 12.9 | Reimbursement after Termination Date | 38 |
| 24 | 12.10 | Payment to Maintenance Provider | 39 |
| 25 | | | |
| 26 | ARTICLE 13 | TITLE AND REGISTRATION | 40 |
| 27 | 13.1 | Title to the Aircraft during Lease Term | 40 |
| 28 | 13.2 | Registration of Aircraft | 40 |
| 29 | 13.3 | Filing of This Lease | 40 |
| 30 | 13.4 | Evidence of Registration and Filings | 40 |
| 31 | | | |
| 32 | ARTICLE 14 | IDENTIFICATION PLATES | 41 |
| 33 | 14.1 | Airframe Identification Plates | 41 |
| 34 | 14.2 | Engine Identification Plates | 41 |
| 35 | 14.3 | APU Identification Plates | 42 |
| 36 | | | |
| 37 | ARTICLE 15 | TAXES | 43 |
| 38 | 15.1 | General Obligation of LESSEE | 43 |
| 39 | 15.2 | Exceptions to Indemnity | 43 |
| 40 | 15.3 | After-Tax Basis | 44 |

iii                                        TABLE OF CONTENTS

ILFC 0000109

EXHIBIT D
108

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-2BAER MSN 24344
(Scheduled Delivery Date: January 10, 2005)
ACL04.229a.wpd

| 15.4 | Timing of Payment | 44 |
| 15.5 | Contests | 44 |
| 15.6 | Refunds and Credits | 44 |
| 15.7 | Cooperation in Filing Tax Returns | 45 |
| 15.8 | Survival of Obligations | 45 |
| ARTICLE 16 | INDEMNITIES | 46 |
| 16.1 | General Indemnity | 46 |
| 16.2 | Exceptions to General Indemnities | 47 |
| 16.3 | After-Tax Basis | 47 |
| 16.4 | Timing of Payment | 48 |
| 16.5 | Subrogation | 48 |
| 16.6 | Notice | 48 |
| 16.7 | Refunds | 48 |
| 16.8 | Defense of Claims | 48 |
| 16.9 | Survival of Obligation | 48 |
| ARTICLE 17 | INSURANCE | 49 |
| 17.1 | Categories of Insurance | 49 |
| 17.2 | Write-Back of Any Date Recognition Exclusion | 49 |
| 17.3 | Third Party War Liability Insurance | 49 |
| 17.4 | Installation of Third Party Engine | 49 |
| 17.5 | Insurance for Wet Lease Operations | 49 |
| 17.6 | Insurance for Indemnities | 50 |
| 17.7 | Insurance Required by Manufacturer | 50 |
| 17.8 | Additional Insureds under LESSEE's Insurance | 50 |
| 17.9 | Renewal | 50 |
| 17.10 | Assignment of Rights by LESSOR | 50 |
| 17.11 | Deductibles | 50 |
| 17.12 | Other Insurance | 51 |
| 17.13 | Information | 51 |
| 17.14 | Currency | 51 |
| 17.15 | Grounding of Aircraft | 51 |
| 17.16 | Failure to Insure | 51 |
| 17.17 | Reinsurance | 51 |
| 17.18 | Limit on Hull in Favor of LESSEE | 52 |
| 17.19 | Payment to Maintenance Provider for Repairs | 52 |
| ARTICLE 18 | LOSS, DAMAGE AND REQUISITION | 53 |
| 18.1 | Definitions | 53 |

iv                                    TABLE OF CONTENTS

ILFC 0000110

0203

EXHIBIT D
109

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B737-2BAER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220it.wpd

| 18.2 | Notice of Total Loss | 54 |
| 18.3 | Total Loss of Aircraft or Airframe | 54 |
| 18.4 | Surviving Engine(s) | 55 |
| 18.5 | Total Loss of Engine and Not Airframe | 56 |
| 18.6 | Total Loss of APU | 57 |
| 18.7 | Other Loss or Damage | 57 |
| 18.8 | Copy of Insurance Policy | 58 |
| 18.9 | Government Requisition | 58 |
| 18.10 | LESSOR Retention of Reserves | 58 |
| | | |
| ARTICLE 19 | REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSEE | 59 |
| 19.1 | Representations and Warranties | 59 |
| 19.2 | Covenants | 60 |
| | | |
| ARTICLE 20 | REPRESENTATIONS, WARRANTIES AND COVENANTS OF LESSOR | 62 |
| 20.1 | Representations and Warranties | 62 |
| 20.2 | Covenant of Quiet Enjoyment | 62 |
| | | |
| ARTICLE 21 | FINANCIAL AND RELATED INFORMATION | 63 |
| | | |
| ARTICLE 22 | RETURN OF AIRCRAFT | 64 |
| 22.1 | Date of Return | 64 |
| 22.2 | Last Engine Shop Visits | 64 |
| 22.3 | Technical Report | 64 |
| 22.4 | Return Location | 64 |
| 22.5 | Full Aircraft Documentation Review | 65 |
| 22.6 | Copy of LESSEE's Maintenance Program | 65 |
| 22.7 | Aircraft Inspection | 65 |
| 22.8 | Certificate of Airworthiness Matters | 66 |
| 22.9 | General Condition of Aircraft at Return | 66 |
| 22.10 | Checks Prior to Return | 69 |
| 22.11 | Part Lives | 71 |
| 22.12 | Export and Deregistration of Aircraft | 73 |
| 22.13 | LESSEE's Continuing Obligations | 73 |
| 22.14 | Airport and Navigation Charges | 74 |
| 22.15 | Return Acceptance Receipt | 74 |
| 22.16 | Indemnities and Insurance | 74 |
| 22.17 | Storage | 75 |

v                    TABLE OF CONTENTS

ILFC 0000111

EXHIBIT D
110

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.720h.wpd

| | ARTICLE 23 | ASSIGNMENT | 76 |
|---|---|---|---|
| | 23.1 | No Assignment by LESSEE | 76 |
| | 23.2 | Sale or Assignment by LESSOR | 76 |
| | 23.3 | LESSOR's Lender | 76 |
| | 23.4 | LESSEE Cooperation | 76 |
| | 23.5 | Protections | 77 |
| | ARTICLE 24 | DEFAULT OF LESSEE | 78 |
| | 24.1 | LESSEE Notice to LESSOR | 78 |
| | 24.2 | Events of Default | 78 |
| | 24.3 | LESSOR's General Rights | 78 |
| | 24.4 | Deregistration and Export of Aircraft | 79 |
| | 24.5 | LESSEE Liability for Damages | 79 |
| | 24.6 | Waiver of Default | 80 |
| | 24.7 | Present Value of Payments | 80 |
| | 24.8 | Use of "Termination Date" | 80 |
| | ARTICLE 25 | NOTICES | 81 |
| | 25.1 | Manner of Sending Notices | 81 |
| | 25.2 | Notice Information | 81 |
| | ARTICLE 26 | GOVERNING LAW AND JURISDICTION | 83 |
| | 26.1 | California Law | 83 |
| | 26.2 | Nonexclusive Jurisdiction in California | 83 |
| | 26.3 | Service of Process | 83 |
| | 26.4 | Prevailing Party in Dispute | 83 |
| | 26.5 | Waiver | 83 |
| | ARTICLE 27 | MISCELLANEOUS | 84 |
| | 27.1 | Management Services | 84 |
| | 27.2 | Press Releases | 84 |
| | 27.3 | Power of Attorney | 84 |
| | 27.4 | LESSOR Performance for LESSEE | 84 |
| | 27.5 | LESSOR's Payment Obligations | 84 |
| | 27.6 | Application of Payments | 84 |
| | 27.7 | Usury Laws | 84 |
| | 27.8 | Delegation by LESSOR | 85 |
| | 27.9 | Confidentiality | 85 |
| | 27.10 | Rights of Parties | 85 |

vi                                   TABLE OF CONTENTS

ILFC 0000112

0205

**EXHIBIT D**
**111**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-23AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
AC1.04.240a.wpd

| 27.11 | Further Assurances | 85 |
| 27.12 | Use of Word "including" | 86 |
| 27.13 | Headings | 86 |
| 27.14 | Invalidity of Any Provision | 86 |
| 27.15 | Time Is of the Essence | 86 |
| 27.16 | Amendments in Writing | 86 |
| 27.17 | Counterparts | 86 |
| 27.18 | Documents Delivered by Fax | 86 |
| 27.19 | Entire Agreement | 86 |
| EXHIBIT A | AIRCRAFT DESCRIPTION AT DELIVERY | 88 |
| EXHIBIT B | SUMMARY OF TRANSACTION | 89 |
| EXHIBIT C | FINANCIAL TERMS | 91 |
| EXHIBIT D | CONDITION AT DELIVERY | 97 |
| EXHIBIT E | CERTIFICATE OF INSURANCE | 105 |
| EXHIBIT F | BROKERS' LETTER OF UNDERTAKING | 113 |
| EXHIBIT G | NOTICE AND ACKNOWLEDGMENT | 116 |
| EXHIBIT H | ESTOPPEL AND ACCEPTANCE CERTIFICATE | 121 |
| EXHIBIT I | OPINION OF COUNSEL | 134 |
| EXHIBIT J | FORM OF POWER OF ATTORNEY | 138 |
| EXHIBIT K | ASSIGNMENT OF RIGHTS (AIRFRAME) | 140 |
| EXHIBIT L | ASSIGNMENT OF RIGHTS (ENGINES) | 145 |
| EXHIBIT M | RETURN ACCEPTANCE RECEIPT | 152 |
| EXHIBIT N | MONTHLY REPORT | 165 |
| EXHIBIT O | AIRCRAFT DOCUMENTATION | 168 |
| EXHIBIT P | TECHNICAL EVALUATION REPORT | 170 |

vii                    TABLE OF CONTENTS

ILFC 0000113

0206

**EXHIBIT D**
**112**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

1
2                          AIRCRAFT LEASE AGREEMENT
3
4
5        THIS AIRCRAFT LEASE AGREEMENT is made and entered into as of this 10th day of
6   January, 2005
7
8        BETWEEN:
9
10       RYAN INTERNATIONAL AIRLINES, INC., a Kansas corporation whose address and
11  principal place of business is at 266 North Main, Wichita, Kansas 67202, U.S.A. ("LESSEE")
12  and
13
14       WELLS FARGO BANK NORTHWEST, National Association, not in its individual
15  capacity but solely as Owner Trustee under the Trust Agreement (as defined herein), whose
16  address is 79 South Main Street, Salt Lake City, Utah 84111, United States of America
17  ("LESSOR").
18
19       The subject matter of this Lease is one (1) used Boeing B757-28AER aircraft bearing
20  manufacturer's serial number 24544 which is held by LESSOR for the benefit of Triton Aviation
21  International LLC pursuant to the Trust Agreement. In consideration of and subject to the mutual
22  covenants, terms and conditions contained in this Lease, LESSOR hereby agrees to lease to
23  LESSEE and LESSEE hereby agrees to lease from LESSOR the aircraft for the lease term and
24  the parties further agree as follows:

1                                                RECITALS

ILFC 0000114

EXHIBIT D
113

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

## ARTICLE 12            USE OF RESERVES

**12.1    Airframe Reserves.**   LESSOR will reimburse LESSEE from the Airframe Reserves for the actual cost of the structural inspection portions of completed scheduled "S4C" checks (or equivalent) as described in the MPD and the rectification of any structural deficiencies resulting from such checks (including, for greater certainty, repairs of such deficiencies which are performed in accordance with applicable service bulletins), with work performed for all other causes excluded, including those causes set forth in Article 12.7.  Subject to Article 15.2 and excluding exchange fees and handling, packaging and shipping charges, reimbursement will be made up to the amount in the Airframe Reserves on the commencement date of the structural check.

**12.2    Engine Performance Restoration Reserves.**

12.2.1    LESSOR will reimburse LESSEE from the Engine Performance Restoration Reserves for the actual cost associated with performance restoration of the Basic Engine during completed Engine shop visits (i.e., heavy maintenance visits) requiring off-wing teardown and/or disassembly as described in Article 11.2.3, with work performed for all other causes excluded, including those causes set forth in Article 12.7.  Subject to Article 15.2 and excluding exchange fees and handling, packaging and shipping charges, reimbursement for an Engine will be made up to the amount in the Engine Performance Restoration Reserves applicable to such Engine at the time of removal of such Engine.

12.2.2    Reimbursement from the Engine Performance Restoration Reserves will be limited as to each module of such Engine in accordance with the following percentages of the remaining total amount in the Engine Performance Restoration Reserves for such Engine:

| | |
|---|---|
| Fifteen Percent (15%) | Modules 01 and 07 (LP Compressor and Fan) |
| Twenty Percent (20%) | Modules 02 and 03 (IP Compressor and Intermediate Section) |
| Thirty-Five Percent (35%) | Module 04 (HP System) |
| Thirty-Five Percent (35%) | Module 05 (LP and IP Turbines) |
| Five Percent (5%) | Module 06 (External Gear Box) |

For the avoidance of doubt, the parties hereby agree that, notwithstanding the foregoing percentages, the total amount of reimbursement from Engine Performance

ARTICLE 12
RESERVES

ILFC 0000149

**EXHIBIT D
114**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

Restoration Reserves for any eligible shop visit shall not, under any circumstances, exceed one hundred percent (100%) of the amount in the Engine Performance Restoration Reserves applicable to the relevant Engine at the time of its removal.

12.2.3    For the avoidance of doubt, in the event that a life-limited Engine Part is removed and replaced during a shop visit which otherwise qualifies for reimbursement from Engine Performance Restoration Reserves pursuant to this Article 12.2, any labor costs associated with the removal and replacement of such life-limited Engine Part shall be reimbursable from Engine Performance Restoration Reserves, subject to the percentage limitations set forth in Article 12.2.2.

12.2.4    LESSEE will not enter into any Engine maintenance cost per flight hour, power-by-the-hour or similar agreement with the Engine manufacturer or any other Engine maintenance facility or organization without LESSOR's consent.

12.3    **Engine LLP Reserves**.    LESSOR will reimburse LESSEE from the Engine LLP Reserves for an Engine for the actual out-of-pocket materials cost without overhead, markup or profit factor associated with the replacement of life-limited Parts in such Engine during completed Engine shop visits (i.e., heavy maintenance visits) requiring off-wing teardown and/or disassembly as described in Article 11.2.3, with work performed for all other causes excluded, including those causes set forth in Article 12.7.  Subject to Article 15.2 and excluding exchange fees and handling, packaging and shipping charges, reimbursement for replacement of life-limited Parts in an Engine will be made up to the amount in the Engine LLP Reserves applicable to such Engine at the time of removal of such Engine.

12.4    **Landing Gear Reserves**.    LESSOR will reimburse LESSEE from the Landing Gear Reserves for the actual cost of an Overhaul of the Landing Gear, up to the amount remaining in the Landing Gear Reserves, with work performed for all other causes excluded, including those causes set forth in Article 12.7.  Subject to Article 15.2 and excluding exchange fees and handling, packaging and shipping charges, reimbursement will be made up to the amount in the Landing Gear Reserves at the time of removal of the Landing Gear.

12.5    **APU Reserves**.    LESSOR will reimburse LESSEE from the APU Reserves for the actual cost of a completed hot section refurbishment or Overhaul of the APU, up to the amount remaining in the APU Reserves, with work performed for all other causes excluded, including those causes set forth in Article 12.7.  Subject to Article 15.2 and excluding exchange fees and handling, packaging and shipping charges, reimbursement will be made up to the amount in the APU Reserves at the time of removal of the APU.

ARTICLE 12
RESERVES

ILFC 0000150

**EXHIBIT D**
**115**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-2BAER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

12.6    Reimbursement.    LESSEE will be entitled to reimbursement from the Reserves after the work is completed and the Airframe, Engine, Landing Gear or APU has left the repair agency, by submitting invoices and proper documentation within six (6) months after completion of the work. For the Airframe, proper documentation includes a list of all routine and nonroutine work cards with corresponding references to the MPD and an itemized labor and materials report. For the Engine and APU, proper documentation includes a description of the reason for removal, a shop teardown report, a shop findings report, a full description of the workscope and complete disk records for the Engine both prior to and after the shop visit. Both the invoice supplied by the Engine repair facility and that submitted by LESSEE to LESSOR with respect to an Engine will state whether or not credits were provided due to life remaining on any removed Engine Parts and the amount of any such credits will be itemized. For the Landing Gear, proper documentation includes the total calendar time, hours and cycles on the Landing Gear both prior to and after the Overhaul.

12.7    Reimbursement Adjustment.    By way of example, among the exclusions from reimbursement are those items resulting from repairs covered by LESSEE's or a third party's insurance (deductibles being for the account of LESSEE) or warranties or required as a result of an Airworthiness Directive, manufacturer's service bulletin, faulty maintenance or installation, improper operations, misuse, neglect, accident, incident, ingestion, or other accidental cause. Reimbursement from the Reserves will not be available for quick engine change (QEC) Parts, thrust reversers, or any of their associated components. All invoices subject to reimbursement from LESSOR will be reduced (by adjustment between LESSEE and LESSOR retroactively if necessary) by the actual amounts received by LESSEE on account of such work from responsible third parties or other sources, such as insurance proceeds, manufacturer's warranties, guarantees, concessions and credits (including, with respect to Engines, credits due to life remaining on any removed Engine Parts).

12.8    Costs in Excess of Reserves.    LESSEE will be responsible for payment of all costs in excess of the amounts reimbursed hereunder. If on any occasion the balance in the Airframe Reserves, Engine Performance Restoration Reserves for a particular Engine, Engine LLP Reserves for a particular Engine, Landing Gear Reserves or APU Reserves (at the time of the structural check, in the case of the Airframe, or at the time of removal, in the case of an Engine, the Landing Gear and the APU) is insufficient to satisfy a claim for reimbursement in respect of the Airframe, such Engine, the Landing Gear or the APU, as applicable, the shortfall may not be carried forward or made the subject of any further claim for reimbursement.

12.9    Reimbursement after Termination Date.    LESSEE may not submit any invoice for reimbursement from the Reserves after the Termination Date unless on or prior to such date LESSEE has notified LESSOR in writing that such outstanding invoice will be submitted after the Termination Date and the anticipated amount of such invoice. So long as LESSEE has

ARTICLE 12
RESERVES

ILFC 0000151

**EXHIBIT D**
**116**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACLM.220h.wpd

provided such notice to LESSOR, LESSEE may then submit such outstanding invoice at any time within six (6) months after the Termination Date.  If, after providing such notice to LESSOR and despite diligent efforts to obtain such outstanding invoice, LESSEE determines that such outstanding invoice will not be available within the said six (6) month period, LESSEE may submit such outstanding invoice at any time up to twelve (12) months after the Termination Date, provided that LESSEE notifies LESSOR of such additional delay no later than six (6) months after the Termination Date.  Subject to the foregoing, any balance remaining in the Reserves on the Termination Date, including termination on account of a Total Loss of the Aircraft, will be retained by LESSOR, subject to the terms of Article 18.10.

12.10    **Payment to Maintenance Provider.**    In any case where reimbursement from Reserves is otherwise required by this Article 12, in lieu of requiring LESSEE to pay the maintenance provider in the first instance, LESSOR will, at LESSEE's request, make the required payment from Reserves directly to the maintenance provider, provided that all of the following conditions have been met:

(a)    LESSOR shall have received from LESSEE the final invoice and all other documentation required by Article 12.6;

(b)    LESSOR shall have received proof acceptable to LESSOR that the Aircraft, Engine, APU, or Landing Gear, as applicable, has been released (or will, simultaneously with receipt of payment, be released) to LESSEE; and

(c)    LESSOR shall have received appropriate wire instructions to facilitate the required payment.

ARTICLE 12
RESERVES

ILFC 0000152

**EXHIBIT D**
**117**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

## ARTICLE 16                    INDEMNITIES

16.1    **General Indemnity**.    Except as set forth in Article 16.2, LESSEE agrees to indemnify and hold harmless each of LESSOR, Beneficiary, Triton Aviation Finance, Triton Aviation Investments LLC, ILFC and Security Trustee and their respective officers, directors, employees, agents, managers, trustees, members and shareholders (individually an "**Indemnitee**" and collectively "**Indemnitees**") from any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, disbursements and expenses (including reasonable legal fees, costs and related expenses) of every kind and nature whether or not any of the transactions contemplated by this Lease are consummated (collectively "**Expenses**") which are imposed on, incurred by or asserted against any Indemnitee and which are in any way relating to, based on or arising out of any of the following:

        (a)     This Lease or any transactions contemplated hereby;

        (b)     the operation, possession, use, nonuse, control, leasing, subleasing, maintenance, storage, overhaul, testing or inspections of the Aircraft, any Engine, the APU or any Part (whether by LESSEE, any sublessee or any other Person) during the Lease Term and until the Termination Date (including the acceptance flights at return), whether or not the same is in compliance with the terms of this Lease, including without limitation claims for death, personal injury, property damage, other loss or harm to any Person and claims relating to any Laws, including without limitation environmental control, noise and pollution laws, rules or regulations;

        (c)     the manufacture, design, acceptance, rejection, delivery, return, sale after an Event of Default, import, export, condition, repair, modification, servicing, rebuilding, enforcement of warranties whether in LESSOR's or LESSEE's name, customer, product support, information or training provided by Manufacturer and other vendors, airworthiness, registration, reregistration, performance, sublease, merchantability, fitness for use, substitution or replacement of the Aircraft, an Engine, the APU or any Part under this Lease or other transfer of use or possession of the Aircraft, an Engine, the APU or any Part, including under a pooling or interchange arrangement, including without limitation latent and other defects, whether or not discoverable and patent, trademark or copyright infringement;

        (d)     any noncompliance by LESSEE with any term of this Lease or the falsity or inaccuracy of any representation or warranty of LESSEE set forth herein;

ARTICLE 16
INDEMNITIES

ILFC 0000159

EXHIBIT D
117-A

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

**EXHIBIT B**          **SUMMARY OF TRANSACTION**

The following is a summary of the lease transaction between LESSEE and LESSOR. It is set forth for the convenience of the parties only and will not be deemed in any way to amend, detract from, add to or simplify the other provisions of this Lease.

1. **Description of Aircraft**

   One used Boeing B757-28AER aircraft bearing manufacturer's serial number 24544 and 2 Rolls-Royce RB211-535E4 engines serial numbers 30751 and 30752

2. **Scheduled Delivery Date and Location**

   On or about January 11, 2005 at Miami International Airport, Florida, U.S.

3. **Lease Term**

   Thirty-six (36) months

4. **Security Deposit**

   US$300,000, payable as follows:

   | Payment Date | Amount |
   |---|---|
   | Received | US$100,000 |
   | 2 business days after lease execution or 1 business day prior to the scheduled delivery date, whichever occurs first | US$100,000 |
   | On or before the delivery date | US$100,000 |

5. **Transaction Fee**

   US$12,500, payable at least 1 business day before the Scheduled Delivery Date.

6. **Rent during Lease Term**

   US$135,000, payable monthly in advance

90

EXHIBIT B
SUMMARY OF TRANSACTION

ILFC 0000203

**EXHIBIT D**
**118**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

**7.** <u>Reserves</u>

| Type of Reserves | Amount of Reserves* |
|---|---|
| Airframe Reserves | US$100 per airframe flight hour |
| Engine Performance Restoration Reserves | US$142 per engine flight hour for each engine |
| Engine LLP Reserves | US$153 per engine cycle for each engine |
| APU Reserves | US$11 per airframe flight hour |
| Landing Gear Reserves | US$15 per airframe flight hour |

*The reserve rates set forth above shall escalate 2.5% per year, commencing on the first anniversary of the delivery date.

**8.** <u>Country of Aircraft Registration</u>

U.S.A.

**9.** <u>Maintenance Program</u>

LESSEE's Maintenance Program

**10.** <u>Agreed Value of Aircraft</u>

US$31,000,000

**11.** <u>LESSOR's Bank Account</u>

Deutsche Bank Trust Company Americas
New York, New York 10015
ABA #021-001-033
DDA#00359283
Account Name: BTCO as Security Trustee Triton Rental A/C
Reference: Ryan International Airlines (24544)

EXHIBIT B
SUMMARY OF TRANSACTION

ILFC 0000204

**EXHIBIT D**
**119**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28 AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220h.wpd

## EXHIBIT C      FINANCIAL TERMS

**1.**    Article 4.1—Security Deposit

(a)    Article 4.1.1. LESSEE will pay LESSOR a security deposit in the total sum of Three Hundred Thousand U.S. Dollars (US$300,000) for its lease of the Aircraft (the "Security Deposit"). The Security Deposit is payable as follows (in US$):

| Payment Date | Amount |
|---|---|
| Received | US$100,000 |
| 2 Business Days after Lease execution or 1 Business Day prior to the Scheduled Delivery Date, whichever occurs first | US$100,000 |
| On or before the Delivery Date | US$100,000 |

(b)    Article 4.1.2. The Security Deposit may be commingled with LESSOR's general funds and any interest earned on such Security Deposit will be for LESSOR's account. If the Security Deposit is reduced below the required amount by application to meet LESSEE's unperformed obligations under this Lease, LESSEE will replenish the Security Deposit within ten (10) days after LESSOR's demand therefor. The Security Deposit will serve as security for the performance by LESSEE of its obligations under this Lease and any other agreements between LESSEE and LESSOR relating to aircraft, engines, aircraft equipment or the extension of credit and may be applied by LESSOR upon the occurrence of a Default or Event of Default hereunder or of a default by LESSEE under any such other agreements.

(c)    Article 4.1.3. Upon termination of this Lease in accordance with Article 3.3 other than if an Event of Default has occurred and is continuing, LESSOR will return to LESSEE the amount of the Security Deposit then held by LESSOR (so long as no default by LESSEE exists under any other agreement between LESSEE and LESSOR relating to aircraft, engines or aircraft equipment or the extension of credit by LESSOR to LESSEE), without interest, less an amount determined by LESSOR to be a reasonable estimate of the costs, if any, which LESSOR will incur to remedy any unperformed obligations of LESSEE under this Lease, including the correction of any discrepancies from the required condition of the Aircraft on return of the Aircraft.

EXHIBIT C
FINANCIAL TERMS

ILFC 0000205

**EXHIBIT D**
**120**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220it.wpd

2.    **Article 4.2—Transaction Fee**

At least one (1) Business Day prior to the Scheduled Delivery Date, LESSEE will pay LESSOR a nonrefundable transaction fee of Twelve Thousand Five Hundred U.S. Dollars (US$12,500) (the "**Transaction Fee**").

3.    **Article 4.3—Rent**

(a)    **Article 4.3.1**. During the Lease Term, LESSEE will pay to LESSOR One Hundred Thirty-Five Thousand U.S. Dollars (US$135,000) monthly in advance as rent for the Aircraft ("**Rent**").

(b)    **Article 4.3.2**. The first payment of Rent during the Lease Term will be paid no later than two (2) Business Days prior to actual Delivery. Each subsequent payment of Rent will be due monthly no later than the same day of the month as the Delivery Date of the Aircraft except that, if such day is not a Business Day, the Rent will be due on the immediately preceding Business Day.

4.    **Article 4.4—Reserves**

(a)    **Article 4.4.1**. LESSEE will pay to LESSOR supplemental Rent, based on LESSEE's use of the Aircraft during the Lease Term, in the form of the following reserves in the following amounts per Flight Hour or Engine Cycle as indicated (individually, "**Airframe Reserves**", "**Engine Performance Restoration Reserves**" and "**Engine LLP Reserves**", and collectively "**Reserves**"):

| Type of Reserves | Amount of Reserves* |
|---|---|
| Airframe Reserves | One Hundred U.S. Dollars (US$100) per Airframe Flight Hour |
| Engine Performance Restoration Reserves | One Hundred Forty-Two U.S. Dollars (US$142) per Engine Flight Hour for each Engine (payable when the Engine is utilized on the Aircraft or another aircraft) |

93

EXHIBIT C
FINANCIAL TERMS

ILFC 0000206

**EXHIBIT D**
**121**

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date:  January 10, 2005)
ACL04.220h.wpd

| Type of Reserves | Amount of Reserves* |
|---|---|
| Engine LLP Reserves | One Hundred Fifty-Three U.S. Dollars (US$153) per Engine cycle for each Engine (payable when the Engine is utilized on the Aircraft or another aircraft) |
| APU Reserves | Eleven U.S. Dollars (US$11) per Airframe Flight Hour |
| Landing Gear Reserves | Fifteen U.S. Dollars (US$15) per Airframe Flight Hour |

*All Reserves will escalate at the rate of two and one half percent (2.5%) on each anniversary of the Delivery Date.

(b)    Article 4.4.2.  The amount of the Engine Performance Restoration Reserves and Engine LLP Reserves set forth in Article 4.4.1 may be increased by LESSOR in the event of an increase in the thrust rating of an Engine in accordance with Article 11.9.

(c)    Article 4.4.3.  Such Reserves will be paid on or before the 10th day of the calendar month next following the month in which the Delivery Date occurs and on or before the 10th day of each succeeding calendar month for flying performed during the calendar month prior to payment.  All Reserves for flying performed during the month in which the Termination Date occurs will be paid on the Termination Date, unless otherwise agreed by the parties.

(d)    Article 4.4.4.  No interest will accrue or be paid at any time to LESSEE on such Reserves and, subject to LESSOR's obligations under Article 12, LESSOR may commingle the Reserves with LESSOR's general funds.

5.    Article 4.5—Additional Rent for Excess Cycles

If during the first eighteen (18) months of the Lease Term (the "First 18-Month Period") or during the remainder of the Lease Term the Airframe or any Engine operated more cycles than the maximum number of cycles which would result from an average hour/cycle ratio of 2 hours to 1 cycle, LESSEE will pay LESSOR as additional Rent US$200 for each Airframe cycle and US$200 for each Engine cycle the Airframe and any Engine actually operated during such period in excess of the number of cycles which result from an average hour/cycle ratio of 2 hours to 1 cycle.  A calculation will be made promptly after the First 18-Month Period and any such additional Rent due will be paid by LESSEE on the date on which the next Reserves payment is

94

EXHIBIT C
FINANCIAL TERMS

RYAN INTERNATIONAL AIRLINES, INC.
One (1) Used Boeing B757-28AER MSN 24544
(Scheduled Delivery Date: January 10, 2005)
ACL04.220a.wpd

due (in accordance with Article 4.4.3) following the First 18-Month Period. A similar calculation will be made at the end of the Lease Term with respect to the period extending from the end of the First 18-Month Period until the end of the Lease Term, and any such additional Rent due will be paid by LESSEE no later than the Termination Date.

Example: If the Airframe operated 2,000 hours during the First 18-Month Period, it would have 1,000 cycles resulting from an average hour/cycle ratio of 2 hours to 1 cycle. If in fact the Airframe operated 1,050 cycles during such period, the Airframe operated 50 excess cycles in such period and LESSEE will pay LESSOR US$10,000 (50 excess cycles × US$200 = US$10,000).

Similarly, if an Engine operated 1050 cycles and 2,000 hours during the First 18-Month Period, such Engine operated 50 excess cycles in such period and LESSEE will pay LESSOR US$10,000.

6.    **Article 18.1—Definitions**

In Article 18 and elsewhere in the Lease and the Exhibits:

"**Agreed Value**" means Thirty-One Million U.S. Dollars (US$31,000,000).

7.    **Article 24.2—Events of Default**

The occurrence of any of the following will constitute an Event of Default and material breach of this Lease by LESSEE:

(a)    LESSEE fails to take delivery of the Aircraft when obligated to do so under the terms of this Lease;

(b)    LESSEE fails to make a Rent or other payment due hereunder in the manner and by the date provided herein and fails to make such payment within three (3) Business Days after such payment is due;

(c)    LESSEE fails to obtain or maintain the insurance required by Article 17;

(d)    LESSEE fails to return the Aircraft to LESSOR on the Expiration Date in accordance with Article 22;

(e)    LESSEE fails to observe or perform any of its other obligations hereunder and fails to cure the same within fifteen (15) days after written notice thereof to LESSEE.

95

EXHIBIT C
FINANCIAL TERMS

ILFC 0000208

```
                        08030Ruff.txt
1  Wells Fargo-Triton/ Ryan Matter

2  8/3/10 Depo of Paul Malcolm Rehder

3  Rough Draft

4

5

6      C A U T I O N   C A U T I O N   C A U T I O N

7      ROUGH DRAFT ASCII  -  NOT A CITABLE DOCUMENT

8

9

10        Los Angeles, California, Tuesday, August 3, 2010

11                     12:49 p.m.

12                       -oOo-

13

14                PAUL MALCOLM REHDER,

15        called as a witness, having been first

16        duly sworn, was examined and testified

17        as follows:

18

19                    EXAMINATION

20  BY MR. MALZAHN:

21     Q.   Hello, Mr. Rehder.  My name is Scott Malzahn.

22  I'm an attorney at Gibson, Dunn and Crutcher, and I

23  represent the plaintiffs in this lawsuit, Triton

24  Aviation International and Wells Fargo Bank Northwest

25  National Association.
                                                    1
1           Could please of you state your full name for

2  the record, and also spell it?

3     A.   It's Paul, P-a-u-l, Malcolm, M-a-l-c-o-l-m,

4  Rehder, R-e-h-d-e-r.

5     Q.   And could you also provide your business

6  address?

7     A.   Did you want the company?  Or where I work?
                        Page 1
```

EXHIBIT E
124

08030Ruff.txt

15    Q.    Great.  Thank you.  Now, do you understand that

16  in this litigation Ryan claims that it is entitled to an

17  offset for certain alleged damage to a temporary engine?

18    A.    Yes.

19    Q.    And what do you understand the word "temporary"

20  engine to mean?

21    A.    I understand it to be an engine that was

22  substituted for the engine that was intended to be on

23  the aircraft.

24    Q.    So if I us the word "temporary" engine in this

25  case, that's what you would understand it to mean?

                                                          8

1     A.    Yes.

2     Q.    And can you describe to the extent that you

3   know what the alleged damage is to the temporary engine

4   for which Ryan is seeking an offset?

5     A.    Yes.  The damage is a delamination and heavy

6   damage to the Teflon sleeve which protects the Kevlar

7   wrapping on the front fan case.

8           I would use the words extensively deteriorated.

9     Q.    I believe you mentioned that it's delamination?

10    A.    Yes.

11    Q.    What is that?

12    A.    That's where the sleeve itself delaminates and

13  movers away from the compressor case itself.

14          It's attached to the casing on the edges.  And

15  it's delaminated from the case.  It's actually detached.

16    Q.    Do you know whether Ryan has actually conducted

17  any repairs to correct that alleged damage?

18    A.    I understand that they have, yes.

19    Q.    And what is that understanding based on?

20    A.    I was told that by Ryan.

21          And also I viewed the proposed work scope from
                          Page 7

**EXHIBIT E**
**125**

08030Ruff.txt

22  the company that performed the repair.

23      Q.   Who did you speak with at Ryan who told you

24  that the repairs had actually been conducted?

25      A.   That would be Jim Flynn.

                                                                    9

1       Q.   When did that conversation take place?

2       A.   Oh, I would say --

3       Q.   To the best of your recollection.

4       A.   Yeah.  It was -- there is a date in this -- say

5   early June 2010.

6       Q.   So before your expect report was signed?

7       A.   Yes.

8       Q.   You testified before that you have given

9   deposition testimony approximately five times; is that

10  right?

11      A.   Yes.

12      Q.   And have all of those cases situations where

13  you were retained as an expert?

14      A.   Yes.

15      Q.   And in your report you identify four different

16  cases in the last four years where you provided expert

17  testimony.

18      A.   Uh-huh.

19      Q.   Do you recall that?

20      A.   Yes.

21      Q.   And was the fifth case where you provided

22  deposition testimony another lawsuit that took place

23  more than four years ago?

24      A.   Yes.

25      Q.   Do you know the name of that lawsuit?

                                                                    10

1       A.   That was B.F. Goodrich and -- the company, the

2   other -- I represented B.F. Goodrich.  The other

                          Page 8

08030Ruff.txt

29

1     A.   No.

2     Q.   And in the five cases where you have been

3 retained to provide expert testimony, have you been

4 qualified as an expert?

5     A.   I don't understand what that means.

6     Q.   Well, in lawyerly language, did the judge ever

7 consider your qualifications to provide expert testimony

8 and decide to admit that testimony?

9     A.   None of the cases actually went to court.

10     Q.   So you don't know in any of these cases whether

11 the judge ever ruled on the issue of whether you were,

12 in fact, an expert; correct?

13     A.   Correct.

14     Q.   I'd like to briefly talk about what your

15 qualifications are.  And I have your resume here, which

16 I have certainly looked at.

17          But can you describe what your educational

18 background is?

19     A.   Education -- I completed the normal 12 years of

20 school.

21          And then attended Emory Riddle Aeronautical

22 University in Daytona Beach, Florida, where I received a

23 BS degree in aviation maintenance engineering.

24          And graduated in 1972 with that degree.

25          And also at that time I obtained a mechanic's

30

1 license, FAA airframe and power plant mechanic

2 certification.

3          And since then, it's been training school --

4 various training schools at the engine manufacturers.

5     Q.   Have you received any special training or

6 instruction in the particular model of aircraft engine

Page 24

08030Ruff.txt

7  at issue in this case?

8     A.    Yes.

9     Q.    Can you describe what that training or

10  instruction is?

11    A.    It's done by Rolls Royce at their plant in

12  England.

13    Q.    Is there a title or a name for that training?

14    A.    Just maintenance -- typically referred to as --

15  I don't know the specific one in this case, but they

16  typically refer to them as familiarization training.

17         When the airline that you are working for first

18  gets the aircraft with that particular engine type, they

19  obviously get some training along with it.

20    Q.    And you have received that training; correct?

21    A.    Yes, uh-huh.

22    Q.    Was it one time you received the training?

23         Or does it happen periodically over time?

24    A.    The familiarization part just was the initial

25  training.

                                                    31

1     Q.    And was there subsequent training that you have

2  received since that initial training?

3     A.    Not on this engine type, no.

4     Q.    When did that initial training take place?

5     A.    It's a guess here but --

6     Q.    I don't want any guesses.

7     A.    But I don't have --

8     Q.    I would like your best recollection or your

9  estimate.

10    A.    I would say 1982.

11    Q.    Okay.  And you mentioned Ms. Gray has also

12  received training --

13    A.    Oh, yes.

                    Page 25

EXHIBIT E
128

08030Ruff.txt

22   an E-mail to counsel letting them know.

23      Q.   Okay.  So the first time you heard about this

24   case and the possibility of you being an expert was when

25   Mr. Jim Flynn sent an E-mail that you were copied on to

43

1   his counsel stating that you would be the expert;

2   correct?

3      A.   I -- to the best of my knowledge, yes.

4      Q.   And you didn't have a problem with that?

5           You agreed to be the expert; correct?

6      A.   Correct.

7      Q.   What did you know about the case before you

8   agreed to be an expert?

9      A.   I only -- didn't know anything about the case.

10          Jim Flynn -- concurrently with that he sent the

11   TES report, and asked me to review it and give an

12   opinion.

13      Q.   And what opinion did he ask you to give?

14      A.   The question was:  Is it normal wear and tear?

15   Or is it something more?  Basically.

16      Q.   You certainly have the expert report in front

17   of you.  It's Exhibit 46.

18          I looked through this report myself to find the

19   words "normal wear and tear" or something similar, and I

20   didn't find anything like that.

21          Is that consistent -- do you have a different

22   view on that?

23      A.   Well, it's not in there, because I don't

24   believe it is normal wear and tear.

25      Q.   So you were asked by Jim Flynn to answer the

44

1   question whether there was any normal wear and tear?

2      A.   Right.  That was a term he used in the verbal

3   conversation.

Page 35

08030Ruff.txt

9    Q.    And what photographs?

10    A.    Well, the report was a copy of the -- the

11    original report, and the pictures weren't very clear, so

12    it was hard to make a determination of exactly what we

13    were looking at without the original pictures.

14          So I asked that I be provided with the pictures

15    that came -- the color photographs that came with the

16    original report.

17    Q.    Did they provide those photographs to you?

18    A.    Yes.

19    Q.    And when did you receive those photographs?

20          Was it before or after you finished preparing

21    your report?

22    A.    Oh, before.

23    Q.    And what were you able to determine from those

24    higher quality photographs?

25    A.    The -- that allowed us to determine that the

41

1    damage was very extensive, something that was not clear

2    in the initial report.

3    Q.    So you wouldn't have been able to tell by

4    looking at the pictures attached to the TES report

5    whether any damage had, in fact, occurred; correct?

6    A.    Right.

7    Q.    And you wouldn't expect another engineer with

8    similar expertise as yours to have been able to make

9    that determination based on those photographs; correct?

10          MS. MEYER:  Objection; calls for speculation.

11          THE WITNESS:  I didn't feel comfortable

12    personally making any determination based on that.  How

13    someone else would feel, I don't know.  But --

14    BY MR. MALZAHN:

15    Q.    And I have looked at same photographs as you.

Page 33

EXHIBIT E
130

08030Ruff.txt

18    Q.    And he seems an honest guy to you?

19    A.    Yes.

20    Q.    What portions of Mr. Merizalde's deposition

21  testimony did you -- do you believe are relevant to the

22  opinion that you have offered in your report?

23    A.    There were several, but the -- primarily it's

24  the fact that he refers to this damage -- what I refer

25  to as damage in my report, he refers to as normal wear
                                                        52

 1  and tear.

 2    Q.    Okay.

 3    A.    And in my opinion, it is not normal wear and

 4  tear.  And there is a big difference.

 5    Q.    But again, your expert report never uses the

 6  words:  Normal wear and tear -- correct?

 7    A.    No.  Not in the report, but there were --

 8  conversations with Jim Flynn primarily that -- I'm

 9  trying to think if there are others I talked to about

10  it, but Trish Gray, of course.

11          But Jim Flynn did ask me if I thought this was

12  normal wear and tear, and I responded to him that it

13  wasn't.

14    Q.    So you told other people such as Jim Flynn that

15  it's your belief that the damage to the temporary engine

16  was not normal wear and tear; correct?

17    A.    Correct.

18    Q.    Did you tell that to anybody else besides Jim

19  Flynn?

20    A.    To Ryan's counsel.

21    Q.    Was that Ms. Meyer?  Or Mr. Lester?

22    A.    Ms. Meyer.

23    Q.    Anybody else that you have expressed that

Page 42

08030Ruff.txt

25      Q.   Is it your belief that any damage exceeds
                                                                    58
1  normal wear and tear because it's on the Teflon sleeve

2  which is protecting the Kevlar wrap?

3      A.   Not any damage, no.  There is a small minor --

4  dents, for instance, holes that can be repaired -- that,

5  I would consider normal --

6      Q.   And --

7      A.   -- wear and tear.

8      Q.   What's your belief as to where that line, you

9  know -- how do you make that distinction between what's

10  ordinary wear and tear and what's not?

11          What's the basis of your belief?

12      A.   The extent of the damage.

13      Q.   Is there a certain criteria that you would take

14  into consideration making that judgment call?

15      A.   Yes.

16      Q.   What are those criteria?

17      A.   The engine manual, the acceptance limits makes

18  specific mention to what I was referring to earlier as

19  delamination or detachment of the sleeve from the frame.

20          That is specifically pointed out as a non-

21  repairable condition, and is not normally seen.

22      Q.   So is it your belief if that -- if the operator

23  of the aircraft operates within the guidelines set forth

24  in the aircraft maintenance manual and replaces parts

25  when they are required to be replaced by that manual,
                                                                    59
1  then that owner is fulfilling their obligations?

2          MS. MEYER:  Objection; vague and ambiguous.

3          THE WITNESS:  They -- their obligation is to

4  maintain the airplane and engines in accordance with FAA

5  regulations and the manufacturer's standards.

6          If they do that, then yes, they are in
                        Page 47

08030Ruff.txt

14  BY MR. MALZAHN:

15      Q.   So how do you -- what's your opinion or belief

16  -- what's your belief as to what normal wear and tear

17  is?

18      A.   I relate it -- if I can use an example, I would

19  relate it to the tires on your car.

20          If you take care of them, use the correct air

21  pressure, they will go for 30,000 miles or so.

22          If for some reason you detect a slow leak in

23  one of those tires and then continue to operate it, not

24  do anything about it except put more air in it every now

25  and then, pretty soon it's going to fail.

66

1           And where the other tires ran out normally to

2   the point they would wear out, that's normal wear and

3   tear.

4           To the tire that you ignored doing maintenance

5   to, it failed prematurely and is not normal.

6       Q.   And in the case of an aircraft engine, would

7   you agree an aircraft engine is much or sophisticated

8   than a tire?

9       A.   Oh, sure.

10      Q.   In the case of an aircraft engine, how do you

11  make that judgment call?  In particular, with respect to

12  damage to the Teflon sleeve?

13      A.   You make the call because of the extent of the

14  damage.

15          It's not -- just because it's listed in the

16  AMM, the maintenance manual, doesn't make it normal wear

17  and tear.

18          It lists everything on the airplane in that

19  manual.  And obviously, engines fail.  Airplanes fail.

20  So -- that have been maintained to that manual.

Page 53

EXHIBIT E
133

08030Ruff.txt

3    A.    It's right at the bottom of the fourth page.

4             Must have been present for some

5        period of time and any repairs ignored.

6    Q.    So I don't understand what that clause stating:

7  Must have been present for some period of time and any

8  repairs ignored -- end quote -- has anything to do with

9  whether the damage to the temporary engine exceeds the

10 aircraft maintenance limits set forth in the manual.

11   A.    What it means is that they have exceeded the

12 limit in the manual and have chosen to ignore it.

13   Q.    But you don't say in this sentence anything --

14        MS. MEYER:  Objection.

15 BY MR. MALZAHN:

16   Q.    -- about aircraft maintenance limits; correct?

17        MS. MEYER:  Objection; argumentative.

18        THE WITNESS:  I think that statement says it,

19 actually.

20 BY MR. MALZAHN:

21   Q.    What in this report refers to aircraft

22 maintenance limits?

23   A.    You can't ignore a repair.  That's just not

24 done.

25   Q.    Is your definition of a repair something that

                                                        74

1  exceeds aircraft maintenance limits?  I don't --

2    A.    Because the maintenance limits says:  Inspect,

3  and if you find this condition, you repair it.

4             If you choose not to repair it, then you are

5  not in compliance with the maintenance manual.

6    Q.    Are you defining the word repair in a special

7  way that's used in your industry?

8    A.    I'm not defining it.  I'm -- that comes

9  straight out of the maintenance manual.  It says:

                    Page 59

08030Ruff.txt

7       A.   So it's included in that first sentence by

8   reference.

9       Q.   Okay.  So what did you -- what were you able to

10  determine from the poor quality photographs on this

11  page?

12      A.   That there appears to be extensive damage to

13  the sleeve.

14      Q.   Okay.  And are you looking right now at the

15  original copy that you saw before you prepared your

16  expert report?

17      A.   Yes.

18      Q.   Okay.

19      A.   But --

20      Q.   So could I look over your shoulder, and you can

21  point to what you perceive looking at those photographs?

22           Because my copy is actual a little darker than

23  yours.

24      A.   Oh, it is.  Yes.

25      Q.   And so I'd like to be able to understand what          94

1   the factual basis for your opinions are, and go

2   piecemeal through them.

3            So let's talk about the picture right now.  So

4   what on this picture shows you the extent of damage?

5       A.   First of all, the reason for the picture -- and

6   I write reports like this myself in other cases, and we

7   take pictures of things that are bad.  We don't take

8   pictures of things that are good.

9            So the fact that the pictures are in here

10  indicates that there was something there that needed

11  more attention of some sort.

12           So what I was looking at is this area here

13  where -- this is where the sleeve, which is now laying

Page 75

08030Ruff.txt

20    that I was asking you about.  This sentence says:

21           The Teflon sleeve was found damaged

22           at the 8:00 o'clock position.

23           That sentence only tells us something about the

24    location of the damage; doesn't tell us anything about

25    the extent of the damage; correct?

96

1     A.   Other than it refers to the picture.

2     Q.   Yes.

3     A.   which give me an idea of the extent.

4     Q.   And the text itself does not specifically tell

5     us the extent of the damage, you have to look at

6     pictures below to understand that?

7     A.   Yes.

8     Q.   Let's look at the second sentence in the text.

9     It states, quote:

10           The underlying Kevlar wrap appeared

11           dirty but otherwise in good condition.

12           Do you see that?

13    A.   Yes.

14    Q.   Now, it was a Teflon sleeve that has damage to

15    it; correct?

16           You aren't aware of any damage to the Kevlar

17    wrap; correct?

18    A.   Correct.

19    Q.   So this sentence doesn't tell us anything about

20    the extent of the damage to the Teflon sleeve; correct?

21    A.   Other than referencing the requirement for

22    repair.

23    Q.   No --

24    A.   If there was no damage there, then it wouldn't

25    reference the requirement to repair.

97

1     Q.   That's the third sentence.  You are ahead of me

Page 77

**EXHIBIT E**
**136**

08030Ruff.txt

2  again.  The second sentence says, quote:

3          The underlying Kevlar wrap appeared

4          dirty but otherwise in good condition.

5     A.   I thought I answered that.

6     Q.   That sentence doesn't tell us anything about

7  the extent of damage to the Teflon sleeve?

8     A.   Correct.

9     Q.   What it does tell us is the Kevlar wrap is

10  dirty, but it's in good condition?

11     A.   Yes.

12     Q.   That's a good sign; correct -- that the Kevlar

13  wrap is in good condition?

14     A.   It's -- very rarely not in good condition.  It

15  doesn't really -- that's what you would expect.

16     Q.   Well, is that what you would expect if there

17  was extensive damage to the Teflon sleeve?

18     A.   Yes.  Kevlar, obviously, is very strong and

19  it's very difficult to damage it.

20     Q.   And the purpose of the Teflon sleeve is to

21  protect the Kevlar wrap?

22     A.   Yes.

23     Q.   So -- but the Kevlar wrap, as you said, is very

24  difficult to damage?

25     A.   Yes.

                                                        98
1     Q.   Now, another document that you identified in

2  your report that you relied on was the Rolls Royce

3  inspection instructions and other pertinent manuals?

4     A.   Yes.

5     Q.   What does that language -- other pertinent

6  manuals -- refer to?

7     A.   There is a Boeing manual, it's called a

                        Page 78

08030Ruff.txt

8   maintenance planning document.  This is it here.

9      Q.   I see.

10     A.   Just the one page.

11     Q.   So the Boeing manual, the maintenance planning

12  document, is the first page on Exhibit 47; is that

13  correct?

14     A.   Yes.

15     Q.   And what does this show us that's relevant to

16  your opinions?

17     A.   It's -- if you look at the second line item

18  from the bottom --

19     Q.   Okay.

20     A.   -- it tells you that -- to inspect the

21  containment area every 1,000 flight hours.

22          MS. MEYER:  Where is that?

23  BY MR. MALZAHN:

24     Q.   I don't see it, either.

25     A.   Second -- right here.  They are all separate

                                                            99

1   line items.

2          This is the one that is relevant.

3          MS. MEYER:  Where it says general inspection?

4          THE WITNESS:  Right.  And the column to the

5   left, as you can see it references the AMM reference

6   that we have been looking at, and then it tells -- this

7   tells you when to look at it.  The AMM tells you.

8          MS. MEYER:  Oh, okay.  This one.

9          THE WITNESS:  Yes.  The AMM tells you the

10  acceptance limits, but this is the documents that tells

11  you how often they should be looking at it.

12         MS. MEYER:  Okay.

13  BY MR. MALZAHN:

14     Q.   So the maintenance planning document tells us

                    Page 79

08030Ruff.txt

3   records; correct?

4       A.   Yes.

5       Q.   And you never requested those records before

6   you prepared your report?

7       A.   No.  I didn't.

8       Q.   Okay.  Now, let's move to the aircraft

9   maintenance manual that you relied on in forming your

10  opinion, including the cautionary statement and

11  acceptance statements below.

12      A.   Okay.

13      Q.   You see that -- you are looking at a copy right

14  now?

15      A.   Uh-huh.

16      Q.   Is that copy contained in Exhibit 47?

17      A.   Yes, uh-huh.

18      Q.   It's the second page in Exhibit 47; is that

19  right?

20           MS. MEYER:  Yes.  It's the one take says:

21  Boeing 757 Maintenance Manual.

22  BY MR. MALZAHN:

23      Q.   Great.  How many pages -- could you tell me

24  what page in this aircraft maintenance manual you relied

25  on in forming your opinions in this case?
                                                      103

1       A.   Well, actually the whole section.  It all has

2   to do with the Teflon sleeve and the wrapping -- and the

3   Kevlar wrap.

4            But since the damage was to the sleeve,

5   apparently, I -- based on pictures and the comments in

6   the report, I focused on the condition of the acceptance

7   standards of the Teflon sleeve on page 618, paragraph D.

8       Q.   All right.  So I'm looking at page 618 on

Page 82

**EXHIBIT E**
**139**

08030Ruff.txt
 9  Exhibit 47, and paragraph D entitled:  Acceptance
10  standards.
11          That is the portion of this aircraft
12  maintenance manual that was relevant to your opinion in
13  this case?
14      A.   Correct.
15      Q.   Okay.  I'd like you to look at -- I guess it
16  would be D(1)1) where it says:
17              Accept the damage if you obey the
18              conditions that follow.
19          Do you see that?
20      A.   Yes.
21      Q.   Then there are four conditions?
22      A.   Correct.
23      Q.   Do you have an opinion as to whether any of
24  these conditions were not followed?
25      A.   Yes.  And it's in combination with what I just

                                                          104
 1  explained before about how long the engine had been
 2  operated.
 3      Q.   And so I'd like to ask you to just tell me
 4  which of these conditions -- because there are four of
 5  them -- is it your opinion Air Slovakia did not follow?
 6      A.   It would be C and D.
 7          No.  Actually B, C and D.
 8      Q.   Okay.  So just focusing on A, it says:
 9              A fly-on condition is permitted for
10              a maximum time of 1000 engine hours .
11          You don't have any reason to believe that that
12  condition was not followed; correct?
13          MR. MALZAHN:  Objection --
14          THE WITNESS:  No.
15          MS. MEYER:  -- vague.
                        Page 83

EXHIBIT E
140

08030Ruff.txt

16      THE WITNESS:  It's hard to tell.  I can't --

17  that would speculate as to what was going on in their

18  mind if they saw damage.

19  BY MR. MALZAHN:

20      Q.   Right.  So you don't have any factual basis to

21  opine that a fly-on -- that this condition A was not

22  followed?

23      A.   That's correct.

24      Q.   Let's focus on condition B, which states,

25  quote:
                                                    105

1            A repair to the Teflon sleeve must

2            be done before 1000 hours of engine

3            operation is complete.

4            What is the factual basis for your opinion that

5   that condition was not followed?

6       A.   Again, due to the time operated on the engine

7   and the condition of the damage, that the damages is

8   what it is now, but at some point -- it didn't do that

9   overnight.  It started small and the -- the failure --

10  progression here is that it starts small with a dent,

11  nick, like they mentioned -- cuts, holes -- and then

12  progresses to where it is today -- or back then.

13           So that leads me to believe that the repair was

14  not done.

15      Q.   All right.  And in your expert report you state

16  the damage to the Teflon sleeve must have been present

17  for, quote, a period of time --

18      A.   Yes.

19      Q.   -- correct?

20           But did you not state in your report whether

21  that damage had existed for a thousand hours or more of

Page 84

EXHIBIT E
141

08030Ruff.txt

22  engine operation; correct?

23      A.   Well, it would have to.

24      Q.   But you never asked for the technical records

25  relating to repairs to the temporary engine, did you?

106

1           MS. MEYER:  Objection; asked and answered.

2           THE WITNESS:  I did not.  My opinion was that

3   it was somehow ignored.  It was not repaired in a timely

4   manner.

5   BY MR. MALZAHN:

6       Q.   Right.  But you never reviewed the technical

7   records that you would want to review before making the

8   conclusion that, in fact, Air Slovakia had not repaired

9   this condition; correct?

10      A.   That's correct.

11      Q.   Now, let's focus on condition C, which states,

12  quote:

13              Do the repair at the first

14              available time.

15          What is the factual basis for your conclusion

16  that Air Slovakia did not comply with that condition?

17      A.   There are many opportunities to do the repair.

18  It gives you a maximum limit of a thousand hours, but

19  what Boeing wants you to do is repair it as soon as

20  possible at the earliest opportunity.

21          The cowling is open for many reasons in between

22  these thousand hour periods.

23          And it should have been done.

24      Q.   Did you ever -- you're aware that -- let me go

25  back and ask this:

107

1           Are you aware that the temporary engine was

2   operated for a period of time on the Air Slovakia

3   aircraft?  Correct?

Page 85

08030Ruff.txt

14   relating this matter and destroyed it or discarded it?

15   A.   No.

16        (Staff interruption.)

17        MR. MALZAHN:   I'm going to have the court

18   reporter mark as Exhibit 49 and Exhibit 50 two separate

19   photographs that purport to represent the condition of

20   the temporary engine.

21        (The documents referred to were marked

22         by the Certified Shorthand Reporter as

23         Plaintiffs' Exhibit 49 and Exhibit 50 for

24         Identification.)

25   ///
                                                      129

1   BY MR. MALZAHN:

2    Q.   Okay.  So I understand that when you looked at

3   these photographs, you looked at them on your computer

4   screen; is that right?

5    A.   Uh-huh, yes.

6    Q.   Now, we have tried to create high image color

7   photographs of that, but I will ask you if these appear

8   to be, in fact, high quality photographs?

9         Is there additional information you can see in

10   your version on your computer that is not visible in

11   this photograph that's printed?

12   A.   You can see some detail on the computer that

13   you can zoom in on.  That's a feature.  But this is

14   essentially it -- what I looked at.

15   Q.   And for Exhibit 49 and Exhibit 50, these

16   printed versions -- are these sufficient to provide --

17   are they of sufficient quality to provide all the

18   information that you need to support your opinion?

19   A.   Yes.

20   Q.   So let's work off these copies rather than the
                        Page 103

**EXHIBIT E**
**143**

08030Ruff.txt

21 electronic ones, that are ephemeral.

22          Can you describe what we are looking at in

23 Exhibit 49?

24     A.   Well, this is the -- as they said, it's the

25 6:00 o'clock, very bottom position of the engine.

                                                          130

1          The Teflon sleeve is the yellow -- yellowish

2 brown part, has kind of a checkerboard appearance?

3 That's the Kevlar.  Didn't say that right.  That's the

4 Kevlar.

5          MS. MEYER:  This one?

6          THE WITNESS:  Yes.  The -- you can just barely

7 see it there.

8          And the sleeve you can see is peeled back in

9 two directions.

10          And the white is the adhesive that holds the

11 sleeve to the case.

12          The case is the large area here.

13          This is a case flange.

14          MS. MEYER:  How to you spell flange?

15          THE WITNESS:  This is the front flange.

16          WIT ATTY:

17          MS. MEYER:  F-l-a-n-g-e?

18          THE WITNESS:  Yes.  Which is the very front of

19 the engine.

20          MS. MEYER:  Okay.

21          THE WITNESS:  So the picture shows that the

22 Teflon sleeve, which is the part that is kind of opened

23 out here -- used to be up against the Kevlar.

24          And it's now peeled back.  It's separated from

25 the flange, and has collected quite a bit of oil and

                                                          131

1  other debris, likely over a period of time that it's

                    Page 104

08030Ruff.txt

2 been sitting there like that.

3 BY MR. MALZAHN:

4     Q.   Can you do me a favor so that the record is

5 clear later -- first, do you have good handwriting?

6     A.   Fair.

7     Q.   Other people can read your handwriting?

8     A.   Probably not.  If I'm careful --

9     Q.   How about your counsel --

10         MS. MEYER:  I'm fine.  You can read my

11 handwriting.

12 BY MR. MALZAHN:

13     Q.   So how about if you tell her where she should

14 write on your exhibit -- or on the court reporter's

15 exhibit these features.

16         I think what we need to identify is the Kevlar

17 wrap, the Teflon sleeve, and the case.

18         MS. MEYER:  This is the Kevlar wrap?

19         THE WITNESS:  Right there.

20         MS. MEYER:  This one; right?

21         Okay.  And then this is the Teflon sleeve;

22 correct?  This?

23         THE WITNESS:  Yes.  You want to make two.  This

24 and that.

25         MS. MEYER:  Okay.  This here?

                                                    132

1         THE WITNESS:  Just draw it over to that line.

2 You can say it just once.

3         MS. MEYER:  Like that?

4         THE WITNESS:  Yes.  Teflon sleeve.

5         MS. MEYER:  Okay.

6         THE WITNESS:  This is the flange, if you want

7 -- forward case front flange.

8 BY MR. MALZAHN:

                    Page 105

EXHIBIT E
145

08030Ruff.txt

15    Q.    So there is one brackets on Exhibit 49, and

16   that bracket also appears on the left-hand side of

17   Exhibit 50; correct?

18    A.    Yes.

19    Q.    So the images overlap?

20    A.    Right.

21    Q.    And the images show two different areas where

22   the Teflon sleeve is torn; correct?

23    A.    Right.

24    Q.    Okay.

25    A.    In this case, it's torn away completely,
                                                          134

 1   whereas this has just opened.

 2          MS. MEYER:  It's 50 it's torn away completely;

 3   right?

 4          THE WITNESS:  Yes.

 5   BY MR. MALZAHN:

 6    Q.    So let's focus on Exhibit 49, and the torn

 7   piece that's kind of in the center -- center left.

 8    A.    Uh-huh.

 9    Q.    Do you see that?

10          Approximately how many inches wide is that

11   tear?

12    A.    It's -- as I recall, the sleeve itself is --

13   you are talking about in this direction?

14    Q.    I would measure it along the flange.

15    A.    Oh, you mean the arc?

16    Q.    Yes.

17    A.    It's difficult to tell.

18    Q.    That arc is the widest section of the tear?

19          It gets more narrow in other places; correct?

20    A.    No.  It goes completely across the width of the

21   sleeve, which as I recall is about 14, 15 inches wide

                        Page 107

EXHIBIT E
146

08030Ruff.txt

4     Q.   Okay.  So at this point I'm going to turn it

5   over to Ryan's counsel.  She can ask you any follow-up

6   questions, if she has any.

7          MS. MEYER:  Let me see.

8

9                    EXAMINATION.

10  BY MS. MEYER:

11     Q.   I just want had to explore further the tire

12  analogy and see if I understood it.

13          You said that -- correct me if I'm wrong --

14  that you believe that this is beyond normal wear and

15  tear, and you compared it to a tire analogy.

16          And in your tire analogy, you said normal wear

17  and tear to would be on the tire treads if you drive --

18  you can driver the car for a certain number of miles?

19     A.   Correct.

20     Q.   And even though the tire treads are bad -- I

21  mean, are bald, that would be normal wear and tear;

22  correct?

23     A.   Right.  Reaches a point where you replace them.

24     Q.   On the tires.  But that's still normal wear and

25  tear?

                                              142

1     A.   Correct.

2     Q.   The damage or the wearing of the treads?

3     A.   Yes.

4     Q.   Now, if there is -- but you compared the damage

5   her to a hole in the tire?

6     A.   Yes.

7     Q.   And so if there is a hole in the tire, you have

8   to repair that immediately, otherwise you will get a

9   flat tire?

10     A.   Yes.

                    Page 113

EXHIBIT E
147

08030Ruff.txt

11    Q.    So is that the reason that in the Boeing 757

12  maintenance manual acceptance standards -- is that the

13  reason it says under D(1)1C -- is that the reason they

14  say:  Do the repair at the first available time?

15    A.    Yes.

16    Q.    Because like a hole in the tire, if they don't

17  do the repair at the first available time, it could

18  become much worse?

19    A.    Obviously, if your have a hole in the sleeve,

20  it allows moisture in, it allows oil fumes and things

21  that are going on around this part of the engine, and

22  eventually it will attack it further.

23        It just progresses to that point.

24    Q.    And the reason you believe that this was

25  present for a long period of time and was neglected was

                                                          143

 1  because this -- the damage shown on Exhibit 49 and

 2  Exhibit 50 is not something that appears overnight?

 3        MR. MALZAHN:  Objection; leading.

 4  BY MS. MEYER:

 5    Q.    Is that correct?

 6    A.    That's correct.

 7    Q.    So how would this type of damage typically

 8  start in your --

 9    A.    It would start, like in the earlier paragraphs,

10  it will starts as a nick or a tear or a hole, and then

11  the -- the repairs that it calls out are very easy

12  repairs to do.

13        One is actually put some tape over it.

14        Next level, patch it with like a fiberglass

15  patch with some adhesive.

16        So that it progresses, and then to a full

                         Page 114

08030Ruff.txt

17    replacement.

18          So it's -- the program is designed to be very

19    easily fixed -- those small areas of damage.

20          It's -- another thing, it's just common to the

21    industry is that -- well, not common, but because of

22    where it is, it's on the very bottom of the engine -- if

23    it's right at eye level, it's a lot easier to see and a

24    lot easier to fix.

25          But the hard to -- the inaccessible areas, it's

                                                          144

 1    more difficult and it's -- can lead to a lesser level of

 2    inspection.

 3      Q.   When an airplane or an engine is leased and

 4    then it's -- is it part of the return delivery condition

 5    to inspect the condition of the Kevlar wrap and the

 6    Teflon sleeve before it gets returned?

 7      A.   Yes.  They should do a thorough visual

 8    inspection of the engine.

 9          And I don't know the circumstances of that

10    inspection, but two things should have come out of that

11    inspection.

12          Number one, the engine did not meet return

13    conditions -- because it has an ongoing repetitive

14    inspection requirement.

15          Even if you don't do the repair, you have got

16    to inspect it within a thousand cycles -- or it's got to

17    be repaired within a thousand cycles.

18          So it should not have any follow-on

19    maintenance.

20      Q.   While it is in the hands of the lessee of the

21    engine or the aircraft, how often is a -- the Teflon

22    sleeve or Kevlar wrap inspected, if at all?

23      A.   If it's in the hands of the --
                          Page 115

EXHIBIT E
149

08030Ruff.txt

24    Q.   The lessee.  Entity that's renting it.

25    A.   A thousand hours.

                                                            145

1     Q.   So every thousand hours they are required to --

2  under -- they are required to inspect the condition --

3     A.   Yes.

4     Q.   -- of the Kevlar wrap --

5     A.   Yes.

6     Q.   -- and the Teflon sleeve?

7     A.   Yes.

8     Q.   That's pursuant to the AMM manual?

9     A.   No.  The MPD.  Maintenance planning document

10  from Boeing.

11    Q.   That one page that we said?

12    A.   Yes.

13    Q.   So is the reason that you think that this was

14  present for a long period of time and neglected, because

15  had they inspected this every thousand hours they would

16  have noticed --

17    A.   Yes.

18    Q.   -- this damage?

19         Or the original damage?

20    A.   The original damage should have been noticed

21  first.

22         In other words, this does -- again, it doesn't

23  happen overnight.  It's a progression.

24         There is nothing that would cause this

25  immediately.

                                                            146

1          In other words, there is no fire or something

2  like that that would cause this kind of damage to happen

3  like that.

4     Q.   Even though the environment is hostile?

Page 116

EXHIBIT E
150

# EXHIBIT 47

## 757 MAINTENANCE PLANNING DOCUMENT

### SYSTEMS AND POWERPLANT MAINTENANCE PROGRAM

**ATA 72: ENGINE: ROLLS ROYCE**

| MPD ITEM NUMBER | AMM REFERENCE | C A T | T A S K | INTERVAL THRES. | INTERVAL REPEAT | ZONE | ACCESS | APPLICABILITY APL | APPLICABILITY ENG | MAN-HOURS | TASK DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 72-101-00 | 05-00-01-900 | 6 | DIS | LIF LIM NOTE | LIF LIM NOTE | 411 421 | | ALL | 535 | 0.00 | Discard the low pressure compressor rotor blades. INTERVAL NOTE: At manufacturer's life limit (see engine manual). |
| 72-103-00 | 05-00-01-900 | 5 | DIS | LIF LIM NOTE | LIF LIM NOTE | 411 421 | | ALL | 535 | 0.00 | Discard the low pressure compressor rotor shaft and disk. INTERVAL NOTE: At manufacturer's life limit (see engine manual). |
| 72-105-00 | 79-00-00-216 79-00-00-996 | 9 | DET | 400 FH NOTE | 400 FH NOTE | 411 421 | 414AR 414CR 415FL 424AR 424CR 425FL | ALL | 535 | 0.60 | Detailed inspection of the left and right engine master, internal gearbox, and external gearbox magnetic chip detectors for metallic debris. INTERVAL NOTE: Service Bulletin (SB) RB.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 (Rolls-Royce non-mod). The external magnetic chip detector is to be inspected at 100 hour intervals per Rolls-Royce non-mod SB RB.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 unless Rolls-Royce SB RB.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 is incorporated. Rolls-Royce non-mod SB RB.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 is a CMP requirement for ETOPS only. |
| 72-106-00 | 05-00-01-900 | 5 | DIS | LIF LIM NOTE | LIF LIM NOTE | 411 421 | | ALL | 535 | 0.00 | Discard the intermediate pressure compressor rotor shaft. INTERVAL NOTE: At manufacturer's life limit (see engine manual). |
| 72-109-00 | 05-00-01-900 | 5 | DIS | LIF LIM NOTE | LIF LIM NOTE | 411 421 | | ALL | 535 | 0.00 | Discard the intermediate pressure compressor rotor rear stub shaft. INTERVAL NOTE: At manufacturer's life limit (see engine manual). |
| 72-112-00 | 72-34-10-216 | 8 | GVI | 1000 FH | 1000 FH | 411 421 | 413AL 414AR 423AL 424AR | ALL | 535 | 1.20 | General inspection of the left and right engine LP compressor case (Kevlar) containment ring for security, damage or deterioration. |
| 72-117-00 | 05-00-01-900 | 5 | DIS | LIF LIM NOTE | LIF LIM NOTE | 411 421 | | ALL | 535 | 0.00 | Discard any component in the high pressure compressor rotor shaft assembly which has achieved the manufacturer's published life limit. INTERVAL NOTE: At manufacturer's life limit (see engine manual). |

May 20/2010

D622N001

BOEING PROPRIETARY – Copyright © Unpublished Work - See title page for details

PAGE 1.1-145

Exh. 47



757
MAINTENANCE MANUAL

```
/////////////////////////
/  RB.211 ENGINES  /
/                  /
/////////////////////////
```

S 416-051-R02

CAUTION: OBEY THE PRECAUTIONS FOR THE KEVLAR WRAPPING WHEN YOU CLOSE THE
FAN COWL PANEL.  IF YOU DO NOT OBEY THE PRECAUTIONS, DAMAGE TO
THE KEVLAR WRAPPING CAN OCCUR.

(2)  Close the fan cowl panels (AMM 71-11-04/401).

S 446-052-R02
(3)  Do the activation procedure for the thrust reverser
(AMM 78-31-00/201).

S 866-037-R02
(4)  For the left engine, remove the DO-NOT-CLOSE tag and close this
circuit breaker:
(a)  P11-2 Overhead Circuit Breaker Panel
1)  11D19, ENGINES START CONT LEFT

S 866-038-R02
(5)  For the right engine, remove the DO-NOT-CLOSE tag and close this
circuit breaker:
(a)  P11-2 Overhead Circuit Breaker Panel
1)  11D20, ENGINES START CONT RIGHT

TASK 72-34-10-216-056-R02
3.  Examine the Kevlar Wrapping on the LP Compressor Case
A.  References
(1)  AMM 71-11-04/201, Fan Cowl Panels
(2)  AMM 72-34-10/801, LP Compressor Case
(3)  AMM 78-31-00/201, Thrust Reverser System
B.  Access
(1)  Location Zones
410        No. 1 Power Plant (Left)
420        No. 2 Power Plant (Right)

(2)  Access Panels
415AL    Thrust Reverser (Left)
416AR    Thrust Reverser (Right)
425AL    Thrust Reverser (Left)
426AR    Thrust Reverser (Right)

C.  Procedure

S 016-041-R02

CAUTION: OBEY THE PRECAUTIONS FOR THE KEVLAR WRAPPING WHEN YOU OPEN THE
FAN COWL PANEL.  IF YOU DO NOT OBEY THE PRECAUTIONS, DAMAGE TO
THE KEVLAR WRAPPING CAN OCCUR.

(1)  Open the fan cowl panels (AMM 71-11-04/201).
```

EFFECTIVITY
RB211-535E4 ENGINES

72-34-10
CONFIG   2
RO1      Page 614
Jan 28/05

BOEING PROPRIETARY - Copyright (C) - Unpublished Work - See title page for details.

EXHIBIT E
153



757
MAINTENANCE MANUAL

```
/////////////////////////
/  RB.211 ENGINES  /
/                  /
/////////////////////////
```

S 216-042-R02
(2)  Examine the protective plastic cover for the Kevlar wrapping
     (Fig. 601 and 602).
     (a)  Examine the protective cover surface for holes, indentations or
          cuts.
     (b)  Examine the cover edges for separation from the compressor
          casing.

          NOTE:  Condensation under the protective plastic cover can
                 occur, this is permitted.


S 216-070-R02
(3)  Examine the outer layer of the Kevlar Wrapping.

     NOTE:  You can only examine the Kevlar wrap outer layer if the
            damage to the teflon sleeve goes through to the Kevlar wrap
            outer layer.

     (a)  Examine the outer layer surface for witness marking.
     (b)  Examine the outer layer from the adjacent inner layer for
          separation.
     (c)  Examine for cuts or fraying.
     (d)  Examine for hydraulic fluid contamination.

S 216-044-R02
(4)  Examine the sub-layers of the Kevlar wrapping.

     NOTE:  You can only examine the Kevlar wrap sub-layer if the
            damage to the Kevlar wrap outer layer goes through to the
            sub-layer.

     (a)  Examine the sub-layer for cracks, cut and holes.
     (b)  Examine the adjacent layers for separation.

S 216-045-R02
(5)  Examine the Kevlar Wrapping Attachments.
     (a)  Examine the accessory end fitting of mounting strap for cracks.

S 216-046-R02
(6)  Examine the Kevlar Wrapping Gripper.
     (a)  Examine the front and rear attachment points for the correct
          attachment.
     (b)  Examine the gripper for cracks.

EFFECTIVITY
RB211-535E4 ENGINES

**72-34-10**
CONFIG   2
R01        Page 615
Jan 28/05

BOEING PROPRIETARY - Copyright (C) - Unpublished Work - See title page for details.

**EXHIBIT E**
**154**



757
MAINTENANCE MANUAL

///////////////////////
/  RB.211 ENGINES  /
///////////////////////



UPPER SECTOR
(20 VANES)

RIGHT
SECTOR
(15 VANES)

LEFT
SECTOR
(15 VANES)

LOWER SECTOR
(20 VANES)

VIEW OF LP COMPRESSOR OUTLET GUIDE
VANES LOOKING AFT

59549

LP Compressor Outlet Guide Vanes
Figure 601

EFFECTIVITY
RB211-535E4 ENGINES

72-34-10
CONFIG   2
RO2      Page 616
Sep 28/04

BOEING PROPRIETARY – Copyright (C) – Unpublished Work – See title page for details.

**EXHIBIT E**
**155**



_BOEING_
757
MAINTENANCE MANUAL

/////////////////////////
/  RB.211 ENGINES  /
/////////////////////////

LP Compressor Case
Figure 602

EFFECTIVITY
RB211-535E4 ENGINES

72-34-10
CONFIG   2
RO1      Page 617
Jan 28/05

BOEING PROPRIETARY - Copyright (C) - Unpublished Work - See title page for details.

EXHIBIT E
156

Case 2:09-cv-03489-AHM-JWJ    Document 39-1    Filed 08/04/10    Page 158 of 165
Page ID #:1274



**_BOEING_**
757
MAINTENANCE MANUAL

///////////////////////
/  RB.211 ENGINES  /
///////////////////////

S 416-047-R02

CAUTION:  OBEY THE PRECAUTIONS FOR THE KEVLAR WRAPPING WHEN YOU CLOSE THE
FAN COWL PANEL.  IF YOU DO NOT OBEY THE PRECAUTIONS, DAMAGE TO
THE KEVLAR WRAPPING CAN OCCUR.

(7)  Close the fan cowl panels (AMM 71-11-04/201).
D.  Acceptance Standards

S 866-054-R02
(1)  Teflon sleeve (Kevlar protective coating)
(a)  Dents are permitted.
(b)  Holes or cuts.

CAUTION:  YOU MUST REPAIR THE TEFLON SLEEVE AT THE FIRST
AVAILABLE TIME.  IF YOU DO NOT REPAIR THE SLEEVE, THE
DAMAGE TO THE SLEEVE WILL CONTINUE.  IF THERE IS TOO
MUCH DAMAGE, YOU MUST REPLACE THE SLEEVE.

1)  Accept the damage if you obey the conditions that follow:

a)  A fly-on condition is permitted for a maximum time of
1000 engine hours.
b)  A repair to the teflon sleeve must be done before
1000 hours of engine operation is complete.
c)  Do the repair at the first available time.
d)  Repair the damage to the teflon sleeve to FRS.5193,
FRS.5194 or FRS.5972 (AMM 72-34-10/801).

NOTE:  Use the repair procedure that is applicable to
the type of repair that is necessary.

(c)  Large areas of missing material that you cannot repair.
1)  A fly on condition is permitted if you do an inspection at
a maximum of every 1000 engine hours to make sure that
there is no damage or contamination to the Kevlar wrapping.
(d)  Separation.
1)  Separation of the edges on the covering to the compressor
casing — Accept the damage if you obey the conditions that
follow:

a)  A fly-on condition is permitted for a maximum time of
1000 engine hours.
b)  A repair to the teflon sleeve must be done before
1000 hours of engine operation is complete.
c)  Do the repair at the first available time.

EFFECTIVITY
RB211-535E4 ENGINES

72-34-10
CONFIG  2
R02      Page 618
Jan 28/05

BOEING PROPRIETARY - Copyright (C) - Unpublished Work - See title page for details.

EXHIBIT E
157



757
MAINTENANCE MANUAL

//////////////////////////
/  RB.211 ENGINES  /
//////////////////////////

d) Repair the damage to the teflon sleeve to FRS.5193,
FRS.5194 or FRS.5972 (AMM 72-34-10/801).

<u>NOTE</u>: Use the repair procedure that is applicable to
the type of repair that is necessary.

(e) Corrosion on the LP Compressor Case outer surfaces behind, aft
and forward edges of the Kevlar wrapping.
  1) Corrosion is permitted on the outer surface behind, aft and
forward edges of the Kevlar wrapping. Remove all obvious
moisture. You must do a visual check of the case for
corrosion at the next shop visit.

S 866-049-R02
(2) Kevlar Wrapping - Outer Layer
  (a) You can permit witness marking that includes scratch of outer
layer surface but not holes or cut.
  (b) Outer layer cut or frayed less than 2.0 inches (50,8 mm) in
length - Repair FRS.5196 (AMM 72-34-10/801).
  (c) Cut or frayed more than 2 inches (50.8 mm) in length - Reject.
  (d) Accept damage to the outer layer up to 9.0 inches (228,6 mm)
long and 1.0 inch (25,4 mm) wide if:
    1) The maximum axial length of damage (from front to rear of
the fan case) at any angular position is less than 1.0 inch
(25.4 mm).
    2) The second layer of Kevlar is not affected.
    3) The area is less than 3.150 inch (80.0 mm) from the rear
edge of the Kevlar.
    4) Damage more than the limits above - Reject.
  (e) Hydraulic fluid contamination.
    1) Use a dry, clean lintfree cloth to make the surfaces clean
that have unwanted hydraulic fluid on them - Accept.

S 866-050-R02
(3) Kevlar Wrapping - Sub Layers
  (a) Damage of any kind - Reject.
  (b) You can permit the separation of adjacent layers and gap that
is shown between the edges of adjacent layers as long as the
Kevlar wrapping grippers are not broken or loose.

S 866-051-R02
(4) Kevlar Wrapping Attachments
  (a) If you find any crack on the accessory mounting strap for end
fitting - Reject.

S 866-052-R02
(5) Kevlar Wrapping Gripper
  (a) Loose or disengage - Reject.
  (b) Cracked - Reject.

EFFECTIVITY
RB211-535E4 ENGINES

72-34-10
CONFIG  2
R01      Page 619
May 28/05

BOEING PROPRIETARY - Copyright (C) - Unpublished Work - See title page for details.

**EXHIBIT E**
**158**


757
MAINTENANCE MANUAL



///////////////////////////
/  RB.211 ENGINES  /
///////////////////////////

LOW PRESSURE (LP) COMPRESSOR CASE — APPROVED REPAIRS

1. General
   A. A List of Repair Schemes (FRS)

| Number | Paragraph Number | Repair Title |
|--------|------------------|--------------|
| 1. | FRS.4941 | Repair the Outer Layer and the Protective Layers |
| 2. | FRS.5021 | Replace the Outlet Guide Vane Infill Panels |
| 3. | FRS.5151 | Repair the Attrition Lining with Blue Filler |
| 4. | FRS.5173 | Repair the Slack Outer Two Layers of the Kevlar Wrapping |
| 5. | FRS.5174 | Repair Cracked Paint with a Polyurethane Adhesive |
| 6. | FRS.4942 | Repair the Kevlar Wrapping Protective Layers |
| 7. | FRS.5258 | Repair the Attrition Lining Below the GRP Layer with Blue Filler |
| 8. | FRS.4873 | Repair the Ice Impact Panel with Cold Cure Adhesive |
| 9. | FRS.5214 | Repair Dents in the Ice Impact Panel with Blue Filler |
| 10. | FRS.5947 | Repair the LP Compressor Case Support ('A' Frame) |
| 11. | FRS.5237 | Repair of LP Compressor (Fan) Case by Replacement of Annulus Former Strip |
| 12. | FRS.5193 | Repair of the Teflon Sleeve with a Patch |
| 13. | FRS.5194 | Repair of the Teflon Sleeve with Tape |
| 14. | FRS.4938 | Replacement of the Rear Diaphragm Stiffeners |

EFFECTIVITY
RB211-535C ENGINES

72-34-10
CONFIG   1
R01        Page 801
May 28/02

BOEING PROPRIETARY - Copyright (C) - Unpublished Work - See title page for details.

EXHIBIT E
159

# EXHIBIT 49



# EXHIBIT 50

KEVLAR
WRAP



TEFLON SLEEVE

50

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am a citizen of the United States and employed in Los Angeles County, California, my business address is 11601 Wilshire Boulevard, Suite 800, Los Angeles, CA 90025. I am over the age of 18 and not a party to the within actions.

     **ON AUGUST 4, 2010, I SERVED THE DOCUMENT(S) ENTITLED, DECLARATION OF FILOMENA E. MEYER IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action as stated below:

Scott M. Malzahn, Esq.
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Ave.
Los Angeles, CA 90071

Fax: (213) 229-7520
Email: smalzahn@gibsondunn.com

[ ]   **BY MAIL:**   I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage fully prepaid. I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

[ ]   **BY FACSIMILE TRANSMISSION:**   I caused a true copy thereof from sending facsimile machine telephone number (310) 909-8001 to be sent via facsimile to the above listed names and facsimile numbers and received confirmed transmission reports indicating that this document was successfully transmitted to the parties named above.

[ ]   **VIA OVERNIGHT MAIL**: I deposit such envelope to be placed for collection and handling via UPS following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for UPS. On the same day that material is placed for collection, it is picked by UPS at Los Angeles, California.

**[ XX ]  BY ELECTRONIC SERVICE**:   I caused such document(s) to be delivered electronically via CM/ECF as noted herein.

**[Federal]**   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 4th day of August, 2010 at Los Angeles, California.

Thomas Litza

1
PROOF OF SERVICE

31150987v1 900828 13518